**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

NORTHERN STATES POWER COMPANY d/b/a Xcel Energy,

Plaintiff,

v.

FEDERAL TRANSIT ADMINISTRATION; MINNESOTA DEPARTMENT OF TRANSPORTATION; ELWYN TINKLENBERG, Commissioner of Transportation, individually and officially, MINNESOTA METROPOLITAN COUNCIL; and the STATE OF MINNESOTA,

Defendants.

Civil No. 01-295 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER GRANTING STATE DEFENDANTS' AND METROPOLITAN COUNCIL'S MOTION FOR A PRELIMINARY INJUNCTION AND DENYING DEFENDANT FTA'S MOTION TO DISMISS**

---

Timothy R. Thornton, BRIGGS AND MORGAN, 2400 IDS Center, 80 South Eighth Street, Minneapolis, MN, 55402, for plaintiff.

Mary L. Trippler, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN, 55415, for defendant Federal Transit Authority.

Donald J. Mueting and Ann K. Bloodhart, Assistant Attorneys General, OFFICE OF THE MINNESOTA ATTORNEY GENERAL, 525 Park Street, #200, St. Paul, MN, 55101, for defendants Minnesota

FILED MAY 2 4 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD. ______
DEPUTY CLERK ______

Department of Transportation, Elwyn Tinklenberg, and the State of Minnesota.

Lewis A. Remele, Jr., Andrew L. Marshall, and J. Scott Andresen, BASSFORD, LOCKHART, TRUESDELL & BRIGGS, P.A., 3550 Multifoods Tower, 33 South Sixth Street, Minneapolis, MN, 55402, for defendant Minnesota Metropolitan Council.

This dispute involves the planned relocation of utility facilities that are currently located under Fifth Street in downtown Minneapolis in connection with the Hiawatha Light Rail Transit ("LRT") project. Plaintiff Xcel Energy brings this lawsuit seeking a declaratory judgment from this Court that, among other things, it need not relocate its utility facilities in the Fifth Street corridor at its own expense. This matter is now before the Court on the motions defendants Minnesota Department of Transportation ("MnDOT"), Elwyn Tinklenberg, the State of Minnesota (collectively "State defendants"), and the Minnesota Metropolitan Council ("Met Council") for preliminary injunctive relief and on defendant Federal Transit Authority's ("FTA") motion to dismiss. The State defendants and Met Council seek an order from this Court requiring plaintiff to immediately commence relocation of its utility facilities east of Nicollet Avenue on Fifth Street.

Because the State defendants and Met Council have satisfied their burden of proof with respect to the *Dataphase* factors required for preliminary injunctive relief, the Court grants defendants' motion and orders plaintiff to comply with the directives of the Commissioner of Transportation. The Court also denies FTA's motion to dismiss as

plaintiff has established an actual case or controversy for purposes of Article III of the United States Constitution.

There is no question in the Court's mind that the citizens of the State of Minnesota will be harmed significantly if the LRT project is suspended or even cancelled due to the refusal of plaintiff to relocate its utility facilities. The potential harm to plaintiff is not only compensable in the future, but also is far outweighed by the public cost of delaying construction of the LRT. Although the Court finds that the State defendants and the Metropolitan Council have demonstrated a likelihood of success on the merits of this dispute, it must be noted that the Court is making this finding without the benefit of a complete record and that the relief granted by this Court is preliminary relief. Trial is scheduled for March 2002. While the Court has little doubt that the legislature intended to give MnDOT the authority to order relocation of utility facilities in order to facilitate the construction of LRT, the question of who pays for relocation is one that will finally be resolved at trial. The high cost of delaying construction is the primary reason the Court is ordering plaintiff to commence immediately the Fifth Street relocation project rather than waiting for trial. The Court also orders all parties to work together much more closely than has been the case thus far. There is no reason why the Court should have to "don a hardhat" and supervise construction if the parties act responsibly in the public interest. The Court expects the parties to work together to accomplish the relocation of the Fifth Street utility facilities as soon as is practicable.

## BACKGROUND

The LRT project is an 11.6 mile transit project that will connect downtown Minneapolis, the Minneapolis/St. Paul International Airport and the Mall of America in Bloomington. The downtown segment of the LRT will originate at Third Avenue North and run southeast along Fifth Street.[1] The LRT is projected to cost $675.4 million, $334 million of which is to be funded through the FTA pursuant to a Full Funding Grant Agreement ("FFGA").[2] The State of Minnesota has committed $120 million to the project, the Metropolitan Airports Commission $87 million, and the remaining amount of the project will be funded by other local government agencies. The project is being built by the Minnesota Transit Constructors pursuant to a design-build contract with the Commissioner of Transportation ("Commissioner"). As grantee under the FFGA, the Met Council will own and operate the LRT upon completion of the project.

The current LRT construction plan requires that relocation of certain underground utility facilities within the Fifth Street corridor must occur before construction can proceed. LRT construction in the Fifth Street corridor is divided into two separate segments: the first from Nicollet Avenue east to Eleventh Avenue; and the second from Nicollet Avenue west to Third Avenue North. The construction plan calls for plaintiff's

---

[1] The portion of the LRT on Fifth Street between Third Avenue and the Metrodome is the segment at issue in this lawsuit, commonly referred to as the "Fifth Street corridor."

[2] Federal funding for the LRT project is allocated over seven years. Approximately $118 million is allocated for 1999 through 2001, $50 million for 2002, $60 million for 2003, $75 million for 2004, and $30 million for 2005. While the funds for 1999 through 2001 have already been appropriated by Congress, the funds for the 2002 through 2005 have not yet been appropriated. The Met Council must make a formal request for the funds in 2002, 2003, 2004, and 2005.

utility facilities east of Nicollet Avenue in the Fifth Street corridor to be relocated or protected by February 1, 2002.

The chosen Fifth Street location for the LRT currently houses a considerable amount of Xcel Energy's utility distribution facilities.[3] Plaintiff maintains and operates an electric substation at the northwest corner of Fifth Street and Nicollet Avenue, which along with the transformers and switch gear located under the plaza south of Xcel Energy's Nicollet Mall building, carries eighty percent of the electric energy used by downtown Minneapolis. Fifth Street also contains three 115,000 volt transmission lines as well as more than sixty high voltage distribution lines. Plaintiff contends that no other downtown street would present a relocation challenge comparable to that of Fifth Street. Plaintiff argues that LRT construction and operation in the Fifth Street corridor will threaten the reliability of the power supply to downtown Minneapolis. However, plaintiff acknowledges that its Fifth Street utility facilities must be relocated if the current construction plan remains in place.

Xcel Energy maintains its utility facilities in the Fifth Street corridor pursuant to a Franchise Agreement with the City of Minneapolis. The current Franchise Agreement permits plaintiff to use "the streets, alleys and public grounds of the City of Minneapolis from January 1, 1994 until December 31, 2014 for the Company's electric distribution and electric transmission lines" for a franchise fee that is paid to the City of Minneapolis. Plaintiff represents that its franchise fee is approximately $18 million per year.

---

[3] In addition to plaintiff's utility facilities, Fifth Street also contains various other utility facilities owned by entities other than Xcel Energy.

Given the obvious impact of the LRT project on utility companies that maintain facilities in the path of the project, MnDOT began a series of meetings with utility company representatives, including plaintiff, in the spring of 1999. The meetings were intended to begin the process of coordinating and planning for utility relocation. During those meetings, the companies were informed that facility relocation would need to be completed by February 1, 2002. Plaintiff consistently opposed paying for its own relocation. At the time of these initial discussions, the LRT project was not contemplated to extend west of Nicollet Avenue. Accordingly, negotiations regarding utility relocation focused on relocation east of Nicollet Avenue only.

As a result of those discussions, plaintiff signed a letter of intent with MnDOT and the Minnesota Transit Conductors. The letter indicated the conceptual agreement between the parties to include in the design-build contract, the construction of new concrete manholes and duct banks that would be necessary for plaintiff's utility facilities relocation. The letter also indicated that plaintiff would then reimburse MnDOT for the construction expenses and would be responsible for installing its cables in the new structures at its own expense. The idea behind this letter of intent was to take advantage of the cost efficiencies of the design-build contractor in order to keep the costs of relocation as low as possible.

Shortly after the letter of intent was signed, the scope of the LRT project was expanded west of Nicollet Avenue when additional funding was secured. Thereafter, the discussions between plaintiff and MnDOT continued, although no agreement was reached regarding relocation of the facilities west of Nicollet Avenue. MnDOT and Xcel

Energy tentatively agreed that the cost of the new utility duct banks east of Nicollet Avenue, contemplated by the letter of intent, would not exceed $6 million. No formal agreement was ever signed, however.

In October 2000, MnDOT and the Met Council filed a formal application for funding with the FTA. In that application, there was no request for funding to cover private utility relocation. Negotiations between MnDOT and Xcel Energy continued regarding the issue of utility relocation, but began to deteriorate. Negotiations were suspended shortly thereafter with plaintiff claiming that it was entitled to be reimbursed for any relocation expenses incurred in connection with the LRT project. As a result of this standoff, the Commissioner issued an order on November 29, 2000, requiring plaintiff to "assess the impact to its facilities by LRT construction, and take appropriate action to relocate, adjust and/or protect your facility accordingly" within 30 days. The order also required Xcel to submit a plan and schedule to the Commissioner for all relocation and/or adjustment work. MnDOT later extended the deadline for submitting a relocation plan until January 19, 2001. Xcel did not comply with the Commissioner's order and MnDOT again ordered plaintiff to submit its relocation plan and schedule by February 15, 2001. On February 15, 2001, plaintiff commenced this lawsuit rather than comply with the Commissioner's orders.

## DISCUSSION

### I. State Defendants' and Met Council's Motion for a Preliminary Injunction

State defendants and the Met Council move for a preliminary injunction requiring plaintiff to relocate or protect its utility facilities **east** of Nicollet Avenue by February 1, 2002. With respect to plaintiff's utility facilities **west** of Nicollet Avenue, defendants seek an order requiring plaintiff to coordinate and plan for relocation in the same way it would for any other public works project. Plaintiff argues that a mandatory injunction is inappropriate in this case because of the difficulty the Court would face in enforcing such an injunction and because the State defendants and Met Council have failed to demonstrate that all of the *Dataphase* factors compellingly weigh in their favor.

#### A. Standard Applicable to a Motion for a Preliminary Injunction

The standard for granting a preliminary injunction is outlined in *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981). The Court is to weigh four factors in determining whether to grant relief: (1) whether the moving party will suffer irreparable harm absent the injunction; (2) whether the harm to the movant outweighs any potential harm that granting an injunction may cause the nonmoving parties; (3) whether there is a substantial probability that the movant will prevail on the merits; and (4) the public interest. *Id.* at 114. No single factor is dispositive and the Court must consider each factor to determine whether the balance of equities weighs in favor of granting an injunction. *United Industries Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). The plaintiff bears the burden of proof on all four factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

In this case, plaintiff argues that the Court should apply a heightened standard to defendants' motion because they are seeking a "mandatory" injunction, which would require plaintiff to take affirmative action. Plaintiff suggests that in the case of a mandatory injunction, the *Dataphase* factors must weigh heavily and compellingly in favor of the relief sought before an injunction can be issued. The Court disagrees. Plaintiff has directed the Court to no decision by the Eighth Circuit that adopts a more stringent standard when the preliminary relief sought is mandatory. Absent explicit direction by the Eighth Circuit that a heightened burden is appropriate in cases seeking mandatory injunctive relief, this Court will apply the standard articulated in *Dataphase* and its progeny.[4]

Moreover, while it is certainly true, as plaintiff suggests, that preliminary injunctions are intended to maintain the status quo, the status quo is not always a state of rest or inaction. In *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589 (8th Cir.

---

[4] Plaintiff also argues that a heightened burden is appropriate when a preliminary injunction would give the movant all or substantially all of the relief that is sought in the case. Plaintiff contends that granting the preliminary injunction would, in essence, grant summary judgment on the issue of MnDOT's authority to order relocation. While the Court disagrees with plaintiff's characterization of the relief sought by the Met Council and the State defendants, it nonetheless acknowledges that the Eighth Circuit has required a somewhat heightened standard when a preliminary injunction gives movant the relief it would obtain after a trial on the merits. *Sanborn Mfg. Co. v. Campbell-Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993) (explaining that movant bears heavy burden when injunction would give movant substantially all the relief sought at trial); *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) ("[t]he burden on a movant to demonstrate that a preliminary injunction is warranted is heavier when, as here, granting the preliminary injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits"). As noted below, however, State defendants and the Met Council have clearly established their right to injunctive relief in this case and have satisfied any heightened standard that might be appropriately applied pursuant to *Sanborn Mfg. Co.* and *Calvin Klein.*

1984), the Eighth Circuit explained that "[w]hile the granting of preliminary injunctions is not favored unless the right to such relief is clearly established, where the status quo is a condition not of rest, but of action, and the condition of rest . . . will cause irreparable harm, a mandatory preliminary injunction is proper." *Id.* at 592. Here, the Court finds that the right to a preliminary injunction is clearly established[5] and that the status quo, under these circumstances, is the continued construction of the LRT project.

## B. Analysis of the *Dataphase* Factors

### 1. Irreparable Harm

The State defendants and Met Council have the burden of demonstrating as a threshold issue that an injunction is necessary to prevent irreparable harm and that such harm is not compensable by an award of money damages. *Baker Elec. Corp., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994); *Graham Webb Int'l. v. Helene Curtis, Inc.*, 17 F. Supp. 2d 919, 924 (D. Minn. 1998). "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959). The absence of such a showing is alone sufficient to deny a preliminary injunction. *Gelco*, 811 F.2d at 420.

The State defendants and Met Council argue that they will experience irreparable harm if the Court does not order plaintiff to immediately begin the relocation of its utility facilities. They contend that failure of plaintiff to comply with the orders of the Commissioner will result in delay of the overall project. Any delay in the project, they

---

[5] The Court notes that even if it were to apply a heightened burden as suggested by plaintiff, it would still find that a preliminary injunction is warranted in this case.

argue, will cause cost overruns that threaten the very existence of the project. Defendants also suggest that significant cost overruns and delay endangers the federal funding necessary to complete the project.

Plaintiff argues in response that any potential delays in the project are caused by defendants because of the unreasonably aggressive construction schedule they have established. Plaintiff also argues that any delay could be avoided by allocating contingency funds contained in the LRT budget toward utility relocation expenses.

The Court finds that the State defendants and Met Council have adequately demonstrated that irreparable harm will occur absent the issuance of an injunction. While plaintiff is correct to point out that the avoidance of monetary expenditure is not a compelling reason to grant injunctive relief, *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986), it is not simply the avoidance of monetary expenditure that is at issue in this case. Instead, defendants have shown that the very existence of the LRT project is in jeopardy given the construction delays and cost overruns that are certain to occur in the absence of injunctive relief. There are few examples of harm that strike the Court as more irreparable than rendering a $675 million public transit project incapacitated. It is also clear that the legal remedy available to the State defendants and Met Council is inadequate. The potential injury to defendants, and indeed the State of Minnesota, of losing the LRT project cannot be remedied by a later award of money damages.

At this point in time, the fact is that the LRT project would be on schedule but for plaintiff's decision to contest the Commissioner's November 27, 2000 order. There should be no real dispute that the delays in the construction schedule that will result from

plaintiff's action will add millions of dollars to the cost of the LRT project. For each day that the project is delayed, there are additional costs that will need to be absorbed by the Met Council, an entity without the ability to recover those funds through taxation. Accordingly, the absence of a preliminary injunction provides a very real threat that the LRT project will not be completed. The existence of irreparable harm therefore weighs in favor of granting a preliminary injunction.

### 2. Balance of Harms

The second *Dataphase* factor requires the Court to consider whether the harm to the movants outweigh any potential harm that granting an injunction may cause the nonmoving parties. *Dataphase*, 640 F.2d at 114. In order to justify temporary relief, the balance of harms must weigh decidedly in favor of the moving party. *General Mills, Inc., v. Kellogg Co.*, 824 F.2d 622, 624 (8th Cir. 1987).

The harm to plaintiff resulting from a preliminary injunction would be predominately financial.[6] Xcel would be required to expend resources to begin the process of relocating or protecting its utility facilities located in the Fifth Street corridor. In the event plaintiff is ultimately successful on the merits, it would be entitled to recover those relocation costs from defendants. In the event plaintiff is unsuccessful, it will simply be responsible for the costs that the law obligates it to pay. While the scope of the

[6] Plaintiff contends that a preliminary injunction will cause significant injury, including the possibility of putting the downtown power supply at risk and creating unsafe working conditions for Xcel Energy employees participating in the relocation effort. While concerns about the reliability of the electricity supply and the safety of downtown workers are certainly justified and are of utmost importance in the Court's evaluation of this issue, the Court is confident that plaintiff is capable of undertaking the relocation project in an efficient manner that will not cause undue safety or electricity reliability concerns.

relocation project is no doubt considerable, the potential legal injury to plaintiff if an injunction is issued, is in reality, fairly minimal.

Balanced against the strictly financial injury to plaintiff is the potential that the LRT project will be suspended or remain uncompleted. The harm to defendants[7] accompanying a denial of an injunction greatly outweighs the harm to plaintiff. As noted above, the absence of a preliminary injunction will certainly cause delays and cost overruns that threaten the LRT project. The balance of harms therefore strongly favors granting a preliminary injunction.

### 3. Likelihood of Success on the Merits

The responsibility of the Court at this stage of the proceedings is to provide a preliminary evaluation of the relative merits of the case. The Court notes at the outset, that its analysis here is just that – preliminary. Although the Court finds that the likelihood of success on the merits now favors defendants, the Court does not express an opinion as to the ultimate viability or merit of plaintiff's claims. *See Couteau Properties Co. v. Department of Interior*, 53 F.3d 1466, 1483 n.2 (8th Cir. 1995) (J. Heaney dissenting) ("[t]he 'substantial likelihood of success on the merits' prong of the Dataphase test constitutes mere predictive forecasting entitled to no real weight when the merits of the dispute ultimately reach the trial court").

Plaintiff's Complaint includes seven causes of action, six of which appear to be asserted against the State defendants or the Met Council. Those include allegations of

---

[7] Although not critical to the Court's analysis of this *Dataphase* factor, it is noteworthy that the harm to defendants in this case also extends to the citizens of the State and Metropolitan area who are the ultimate beneficiaries of the LRT project.

due process and substantive due process violations, an equal protection violation, a violation of the Fifth Amendment, a violation of a state law right to reimbursement, and an invalid exercise of the police power.

The State defendants and Met Council argue that they are likely to succeed on the merits because: (1) there is a common law duty on the part of plaintiff to relocate its utility facilities from a public right of way at its own expense; (2) state and local law requires plaintiff to relocate at its own expense; and (3) the Franchise Agreement between plaintiff and the City of Minneapolis requires plaintiff to relocate at its own expense. In reply, plaintiff argues that defendants are unlikely to prevail on the merits because MnDOT lacks jurisdiction to order utility relocation in this case. Plaintiff maintains that the Franchise Agreement is enforceable and requires defendants to reimburse plaintiff for relocation expenses. It also argues that Fifth Street falls outside of MnDOT's trunk highway jurisdiction.

On the record currently before the Court, the State defendants and Met Council have demonstrated a substantial likelihood of success on the merits, which weighs in favor of granting preliminary injunctive relief.

**a. Enforceability of the Franchise Agreement**

Plaintiff contends that the Franchise Agreement is controlling in this case and entitles plaintiff to relocation cost reimbursement. While the Court believes that the proper legal analysis likely begins with the Franchise Agreement, the Court does not agree that the Franchise Agreement compels the result that plaintiff recover its relocation

costs. To the contrary, the Franchise Agreement is silent with respect to the issue of relocation costs absent the City vacating a right of way.

The right of a state or municipality to require utilities to relocate at their own expense for a legitimate governmental purpose is a proposition widely accepted by both state and federal courts. *Chicago B. & Q. Railway Co. v. State of Illinois ex rel. Drainage Com'rs.*, 200 U.S. 561, 584-86 (1906); *New Orleans Gaslight Co. v. Drainage Commission of New Orleans*, 197 U.S. 453, 461-62 (1905); *Southern Bell Tel. & Tel. Co. v. State ex rel. Ervin, Fla.*, 75 So.2d 796, 800 (Fla. 1954); *Southern Bell Tel. & Tel. Co. v. Commonwealth, Ky.*, 266 S.W.2d 308, 310 (Ky. 1954); *Natick Gas Co. v. Inhabitants of Natick*, 56 N.E. 292, 293 (Mass. 1900); *Opinion of the Justices*, 132 A.2d 440, 443 (Me. 1957); *Opinion of the Justices*, 132 A.2d 613, 614 (N.H. 1957); *Transit Commission v. Long Island R. Co.*, 171 N.E. 565, 566 (N.Y. 1930); *In re Delaware River Joint Comm'n.*, 19 A.2d 278, 280 (Pa. 1941); *Western Gas Co. of Washington v. City of Bremerton*, 153 P.2d 846, 847 (Wash. 1944). There appears to be no basic principle, however, that prohibits a municipality or governmental entity from granting a private utility a right to compensation for relocation of its facilities as part of a franchise. *See, e.g., Southern California Gas Co. v. City of Los Angeles*, 329 P.2d 289, 291-92 (Cal. 1952); *Northwest Natural Gas Co. v. City of Portland*, 711 P.2d 119, 126 (Or. 1985). The logical starting point for the analysis therefore, is an evaluation of the right granted to plaintiff through the Franchise Agreement.

Plaintiff relies on Section 7 of the Franchise Agreement to support its argument that it is entitled to relocation costs. Section 7 provides in pertinent part:

> Except where required solely for a City improvement project, **the vacation of any public way**, after the installation of electric facilities, shall not operate to deprive [Xcel Energy] of its right to operate and maintain such electrical facilities, until the reasonable cost of relocating the same and the loss and expense resulting from such relocation are first paid to [Xcel Energy].

Minneapolis, MN, Code, App. D (emphasis added). Plaintiff's reliance on this portion of the Franchise Agreement appears misplaced, however, because there is no evidence in the record that the City of Minneapolis has any intention of vacating Fifth Street.

Upon completion of the LRT project, Fifth Street will continue to function as a public right of way over which cars and pedestrians, as well as LRT, will traverse. A "vacation" of a public way is the formal act of abandoning a public street or right of way. In the case of a street located in the City of Minneapolis, vacation can only be accomplished by an act of the City Council as outlined in the City Charter. Minneapolis, MN, Charter Chp. 8, § 3 (outlining the procedure for vacating a city street). The effect of a vacating a public right of way is to release the entire interest of the public in that street, reverting ownership of the land occupied by the street to the abutting private landowners. *See McCuen v. McCarvel*, 263 N.W.2d 64, 66 (Minn. 1978); *In re Hull*, 204 N.W. 534, 447 (Minn. 1912); *Lamm v. Chicago, St. P., M. & O. Ry. Co.*, 47 N.W. 455, 458 (Minn. 1890). There is no indication in the current record that the City of Minneapolis has vacated Fifth Street or has any intention to do so. Absent the City of Minneapolis vacating Fifth Street, Section 7 of the Franchise Agreement does not entitle plaintiff to relocation costs.

The remainder of the Franchise Agreement is silent on the issue of relocation costs. That silence is problematic. Normally, courts will not read into a franchise the

right to compensation for relocation unless one is clearly articulated. *Transit Comm'n v. Long Island R. Co.*, 171 N.E. 565, 568 (N.Y. 1930) ("[t]he reasonable construction . . . is to assume that the people are not to be burdened with any heavier expense than necessity requires, and that to relieve the public service corporations having franchises in the streets of their common-law liabilities and to pass them over to the taxpayer can only be accomplished by the express direction of the Legislature"); *Northwest Natural Gas Co.*, 711 P.2d at 132 (finding that a franchise agreement that is silent on the issue of relocation costs is subject to the implied obligation of the utility company to relocate its facilities at its own expense when a governmental use of the streets makes relocation necessary).

In addition to the silence of the Franchise Agreement on the issue of relocation costs, two other sections of the Franchise Agreement also cut against plaintiff's argument that it is entitled to relocation costs. Section 1 of the Franchise Agreement states that: "[t]he use of the streets by [Xcel Energy] shall be subject to reasonable regulations by the City Council and shall be consistent with the use of the streets for proper street purposes by the public, by the City, by the public utilities and others . . . ." Minneapolis, MN, Code, App. D. The explicit language of this section makes plaintiff's right to use the Minneapolis streets subject to reasonable regulations and to other proper street purposes. Use of city streets for light rail travel is undoubtedly a proper purpose. Indeed, the use of Minneapolis streets for railway travel even predates the use of the streets by cars. Plaintiff's use of Fifth Street is therefore subject to the use of the street for the LRT project.

Further, the clear intent of the City of Minneapolis, evident from regulations to which Xcel Energy is subject through the Franchise Agreement, is that private utilities will **not** be entitled to relocation expenses, **except** when the public way is vacated. Minneapolis City Ordinance § 429.110 is illustrative of this intent. It provides that:

> A right-of-way user shall promptly and at its own expense, with due regard for seasonal working conditions, permanently remove and relocate its facilities in the right-of-way when it is necessary to prevent interference, and not merely for convenience of the city, in connection with: (1) A present or future city use of the right-of-way for public project; (2) The public health or safety; or (3) The safety and convenience of travel over the right-of-way. Notwithstanding the foregoing, a right-of-way user is not required to remove or relocate its facilities from a right-of-way that has been vacated in favor of a nongovernmental entity unless and until the reasonable costs to do so are first paid to the right-of-way user.

17 Minneapolis, MN, Code § 429.110. This regulation, adopted after the Franchise Agreement, makes clear that the Franchise Agreement does not displace, alter, or modify the City or State's police power vis-à-vis plaintiff. The ordinance reaffirms the City's intention, as articulated in the Franchise Agreement, that relocation costs are to be paid only when the City vacates a right of way in favor of a nongovernmental entity. Again, that situation has not occurred here. Therefore, a reading of Section 1 of the Franchise Agreement in connection with the regulations that were enacted in accordance with it, show the intent on the part of the City of Minneapolis to require plaintiff to bear the costs of relocation.

Section 2 of the Franchise Agreement further clarifies the fact that the agreement is subject to the police power of the City and State. It provides that:

> this ordinance is not intended in any way to affect or modify or surrender any powers now held by the City, or which may hereafter be granted to the

> City by the state legislature, or to affect the powers of the state legislature in dealing with the [Xcel Energy]. . . or in other ways regulating or controlling [Xcel Energy] and its properties in all ways consistent with the Constitution of the United States and the Constitution of the state of Minnesota.

Minneapolis, MN, Code, App. D. This provision simply makes explicit the widely accepted common law principle that the Franchise Agreement does not limit or restrict governmental police powers, but is subject to them. *See, e.g., Southern California Gas Co.*, 329 P.2d at 290 ("[i]n the absence of a provision to the contrary it has generally been held that a public utility accepts franchise rights in public streets subject to an implied obligation to relocate its facilities therein at its own expense when necessary to make way for a proper governmental use of the streets") (citations omitted).

The clear implication, based on the Franchise Agreement itself and the regulations to which it is subject, is that relocation expenses are not available to plaintiff under the facts in this case. Nonetheless, the Court will look to additional state law and the common law for further direction.

The common law rule, as noted above, has long been that utilities' rights to use streets and public rights of way are subject to governmental police powers, which include the power to force private utility companies to bear the expense of properly ordered utility relocations. This principle was recognized by the United States Supreme Court as early as 1905 in *New Orleans Gaslight Company v. Drainage Commission of New Orleans*, 197 U.S. 453 (1905). In *New Orleans Gaslight Co.*, the Court explained that the gas company had been granted the right to use the city streets for its business, but had not been granted the right to any particular location in the streets. *Id.* at 458-59. There was

nothing in the franchise to indicate the city's intention to give up its control of the public streets, or its power to regulate for the public health and safety. *Id.* at 459. In fact, the Court expressly stated that "when it located its pipes it was at the risk that they might be, at some future time, disturbed, when the state might require for a necessary public use that changes in location be made." *Id.* at 461. The Court concluded by finding that in requiring the company to relocate at its own expense, no Fifth Amendment taking had occurred. *Id.*

The same analysis is applicable here. Through its Franchise Agreement, plaintiff did not acquire the right to any particular location in the Minneapolis streets. Further, as explained above, there is no indication in the Franchise Agreement or the City's accompanying regulations that it intended to give up control of public streets.

The rule articulated in *New Orleans Gaslight Co.* has been followed and reaffirmed in courts throughout the country. As recently as 1984, the United States Supreme Court confirmed the vitality of the rule. *Norfolk Redevelopment and Housing Authority v. C & P Telephone Co.*, 464 U.S. 30, 35 (1984) ("[u]nder the traditional common law rule, utilities have been required to bear the entire cost of relocating from a public right of way whenever requested to do so by state or local authorities"). So too did the Minnesota Supreme Court in *Smith v. City of Owatonna*. 450 N.W.2d 309, 313 (Minn. 1990) (citing *New Orleans Gaslight Co.* with approval). Moreover, Minnesota Courts have consistently acknowledged the principles underlying the United States Supreme Court's opinion in *New Orleans Gaslight Co. See Bybee v. City of Minneapolis*, 292 N.W. 617, 619 (Minn. 1940) ("[s]uch [police] power can never be bartered or

surrendered and continues in the public although certain rights and franchises have been granted"); *Stillwater Water Co. v. City of Stillwater*, 52 N.W. 893, 894 (Minn. 1892) ("although the exercise of the power may at times cause plaintiff inconvenience and expense, that is nothing more than it took the risk of in accepting the grant"); *Northern States Power Co. v. City of Oakdale*, 588 N.W.2d 534, 542 (Minn. Ct. App. 1999) (recognizing the "long-held view that a city may regulate a utility without compensation in valid exercise of its police power").

Therefore, even beginning with plaintiff's premise that the Franchise Agreement is enforceable and controlling, a thorough analysis leads the Court to conclude that absent an invalid exercise of police power, plaintiff is likely to be responsible for relocation costs associated with the LRT project.

**b. Express Grant of Authority to MnDOT**

Resolution of the dispute then rests on the issue of whether the Commissioner has the authority to order relocation of plaintiff's Fifth Street utility facilities. Given the facts presented thus far, the Court is persuaded that the state legislature's express grant of authority to MnDOT concerning the LRT project is sufficient to empower MnDOT to order relocation of Fifth Street utility facilities at plaintiff's own expense.

In 1993, the state legislature expressly delegated to the Commissioner the authority to "exercise the powers granted in this chapter and chapter 473, as necessary, to plan, design, acquire, construct, and equip light rail transit facilities in the metropolitan area . . . ." Minn. Stat. § 174.35 (2000). This delegation of authority by the legislature appears intended to vest in MnDOT the powers necessary to oversee and effectively

manage the LRT project. The clear intention of the legislation is to consolidate in one state agency, the power to control all aspects of the LRT project. The power delegated necessarily includes the power to order utility facilities that interfere with or are in the direct path of the LRT project to be relocated.

Any other conclusion would offend basic principles of municipal law. The State of Minnesota clearly has the authority, through its police power, to order uncompensated relocation. The general police power of the state includes the right to regulate for the public health, safety or welfare. A public transit project, such as the LRT project, falls within the ambit of the public welfare. Minn. Stat. § 174.35 therefore effectively delegates its authority to order relocation to MnDOT.

Plaintiff maintains, however, that MnDOT lacks jurisdiction to order relocation in this case because MnDOT's jurisdiction extends only to trunk highways and not city streets, such as Fifth Street. Plaintiff implies that if the City of Minneapolis rather than MnDOT ordered relocation, a different outcome may result. This argument is unavailing.

A fundamental principle of municipal law is that local governmental entities are instrumentalities of the state, deriving their power from the legislature. *See* Michael E. Libonti and John Martinez, 1 Local Government Law, § 3.01 (1999). In the absence of constitutional prohibition, a state may resume at any time the authority it has delegated to a municipal corporation, including the power to regulate and control public rights in the streets. *Chicago North Shore & M.R. Co. v. Chicago*, 163 N.E. 141, 148 (Ill. 1928) (explaining that the state has all power necessary for the protection of property health and comfort of public and that the state may assume these powers, even when they have been

delegated to a municipality, whenever expedient); *New England Tel. & Tel. Co. v. Boston Terminal Co.*, 65 N.E. 835, 836 (Mass. 1903) (explaining that the legislature is the superior authority regarding public rights and interests and any authority that it delegates may be resumed at any time and exercised as it deems appropriate); *Monahan v. Armatage*, 15 N.W.2d 241, 243 (Minn. 1944) (explaining that state may at any point modify or exercise those powers entrusted to a municipality). Further, the State's police power cannot be limited by a contract between a municipality and a franchise holder. *See, e.g.*, *Akron v. Public Utilities Comm'n*, 78 N.E.2d 890, 895-96 (Ohio 1948). "[T]he fact that a franchise is granted by one political subdivision as an agent of the state does not defeat the right of another such agent acting it its governmental capacity to invoke the public right for the public benefit." *Southern California Gas Co.*, 329 P.2d at 291 (citations omitted). These fundamental municipal law concepts demonstrate that the State has the authority to confer on MnDOT the police power required to order relocation of plaintiff's utility facilities.

As a result, the Court finds that the State defendants and Met Council have demonstrated a likelihood of success on the merits.[8]

### 4. Public Interest

The final factor in the *Dataphase* analysis is the public interest. While the Court has found that consideration of the public interest often does not play a prominent role in

[8] The Court nonetheless reiterates that its finding in no way reflects an opinion on the ultimate merit or viability of plaintiff's claims.

the decision of whether to grant a preliminary injunction, the facts of this case present a situation in which evaluation of the public interest is critical to the overall analysis.

The public interest in the success of the LRT project is evidenced by the state legislature's approval of the project and the willingness of local governmental agencies to fund the project. In addition, the LRT project is likely to affirmatively impact such public interest issues as metropolitan traffic congestion and urban sprawl. The project also creates new jobs for the metropolitan area and encourages thoughtful housing and urban development strategies. All of these considerations demonstrate that the public interest favors the uninterrupted completion of the LRT project in a timely manner.[9] Accordingly, the public interest factor weighs in favor of granting a preliminary injunction.

**C. Scope of Injunctive Relief**

Having carefully considered the four *Dataphase* factors, the Court finds that the State defendants and Met Council are entitled to preliminary injunctive relief. They have clearly demonstrated that irreparable harm will result absent an injunction, that the harm to them outweighs any potential harm that an injunction may cause plaintiff, and that the public interest strongly favors granting an injunction. The State defendants and Met Council have also persuaded the Court, that based on the current record, they are likely to succeed on the merits. Plaintiff is therefore ordered to comply with the directives of MnDOT concerning utility relocation.

[9] Plaintiff argues that a reliable power supply to downtown is vital to the public interest. While the Court agrees, it is confident that plaintiff will be able to relocate its utility facilities while maintaining a reliable electrical supply to downtown Minneapolis.

In addition, the Court fully expects that until the merits of this lawsuit are resolved, the parties will work together in good faith to begin the efficient, timely, and safe relocation or protection of plaintiff's utility facilities in the Fifth Street corridor. Although the Court expects the parties to cooperate fully in this endeavor, it is worth noting that if the Court becomes aware of the failure by any party to act accordingly it will not hesitate to use its contempt power to remedy the situation.

## II. FTA's Motion to Dismiss

Defendant FTA moves to dismiss plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), claiming that plaintiff has failed to establish a case or controversy within the meaning of Article III of the United States Constitution. In its complaint, plaintiff seeks to enjoin FTA from funding the LRT project until a supplemental Environmental Impact Statement ("EIS") is prepared that evaluates the environmental consequences of constructing the LRT project over plaintiff's underground utility facilities in the Fifth Street corridor. Because plaintiff has articulated a case or controversy within the meaning of Article III, the Court denies defendant FTA's motion to dismiss.

The FTA is a grant-making agency within the United States Department of Transportation authorized to award grants and loans to assist state and local agencies in financing the planning, development, and improvement of mass transportation facilities. 49 U.S.C. § 5301. The FTA provides federal financing, but local agencies are entrusted with making decisions on the details of projects that receive federal funds.

In order to receive federal funding through the FTA, local agencies must submit applications for eligible projects. Before approving a grant of funds, the FTA must ensure that certain statutory and regulatory requirements are met, including the requirements set out in the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. ("NEPA") and its implementing regulations. The LRT project is a capital project subject to NEPA.

On April 26, 2000, the FTA issued a Record of Decision ("ROD"), finding that NEPA requirements had been satisfied for the construction and operation of the LRT project. The ROD explained that MnDOT would be responsible for identifying and coordinating necessary utility relocation. On January 17, 2001, the FTA executed the Full Funding Grant Agreement ("FFGA") with the Met Council, which among other things, requires the Met Council to comply with all conditions of the FFGA in order to continue to receive federal funds. The FFGA, as with the ROD, only contemplated relocation of utility facilities.

Plaintiff argues that NEPA has not been satisfied in this case because the Environmental Impact Statement ("EIS") upon which the ROD and FFGA are based, did not consider the effects of constructing the LRT project over plaintiff's current underground electrical facilities. Plaintiff asserts that the "pave-over" scenario is now possible because of pronouncements by Met Council and MnDOT officials after the execution of the FFGA. Plaintiff therefore argues that the FTA must prepare a supplemental EIS that assesses the environmental impact of this possible alteration in the construction plans of the project.

**A. Standard of Review**

In considering a motion to dismiss for lack of subject matter jurisdiction, the Court has the authority to consider matters outside of the pleadings. *Osborn v. United States*, 918 F.2d 724, 728 (8th Cir. 1990). A Rule 12(b)(1) motion is treated differently from a motion to dismiss for failure to state a claim, even when matters outside the pleadings are considered. *Id.* at 729. A Court deciding a motion under Rule 12(b)(1) must distinguish between a "facial attack" and a "factual attack." *Id.* at n.6. In a facial attack the Court restricts itself to the face of the pleadings and the non-moving party receives the same protections it would defending against a motion brought under Rule 12(b)(6). *Id.* In a factual attack, the Court considers matters outside the pleadings and the non-moving party does not have the benefit of 12(b)(6) safeguards. *Id.* As a result, the Court is free to weigh the evidence and no presumptive truthfulness attaches to plaintiff's allegations. *Id.* at 730. Further, the existence of disputed material facts will not preclude the Court from evaluating the merits of the jurisdictional claims. *Id.*

**B. Article III Standing Analysis**

In its Complaint, plaintiff asserted a NEPA violation, arguing that FTA did not evaluate the environmental impact of the LRT construction alternative of paving over plaintiff's current utility facilities in the Fifth Street corridor. NEPA, however, does not allow for a private cause of action and does not provide an independent basis for review. *Public Citizen v. Office of United States Trade Rep.*, 970 F.2d 916, 918 (D.C. Cir. 1992). It is clear from the parties' submissions, that the appropriate cause of action is one for violation of § 702 of the Administrative Procedures Act ("APA"). The Court will

therefore treat plaintiff's Complaint as pleading a cause of action pursuant to § 702 of the APA.[10]

A claim pursuant to § 702 of the APA requires a final agency action that has an adverse affect on plaintiff. Here, plaintiff has alleged that the EIS, the ROD, and the FFGA constitute final agency action on the part of the FTA. FTA does not dispute this assertion. The Complaint also alleges that FTA's decision to fund the LRT project, based on the ROD and FFGA, will adversely affect the plaintiff by endangering its power supply to downtown and damaging the duct banks that carry its power lines under Fifth Street.

The real issue before the Court is whether plaintiff has established the existence of an actual case or controversy that satisfies the requirements of Article III, Section 2 of the United States Constitution. In order to have standing to pursue its claim, plaintiff must show an injury in fact, which is concrete and particularized as well as actual or imminent, that is fairly traceable to defendant's conduct, and that the requested relief will likely redress the alleged injury. *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 180 (2000); *Novartis Seeds, Inc. v. Monsanto Co.*, 190 F.3d 868, 871 (8th Cir. 1999).

There is no doubt that the plaintiff has alleged an injury. Xcel Energy alleges that its duct banks will be damaged from LRT construction, threatening the reliability of the electrical supply to downtown. While somewhat tenuous, the Court also finds that

---

[10] § 702 of the APA includes a waiver of sovereign immunity for cases arising under 28 U.S.C. § 1331 that seek relief other that money damages.

plaintiff has properly alleged that this injury is fairly traceable to the conduct of the FTA. Plaintiff argues that the decision by the FTA to fund the LRT project, based on the FFGA, ROD and EIS, allows State defendants and Met Council to proceed with construction of the LRT project. Plaintiff also alleges that the option of paving over the Fifth Street corridor, rather than relocating the utility facilities located there, is a very real possibility given representations made by MnDOT and Met Council representatives. However, the State defendants and the Met Council have submitted affidavit testimony indicating that they do not intend to pave over Fifth Street before relocation of utility facilities. While the Court acknowledges that the likelihood the LRT project will be constructed over Fifth Street without relocation of utilities is remote at best, that decision cannot finally be made until the merits of this lawsuit are determined. The possibility of "pave-over" does therefore exist.

In addition, the "pave-over" option was not taken into consideration in preparing the EIS. The plaintiff's requested relief, an injunction to stop the FTA from funding the project until a supplemental EIS in prepared, would redress the alleged injury by forcing the FTA to consider the impact of the "pave-over" option. Given the possibility that "pave-over" could occur, the Court finds that plaintiff has satisfied the requisites for standing and may pursue its claim.

The Court also notes that the FTA raised the issue of the "ripeness" of plaintiff's cause of action. The ripeness doctrine prevents courts from entangling themselves in abstract disagreements. *Nebraska Power District v. MidAmerican Energy Co.*, 234 F.3d 1032, 1037 (8th Cir. 2000). A ripeness inquiry requires the Court to examine both the

"fitness of the issues for judicial determination" and the "hardship to the parties of withholding court consideration." *Id.* at 1038. The "fitness for judicial determination" goes to the Court's ability to visit an issue, while the "hardship" prong includes the concept of damages and the notion that heightened uncertainty may result from delayed resolution. *Id.* Here, the dispute between plaintiff and the FTA is fit for judicial determination because it is largely a legal issue that can be resolved without significant factual development of the record. In addition, a decision on the merits will largely settle the parties' dispute. *Id.* Failure to address the merits of the claim also has the potential to cause plaintiff significant uncertainty and may simply result in a later refiling of the same claim after a final determination of whether MnDOT has the authority to order relocation. Because plaintiff's claim against the FTA is intertwined with its claims against the remaining defendants, the Court finds that the matter is ripe for judicial determination.

FTA's motion to dismiss is therefore denied.

## ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. State Defendants' and Met Council's Motions for a Preliminary Injunction [Docket Nos. 6 and 7] are **GRANTED.**

2. In accordance with Fed. R. Civ. P. 65(c), the preliminary injunction shall become effective upon State Defendants and Met Council posting a bond with the Clerk in the amount of Fifty Thousand Dollars ($50,000)[11] for the payment of such costs and damages as may be incurred or suffered by plaintiff in the event plaintiff is found to have been wrongfully enjoined.

3. FTA's Motion to Dismiss for Lack of Subject Matter Jurisdiction [Docket No. 28] is **DENIED.**

DATED: May 24, 2001
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge

[11] Plaintiff requested a far more substantial bond. If plaintiff is found to have been wrongfully enjoined, the Court has no concern regarding defendants' ability to pay costs and damages.