**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

NORTHERN STATES POWER COMPANY, d/b/a Xcel Energy,

Plaintiff,

v.

FEDERAL TRANSIT ADMINISTRATION; MINNESOTA DEPARTMENT OF TRANSPORTATION; ELWYN TINKLENBERG, Commissioner of Transportation, individually and officially; MINNESOTA METROPOLITAN COUNCIL; and the STATE OF MINNESOTA,

Defendants.

Civil No. 01-295 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER**

---

Timothy R. Thornton, BRIGGS AND MORGAN, 2400 IDS Center, 80 South Eighth Street, Minneapolis, MN, 55402, for plaintiff.

Mary L. Trippler, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN, 55415, for defendant Federal Transit Authority.

Donald J. Mueting and Ann K. Bloodhart, Assistant Attorneys General, OFFICE OF THE MINNESOTA ATTORNEY GENERAL, 525 Park Street, #200, St. Paul, MN, 55101, for defendants Minnesota Department of Transportation, Elwyn Tinklenberg, and the State of Minnesota.

Lewis A. Remele, Jr. and Andrew L. Marshall, BASSFORD, LOCKHART, TRUESDELL & BRIGGS, P.A., 3550 Multifoods

FILED SEP 10 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. ______
DEPUTY CLERK ______

Tower, 33 South Sixth Street, Minneapolis, MN, 55402, for defendant Minnesota Metropolitan Council.

This dispute involves relocation of utility facilities under Fifth Street in downtown Minneapolis necessitated by the Hiawatha Light Rail Transit ("LRT") project. Plaintiff Xcel Energy ("Xcel") has sued the Federal Transit Administration ("FTA"), the Minnesota Department of Transportation ("MnDOT") and its commissioner (together, the "State defendants"), and the Minnesota Metropolitan Council ("Met Council"). Xcel's lawsuit seeks, among other things, a declaration that it need not pay the costs of relocating its utilities in the Fifth Street corridor. This matter is now before the Court on three motions: (1) FTA's Renewed Motion to Dismiss or for Summary Judgment, or Alternatively, to Bifurcate; (2) the Met Council's Motion for Summary Judgment; and (3) the State defendants' Motion for Summary Judgment.

In May 2001, this Court ordered Xcel to relocate its utilities. At that time, the Court made no final determination on the merits of this case; the Court's Order was primarily to ensure that construction of the Hiawatha LRT project would not be delayed, which would have potentially caused great expense to the public. Today, after hearing oral and written argument from all the parties and examining a voluminous record, the Court rules on the merits of this case.

First, the Court has determined that there is no longer an actual, ongoing case or controversy between Xcel and the FTA. Therefore, the Court grants the FTA's motion to dismiss for lack of subject matter jurisdiction. The Court has also concluded that even if Xcel could prove that it still had an active claim against the FTA, no reasonable jury

could return a verdict for Xcel on its claim that the FTA should have studied the possible effects of paving over Xcel's Fifth Street utilities.

As for Xcel's claims against the Met Council and the State defendants, the Court has determined that Xcel has not demonstrated enough facts to show that any defendant violated its constitutional rights to due process and equal protection, nor that Xcel's property was taken without just compensation. Xcel has also failed to demonstrate that its Franchise Agreement with the City of Minneapolis granted a right to be reimbursed for costs of utility relocation. Accordingly, the Court grants the Met Council's and State Defendants' motions for summary judgment. Finally, the Court determines that Xcel's claims against MnDOT Commissioner Tinklenberg are improper, and must be dismissed. The Court will enter judgment for the defendants.

## BACKGROUND

The LRT project is an 11.6 mile transit project that will connect downtown Minneapolis, the Minneapolis/St. Paul International Airport, and the Mall of America. The downtown segment of LRT will originate at Third Avenue North and run southeast along Fifth Street.[1] LRT is projected to cost $675.4 million, $334 million of which is to be funded through the FTA pursuant to a Full Funding Grant Agreement ("FFGA"). The State of Minnesota has committed $100 million to the project, the Metropolitan Airports

[1] The portion of the LRT on Fifth Street between Third Avenue and the Metrodome is the segment at issue in this lawsuit, commonly referred to as the "Fifth Street corridor."

Commission $87 million, with the remaining amounts funded by local government agencies. The project is being built by the Minnesota Transit Constructors pursuant to a design-build contract with MnDOT. The Met Council will own and operate the LRT system upon its completion.

LRT construction plans required that utility facilities beneath the Fifth Street corridor be relocated for construction to proceed. LRT construction in the Fifth Street corridor has been divided into two segments: east of Nicollet Avenue to Eleventh Avenue, and west of Nicollet Avenue to Third Avenue North. The Fifth Street LRT route runs above underground utilities belonging to Xcel and other utility companies. Xcel's facilities carry a significant portion of the electricity used in downtown Minneapolis.

Xcel maintains its utility facilities in the Fifth Street corridor pursuant to a Franchise Agreement with the City of Minneapolis. The Franchise Agreement provides that in exchange for an annual fee of approximately $18 million, Xcel may use "the streets, alleys and public grounds of the City from January 1, 1994 until December 31, 2014 for the Company's electric distribution and electric transmission lines . . . ." (Basting 2d Aff. Ex. H.)

Because of the significant impact that LRT would have on companies with utilities in the project's path, MnDOT began meeting with Xcel and other companies in the Spring of 1999 to plan for utility relocation. During those meetings, MnDOT told the companies that they would need to relocate or protect their facilities in the LRT route by February 1, 2002. Xcel consistently opposed paying for its own relocation. At the time

of these initial discussions, the LRT project was not planned to extend west of Nicollet Avenue. Accordingly, negotiations focused only on relocation east of Nicollet Avenue.

In August 2000, Xcel, MnDOT, and the Minnesota Transit Constructors signed a letter of intent under which Xcel would pay its own relocation costs. MnDOT agreed in the letter to construct new concrete manholes and duct banks for Xcel's utility relocation, while Xcel would reimburse MnDOT for the construction expenses and would pay to install its utilities in the new structures. The letter further provided that Xcel would enter into a relocation agreement with MnDOT if the cost estimate for the work was "acceptable." Finally, the letter added that MnDOT "indicated it would support" state legislation that would allow private utilities to be reimbursed for utility relocation in future LRT projects.

Shortly after the letter of intent was signed, the scope of the LRT project expanded west of Nicollet Avenue. Discussions between Xcel and MnDOT continued, but the two sides could not agree on who would pay for relocating Xcel's utilities west of Nicollet Avenue. Likewise, no formal agreement was ever reached on the cost of relocation east of Nicollet.

In September 2000, MnDOT and the Minnesota Transit Constructors signed the design-build contract for LRT. In October 2000, MnDOT and the Met Council formally applied for FTA funding. That application did not request funding to cover private utility relocation. Relocation negotiations between MnDOT and Xcel were soon suspended. Xcel claimed it deserved reimbursement for any utility relocation, and refused to relocate its facilities without a guarantee of reimbursement.

Because of this standoff, on November 29, 2000 MnDOT ordered Xcel to "assess the impact to your facilities by LRT construction, and take appropriate action to relocate, adjust and/or protect your facilities accordingly." (Mueting Aff. Ex. A.) Xcel was required to conduct this assessment and submit a plan and schedule for relocation within 30 days, by December 29, 2000.[2] MnDOT later extended the deadline until January 19, 2001, but Xcel did not comply.

On January 30, 2001, MnDOT sent a letter to Xcel (the "January 2001 letter"), again ordering it to submit a relocation plan and setting February 15, 2001 as the final deadline to comply with the original order. This letter stated that the February 15 deadline was needed for construction to begin on schedule. The letter also stated:

> If a plan and schedule is not received from Xcel Energy by February 15, 2001, the Commissioner of Transportation will conclude that Xcel facilities will be left in place at Xcel's own risk. . . . [T]he plan then will be to construct the LRT project over the in-place facilities.

(Basting Aff. Ex. D.) On February 15, 2001, Xcel filed this lawsuit rather than comply with MnDOT's orders.

On May 24, 2001, this Court granted the State defendants' motion for a preliminary injunction, and required Xcel to immediately begin relocating its facilities east of Nicollet Avenue on Fifth Street (the "May 2001 Order"). *See Northern States Power Co. v. Federal Transit Admin.*, Civ. No. 01-295, 2001 WL 1618532 at *14 (D.

---

[2] The Order also provided that all relocation work must be completed by February 1, 2002.

Minn. May 24, 2001), *aff'd*, 270 F.3d 586 (8th Cir. 2001). As of April 9, 2002, the hearing date on the present motions, relocation east of Nicollet was completed, and Xcel had begun relocating its utilities west of Nicollet Avenue.[3] The issue now before the Court is who must pay for this relocation.

## ANALYSIS

### I. FTA's Motions

Defendant FTA moves to dismiss Xcel's Complaint pursuant to Rule 12(b)(1) and Rule 56 of the Federal Rules of Civil Procedure. Xcel's Complaint against the FTA seeks to prevent the agency from funding LRT until a supplemental Environmental Impact Statement ("EIS") is prepared that evaluates the environmental consequences of building LRT over Xcel's utilities under the Fifth Street corridor.

The FTA is a grant-making agency within the United States Department of Transportation that awards grants and loans to state and local agencies for developing mass transportation facilities. Before approving a local agency's application for funds, the FTA must ensure that certain statutory and regulatory requirements are met, including those of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"). The LRT project is subject to NEPA, and an Environmental Impact Statement ("EIS") was completed for the project.

---

[3] Work west of Nicollet commenced pursuant to a MnDOT order issued on January 22, 2002.

On April 26, 2000, the FTA issued a Record of Decision ("ROD"), finding that NEPA requirements were satisfied for constructing and operating LRT. The ROD explained that MnDOT would be responsible for identifying and coordinating necessary utility relocation. On January 17, 2001, the FTA executed a Full Funding Grant Agreement ("FFGA") with the Met Council to govern the Council's use of FTA funds. Both the FFGA and the ROD contemplate relocation of utilities, but do not explicitly require it.

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Count One of Xcel's Complaint alleges a violation of § 702 of the Administrative Procedures Act,[4] 502 U.S.C. §§ 701, *et seq*, arguing that FTA did not evaluate the environmental impact of paving over Xcel's utilities under Fifth Street. Xcel also alleges that FTA's decision to fund the project will harm Xcel by endangering the downtown power supply and damaging the ducts that carry its underground power lines. Xcel seeks an order requiring the FTA to prepare a supplemental EIS to consider the impacts of paving over its facilities. (*See* Complaint ¶¶ 31-34.) Claims under § 702 of the APA require a final agency action that has an adverse affect on the plaintiff. *Lujan v. National*

---

[4] Count One is styled as a claim under the NEPA. This Court has already determined that because NEPA does not provide for either a private cause of action or an independent basis for review, this claim is more properly treated as one under § 702 of the APA. *See Northern States Power Co. v. Federal Transit Admin.*, Civ. No. 01-295, 2001 WL 1618532 at *14 (D. Minn. May 24, 2001), *aff'd,* 270 F.3d 586 (8th Cir. 2001). The parties concur with this approach.

*Wildlife Federation*, 497 U.S. 871, 883 (1990). Here, Xcel and the FTA agree that the EIS, ROD, and FFGA constitute such final action.

The relevant question for this motion is whether Xcel can satisfy the standing requirements of Article III, Section 2 of the United States Constitution. Under that section, federal courts are limited to deciding actual "cases" or "controversies." *Novartis Seeds, Inc. v. Monsanto Co.*, 190 F.3d 868, 871 (8th Cir. 1999). "To have standing, a plaintiff must allege an injury that is fairly traceable to the defendant's conduct, and the requested relief must be likely to redress the alleged injury." *Id.* This requirement applies at all stages of a case, and when a case "no longer presents an actual, ongoing case or controversy, the case is moot and the federal court no longer has jurisdiction to hear it." *Neighborhood Transportation Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994); *Hickman v. State of Missouri*, 144 F.3d 1141, 1142 (8th Cir. 1998).

This Court considered a virtually identical motion by the FTA in May 2001. At that time, the Court found that Xcel had alleged an injury, relying primarily on Xcel's allegations of a possible "pave-over" of its underground facilities. Xcel's allegations were based on the January 2001 letter from MnDOT, which threatened to build LRT over Xcel's in-place facilities if the company did not submit relocation plans. Xcel reasoned – and the Court agreed, in theory – that pave-over of the facilities was possible, and because the EIS did not contemplate this possibility, Xcel made a sufficient showing to survive dismissal under Rule 12(b)(1). *See Northern States Power*, 2001 WL 1618532 at *15.

Today, the facts are different. Utility relocation east of Nicollet Avenue has been completed, and relocation west of Nicollet is proceeding. At the hearing on these motions, Xcel argued that there was a factual issue over whether relocation west of Nicollet could be finished by June 1, 2002, as defendants had predicted. Xcel claimed that relocation would take until December 2002. This question, however, is somewhat academic. Even if relocation is still proceeding, it is clear that Xcel's utilities either have been or are now being moved out of LRT's path. Moreover, existence of disputed material facts does not preclude the Court from evaluating the merits of the FTA's jurisdictional claims. *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990) (holding that jurisdictional issues are for the Court to decide whether they involve questions of law or fact). Therefore, if "pave-over" was at best a remote possibility in May 2001, today it is virtually impossible. The only evidence Xcel presents of a pave-over threat is the January 2001 letter from MnDOT. This letter was written before the Court's May 2001 Order, and subsequent events and evidence have largely negated its "bluster." Evidence presented since May 2001 shows that the State defendants have no plans to pave over Xcel's utilities,[5] and that the key LRT funding documents – the ROD and FFGA – always presumed that utilities under Fifth Street would be moved.

Xcel insists that pave-over is still a real threat because relocation west of Nicollet has not concluded, because of ancillary relocation east of Nicollet, and because of

---

[5] Counsel for the State defendants represented at the hearing that even if there was once a pave-over threat, it is now a nullity.

supposedly fragile tile ductwork protecting existing electrical lines. Xcel also continues to warn that relocation could lead to accidents that threaten downtown Minneapolis's power supply. Counsel for Xcel made similar dire predictions in May 2001. In the months since, Xcel has diligently relocated its facilities while ensuring that its customers in downtown Minneapolis did not lose electricity. In fact, the Court is unaware of even slight disruptions in service. The Court remains very confident that Xcel is capable of completing this process without threatening downtown's power supply.

The situation has changed dramatically since May 2001. Then, Xcel insisted that relocation could not occur without a Supplemental EIS. Today, relocation is a fact. The only remaining question is who must pay for it. Xcel cannot point to any actual or imminent injury, nor can it show that it is likely – as opposed to merely speculative – that any injury will be redressed by its requested relief: requiring FTA to perform a supplemental EIS. *See Friends of the Earth, Inc. v. Laidlaw Environmental Serv.*, 528 U.S. 167, 180-81 (2000). Thus, the Court finds that Xcel's claim against the FTA is moot, and will grant FTA's motion to dismiss for lack of subject matter jurisdiction.

**B. Motion for Summary Judgment**

Even if there were a live controversy that would permit Xcel to prevail under Rule 12(b)(1), the Court determines that Xcel's APA case cannot survive summary judgment.

**1. Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.*, 650 F.2d 930, 932 (8th Cir. 1981).

**2. APA Review**

The main issue affecting summary judgment is, again, the likelihood that Xcel's Fifth Street utilities will be paved over by the LRT project. Both FTA and Xcel actually

agree that paving over the in-place utilities was never contemplated. (*See* Xcel Mem. at 13; FTA Mem. at 3-4.) Xcel argues that the impact of a pave-over must therefore be studied, because it could still occur. The FTA contends pave-over need not be studied, because it cannot occur.

The FTA's decision not to prepare a supplemental EIS to study a pave-over scenario can only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 375 (1989). Xcel claims that the FTA's decision violated the APA's requirements and was also arbitrary and capricious. Both of these arguments are based entirely on the presumption that "[t]o this day, MnDOT has maintained the pave-over threat." (Xcel Mem. at 14.)

First, Xcel contends that FTA did not follow the regulations governing when a supplemental EIS is required. The United States Supreme Court has held that a supplemental EIS must be prepared "if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impact." *Oregon Nat. Resources Council*, 490 U.S. at 372 (internal quotation marks omitted). Of course, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Id.* at 373. Rather, a supplement must be prepared "if the new information is sufficient to show that the remaining [federal] action will affect the quality of the human environment in a significant manner or to a significant extent not already considered . . . ." *Id.* at 374. *See* 23 C.F.R. § 771.130; 40 C.F.R. §§ 1502.9, 1508.27.

Xcel argues that the FTA violated these rules because a pave-over of Fifth Street utilities would be a "widespread calamity," and claims that "failure to study impacts cannot be excused by the hope that potential impact will not occur." (Xcel Mem. at 11-12.) Even if Xcel is correct that pave-over would have dire effects, its argument still rests upon the premise that its electrical facilities might actually be entombed underneath Fifth Street. Contrary to Xcel's assertions, however, it does not require "hope" to prevent a pave-over. As the Court has already noted, the entire record in this case shows that pave-over is virtually impossible. Because the Court finds that pave-over is not a realistic possibility, it follows that the FTA need not consider pave-over in a supplemental EIS. Because there is no "new information" to consider, no supplement is required.

Xcel next contends that FTA's decision not to prepare a supplemental EIS was arbitrary and capricious. However, this argument also relies on Xcel's unsupported assumption that pave-over can or is likely to occur. Xcel criticizes the FTA for relying "solely upon [the] expectation about utility facilities not being paved-over." (Xcel Mem. at 13.) However, Xcel can point to no evidence that the facilities will be paved over, other than the January 2001 letter. Even though MnDOT never formally retracted this letter, Xcel misstates the department's position by claiming that "MnDOT **intends and prefers** to construct LRT tracks **regardless of what is in the way**." (Pl. Mem. at 13-14.) (emphasis added). The Court can find no evidence in the record to support this assertion. To the extent it is based upon the deposition testimony of MnDOT official Margo LaBau,

the Court finds that it mischaracterizes that testimony.[6] More important, the record is clear that all aspects of the LRT project always presumed that the Fifth Street utilities would be relocated. The true dispute has always been over who would pay for the relocation: that is what led Xcel to delay submitting a relocation plan, and led MnDOT to threaten to pave over the facilities. Other than the January 2001 letter, Xcel cannot point

---

[6] The relevant exchange between LaBau and deposing counsel shows that LaBau did not testify that MnDOT intended or preferred to pave over Xcel's utilities, but rather that MnDOT intended and preferred to build the project **according to schedule**:

> **Q:** Let me ask you this. As a matter of policy, is it [MnDOT's] intention to build this project [LRT] pursuant to the project schedule that has been submitted to the FTA in connection with the grant application?
>
> **A:** That is our preference, yes.
>
> **Q:** Is it your intention to do so?
>
> **A:** Yes.
>
> **Q:** So, come hell or high water or hot wires in the street, this sucker is going to be built on schedule?
>
> > **Mr. Mueting:** Objection. I think it mischaracterizes her testimony. No foundation.
>
> * * *
>
> **Q: I'm asking her is it a matter of policy that [MnDOT] is going to build [LRT] on schedule?**
>
> > **Mr. Mueting:** I think she answered that it was their preference.
>
> **A:** Yes.
>
> **Q:** Is it [MnDOT's] intention as well?
>
> **A:** Yes.

(LaBau Dep. at 65-66, Basting Aff. Ex. E.) (emphasis added).

to a single piece of evidence that MnDOT intended to pave over the Fifth Street utilities. This episode of bureaucratic "bluster" is not the kind of "new information" that triggers a supplemental EIS. FTA's decision not to prepare such a supplement was therefore not arbitrary and capricious.

Both Xcel and the FTA agree on the key factual issue: Xcel's Fifth Street facilities will not be paved over. With this issue undisputed, and construing any other factual questions in Xcel's favor, the Court determines that no reasonable jury could return a verdict for Xcel on its APA claim. Therefore, even if FTA cannot prevail on its jurisdictional motion under Rule 12(b)(1), the Court would order summary judgment in favor of the FTA.[7]

### C. Alternative Motion to Bifurcate

The FTA's alternative motion is moot. Because the Court is granting the FTA's motion to dismiss or for summary judgment, it need not address the issue of bifurcation.

## II. Metropolitan Council's & State Defendants' Motions for Summary Judgment

The remaining six causes of action in Xcel's Complaint are directed against the Met Council and the State defendants. These counts allege: violation of procedural due process (count 2); violation of substantive due process (count 3); violation of equal

[7] Although Xcel does not specifically exclude the FTA from the other six counts of its Complaint, it is clear that only the APA claim is relevant to the agency. Therefore, to the extent that Counts Two through Seven of Xcel's Complaint purport to state a claim against the FTA, the Court finds that they fail to do so. Accordingly, the Court will dismiss the remaining counts against the FTA for failure to state a claim upon which relief can be based. *See* Fed. R. Civ. P. 12(b)(6).

protection rights (count 4); takings without just compensation (count 5); violation of a "right to reimbursement" (count 6); and invalid exercise of police power (count 7).

The State defendants and Met Council ("defendants") argue that Xcel's case should fail because every relevant body of law requires Xcel to relocate utilities at its own expense: the common law, state and local law, and the Franchise Agreement between Xcel and the City of Minneapolis. Defendants also argue that MnDOT properly exercised its police power in ordering relocation at Xcel's expense, and that constitutional principles run against Xcel's claims. Finally, the State defendants argue that the claim against MnDOT's commissioner must be dismissed pursuant to the doctrine of *Pennhurst v. Halderman*, 465 U.S. 89 (1984).

Xcel responds with several arguments: (1) the meaning of the Franchise Agreement is disputed, and requires that Xcel be compensated for relocation; (2) MnDOT's relocation orders and regulations were "unreasonable;" (3) the Franchise Agreement supercedes any common law principles that prevent reimbursement; (4) MnDOT did not have statutory authority to order uncompensated relocation; (5) Minnesota law requires reimbursement; and (6) failure to reimburse constitutes an uncompensated taking of Xcel's property rights in the Franchise Agreement.

**A. Xcel's Reimbursement Claims**

Counts Six and Seven of Xcel's Complaint contend that MnDOT had no authority to order Xcel to pay for relocation. Xcel not only argues that MnDOT had no such authority, but also claims that the Franchise Agreement it signed with the City explicitly provides for reimbursement. Moreover, Xcel claims that to the extent that common law

or other laws prohibit reimbursement, the Franchise Agreement (and Xcel's interpretation of it) prevails. In order to determine whether Xcel does have a "right to reimbursement," the Court must examine the relevant laws and instruments that govern this case.

**1. Common Law**

The common law rule is well-settled that utilities must "bear the entire cost of relocation from a public right-of-way whenever requested to do so by state or local authorities." *Norfolk Redevelopment & Housing Auth. v. Chesapeake & Potomac Tel. Co. of Virginia*, 464 U.S. 30, 35 (1983) (citing *New Orleans Gaslight Co. v. Drainage Comm. of New Orleans*, 197 U.S. 453 (1905)). In *New Orleans Gaslight*, a gas company was given rights to use the city streets for its business, but was not granted rights to any particular location in the streets. *New Orleans Gaslight*, 197 U.S. at 458-59. The Court noted that nothing in the franchise indicated that the city intended to give up control of the public streets or its power to regulate for the public health and safety. *Id.* at 459. In fact, the Court expressly stated that when the gas company located its pipes, "it was at the risk that they might be, at some future time, disturbed, when the state might require for a necessary public use that changes in location be made." *Id.* at 461. The Court concluded that requiring the company to relocate at its own expense did not constitute a Fifth Amendment taking. *Id.* at 462.

The same analysis applies here. Xcel's Franchise Agreement with the City of Minneapolis did not give the company rights to any particular location in the Minneapolis streets. More important, as will be discussed below, there is no indication in the

Franchise Agreement or in the City's accompanying regulations that Minneapolis intended to give up control of public streets.

The rule of *New Orleans Gaslight* has been followed and reaffirmed by courts throughout the country, including Minnesota. *See, e.g., Smith v. City of Owatonna*, 450 N.W.2d 309, 313 (Minn. 1990); *Bybee v. City of Minneapolis*, 292 N.W. 617, 619 (Minn. 1940) (holding that the government's police power "can never be bartered or surrendered" and that the government continues to hold it even though "certain rights and franchises have been granted"); *Stillwater Water Co. v. City of Stillwater*, 52 N.W. 893, 894 (Minn. 1892) ("[A]lthough the exercise of the [police] power may at times cause [a utility company] inconvenience and expense, that is nothing more than it took the risk of in accepting the grant."); *Northern States Power Co. v. City of Oakdale*, 588 N.W.2d 534, 542 (Minn. Ct. App. 1999) (recognizing the "long-held view that a city may regulate a utility without compensation in valid exercise of its police power"). Thus, the Court concludes that the common law clearly requires that Xcel must bear the costs of relocation.

**2. State Laws and Regulations**

**a. Delegation of Authority to MnDOT**

Minnesota statutes and administrative rules also clearly require Xcel to relocate utilities at its own expense. In 1993, the state legislature expressly delegated to the Commissioner the authority to "exercise the powers granted in this chapter and chapter 473, as necessary, to plan, design, acquire, construct, and equip light rail transit facilities in the metropolitan area . . . ." Minn. Stat. § 174.35. As this Court held in its May 2001

Order, this legislation is clearly designed to vest in MnDOT the powers necessary to oversee and manage LRT, including the power to order relocation of utilities that interfere with the project.

Xcel maintains that MnDOT cannot order relocation in this case because MnDOT's jurisdiction – granted by Minn. Stat. § 174.35 and implemented by Minn. Rule 8810.3300 – extends only to trunk highways and not city streets, such as Fifth Street. Xcel implies that if the City of Minneapolis rather than MnDOT ordered relocation, the outcome might have been different. As the Court noted in May 2001, this argument ignores fundamental principles of municipal law. Municipalities derive their power from the state, and this authority may be resumed by the state at any time, especially when the state seeks to exercise its police power for the public welfare. *See Northern States Power*, 2001 WL 1618532 at *11. Moreover, this fundamental principal of municipal law demonstrates that the state can confer on MnDOT the police power required to order relocation of Xcel's facilities. *See id.*

For Xcel to argue that these statutes and regulations apply only to trunk highways ignores the very purpose of the legislation: to permit MnDOT to use its **existing** highway authority to create LRT. The legislature is free to extend the application of existing rules by statute, and that is precisely what it did when authorizing LRT under Minn. Stat. § 174.35.

Xcel cites three cases in support of its contention that MnDOT does not have such authority. Each of these cases is inapposite. In *Minnesota v. Avery*, 2001 WL 243242, No. C4-00-328 (Minn. Ct. App. Mar. 5, 2001), the Minnesota Court of Appeals held that

criminal defendants could not be convicted of obstructing a highway because the road upon which they were arrested was not yet a constructed highway. *Id.* at *2. The present case can be distinguished because in *Avery*, there was no statute comparable to Minn. Stat. § 174.35 that extended the reach of the criminal statute to locations other than "highways." Here, Minn. Stat. § 174.35 clearly extends MnDOT's highway-related authority to LRT.

Xcel also relies upon *Board of Education of School District of City of Detroit v. Michigan Bell Telephone Corp.*, 232 N.W.2d 633 (Mich. 1975). In that case, the Michigan Supreme Court held that a local school board could not order a utility company to remove its facilities without compensation. The court held that the school board did not have legislative authority to make such an order. *Id.* at 634. In that case, the school board claimed authority from language in the state school code authorizing the board to "do all other things necessary" for the proper maintenance of the schools. The court held that this language was too vague to give the school board a "police power by necessity." *Id.* The school board's argument was also based on the Plat Act, which authorized the "governing body" of a municipality to seek changes to land plats. *Id.* The court also rejected this argument, holding that the school board was clearly not a "governing body" of any municipality. *Id.* In the present case, MnDOT does not rely on such vague language as the permission to "do all other things," nor does its authorizing statute impose restrictions comparable to the Michigan Plat Act. On the contrary, Minn. Stat. § 174.35 is explicitly directed at MnDOT, and clearly authorizes the department to

construct LRT. The vagaries present in *Michigan Bell* are not present here, so that case does not control.

Last, Xcel relies upon *Detroit Edison Co. v. Southeastern Michigan Transportation Auth.*, 410 N.W.2d 295 (Mich. Ct. App. 1987). In that case, which also involved light rail, the Michigan Court of Appeals upheld a transit authority's power to order a utility to pay for relocating its facilities when a statute granted the transit authority "all the powers of a public corporation." *Id.* at 298. Xcel claims that this grant of authority is far greater than that given to MnDOT. The Court disagrees. As discussed above, Minn. Stat. § 174.35 allows MnDOT to "exercise the powers granted" in chapter 174, the chapter that governs the entire department. This Court finds such delegation of authority equally broad as that in *Detroit Edison*, and clearly designed to accomplish the same end.

In May 2001, this Court had "little doubt that the legislature intended to give MnDOT the authority to order relocation of utility facilities in order to facilitate the construction of LRT." *Northern States Power*, 2001 WL 1618532 at *2. Xcel has presented no reason for the Court to question this conclusion. The Court is persuaded that the Minnesota legislature expressly granted authority and police power to MnDOT to create the LRT project, and that this authority sufficiently empowered the department to order relocation of the Fifth Street utilities at Xcel's own expense.

**b. Reasonableness of MnDOT's Regulations**

Xcel raises, apparently for the first time in this summary judgment proceeding, the claim that MnDOT's LRT regulations were unreasonable. In support, Xcel points to

Minn. Rule 8810.3300 and Minn. Stat. § 222.37, which provide that regulations of utilities must be "reasonable." Specifically, Xcel complains that LRT routes and deadlines were determined in a unreasonable manner.

Xcel contends that the "reasonableness" of MnDOT's regulations creates a fact question that must preclude summary judgment. Although Xcel correctly cites the "reasonableness" provisions of Minn. Rule 8810.3300 and Minn. Stat. § 222.37, it does not explain how these contentions relate to any aspect of its Complaint. The Complaint makes no allegations of unreasonableness, nor does it mention Minn. Stat. § 222.37. The purpose of summary judgment is to resolve legal arguments on claims over which there is no factual dispute. The Court cannot find that a factual issue is created by a legal claim that was absent from the Complaint. Because Xcel has not alleged any "unreasonable" regulations, the Court cannot find that such regulations create a factual issue on any of Xcel's counts.

Xcel's argument is not helped by the recent Minnesota Court of Appeals decision in its state case against MnDOT. *See Northern States Power Co. v. Minnesota Dept. of Transportation*, No. CX-02-287, slip op. (Minn. Ct. App. Aug. 26, 2002). In that decision, the court held that the June 1, 2002 deadline that MnDOT set to complete utility relocation west of Nicollet Avenue was arbitrary and capricious, and therefore must be stricken. That decision has no bearing upon the issues in this case, and does not change the fact that Xcel never raised any issues of "reasonableness" in its federal Complaint. None of Xcel's claims allege that MnDOT's deadlines were arbitrary and capricious, and the claims that Xcel raised before the Minnesota Court of Appeals were never properly

alleged here. This fact was even recognized by the Court of Appeals, which was "puzzled as to why Xcel did not address the deadline in its ongoing proceeding in federal court . . . ." *Id.* at 3. Therefore, even though some of the parties in both cases are the same, this Court does not agree with Xcel that the Court of Appeals' decision serves as *res judicata* upon any issues in this case.

### c. Minn. Stat. § 161.46

Xcel also contends that Minn. Stat. § 161.46 requires that Xcel be reimbursed for relocating its facilities under Fifth Street. This statute provides in relevant part:

> Whenever the commissioner [of MnDOT] shall determine the relocation of any utility facility is necessitated by the construction of a project on the routes of federally-aided state trunk highways, including urban extensions thereof, which routes are included within the National System of Interstate Highways, the owner or operator of such utility facility shall relocate the same . . . . After the completion of such relocation the cost thereof shall be . . . paid by the state out of trunk highway funds.

Minn. Stat. § 161.46, subd. 2.

Xcel claims that because Fifth Street "is the direct off-ramp" from Interstate 94 and connects downtown Minneapolis with westbound I-94, Fifth Street must be an "urban extension" of that interstate highway. Xcel gives no basis for this assertion. Inclusion in the Interstate Highway system does not occur by mere geography, but rather by specific designation. Xcel provides no evidence that Fifth Street is included in the National System of Interstate Highways, as § 161.46 requires. Therefore, that section's reimbursement provisions do not apply.

### 3. Franchise Agreement

Xcel contends that the Franchise Agreement controls this case, and entitles it to reimbursement of relocation costs. Xcel's argument rests primarily upon Section 7 of the Franchise Agreement, which provides in relevant part:

> Except where required solely for a City improvement project, **the vacation of any public way**, after the installation of electric facilities, shall not operate to deprive [Xcel] of its right to operate and maintain such electrical facilities, until the reasonable cost of relocating the same and the loss and expense resulting from such relocation are first paid to [Xcel].

Minneapolis, MN, Code, App. D (emphasis added).

Xcel contends this section mandates that it be reimbursed for relocating its utility facilities. Xcel's reading of Section 7 depends entirely upon its contention that Fifth Street was vacated. A "vacation" of a public way is the formal act of abandoning a public street or right of way. In the City of Minneapolis, a street can be vacated only by an act of the City Council as outlined in the City Charter. *See* Minneapolis, MN, Charter Ch. 8, § 3 (outlining the procedure for vacating a city street). When the City vacates a public right-of-way it releases the public's entire interest in that street, reverting ownership of the land occupied by the street to the abutting private landowners. *See McCuen v. McCarvel*, 263 N.W.2d 64, 66 (Minn. 1978); *In re Hull*, 204 N.W. 534, 537 (Minn. 1912); *Lamm v. Chicago, St. P., M. & O. Ry. Co.*, 47 N.W. 455, 458 (Minn. 1890).

Xcel argues that this well-established procedure does not apply here, and claims that Section 7 of the Franchise Agreement created a another type of vacation procedure, different from that prescribed in city ordinances and in the past century of case law. Xcel

argues that it bargained for reimbursement rights, and this bargain is embodied in Section 7. In support, Xcel notes a semantic distinction between "vacation" as used in Section 7, and as used in Minneapolis Ordinance § 429.110. This ordinance was adopted after the Franchise Agreement, and provides:

> A right-of-way user shall promptly and at its own expense, with due regard for seasonal working conditions, permanently remove and relocate its facilities in the right-of-way when it is necessary to prevent interference, and not merely for convenience of the city, in connection with:
>
> (1) A present or future city use of the right-of-way for public project;
>
> (2) The public health or safety; or
>
> (3) The safety and convenience of travel over the right-of-way.
>
> Notwithstanding the foregoing, a right-of-way user is not required to remove or relocate its facilities from a **right-of-way that has been vacated in favor of a nongovernmental entity** unless and until the reasonable costs to do so are first paid to the right-of-way user.

17 Minneapolis, MN, Code § 429.110 (emphasis added).

LRT is clearly a city use, is arguably for the public health or safety, and is designed for the convenience of travel. Therefore, the plain text of § 429.110 would require that Xcel pay its own relocation costs. Xcel, however, argues that the ordinance does not apply to its situation. Xcel instead contends that that because Section 7 of the Franchise Agreement does not refer to vacation "in favor of a nongovernmental entity," but merely to "vacation of any public way," it must imply a broader meaning of "vacation," which includes vacation in favor of government projects like LRT. Xcel argues that this new form of vacation "under the totality of the circumstances" does not require the formalities called for in the Minneapolis City Charter or other ordinances.

Rather, such vacation would take effect even though the City never gave up permanent control of Fifth Street.

This argument is not new. Xcel made the same claims in May 2001, and the Court found that such a novel interpretation was unsupported by any evidence, beyond Xcel's asserted understanding of the Franchise Agreement. *See Northern States Power*, 2001 WL 1618532 at **7-11. Xcel's briefs on this motion provided little new evidence to support its claim. At oral argument, however, Xcel did cite additional Minnesota statutes and regulations, claiming these provisions support its theory of vacation. *See* Minn. Stat. §§ 237.162-.163; Minn. R. 7819.3100. The Court is not persuaded.

First, Xcel does not explain how these provisions, which deal with telecommunications right-of-way users, apply to the present case. The Court sees no need to analogize the telecommunications provisions to the present case, since the Minnesota Legislature has passed specific legislation aimed at LRT. *See* Minn. Stat. § 174.35. Nonetheless, to the extent that these provisions do apply here, they support the argument that Xcel must pay for relocation.

Xcel cites Minn. R. 7819.3100, which provides in relevant part:

> If the local government unit vacates a right-of-way that contains the facilities of a right-of-way user and the right-of-way vacation requires the relocation of the right-of-way user's facilities, payment of the relocation costs must be determined as follows: (1) if the vacation proceedings are initiated by the right-of-way user, the right-of-way user must pay the relocation costs; (2) **if the vacation proceedings are initiated by the local government unit for a public project, the right-of-way user must pay the relocation costs** unless otherwise agreed to by the local government unit and the right-of-way user . . . .

Minn. R. 7819.3100, Subp. 2 (emphasis added). If the Court accepts Xcel's argument that Fifth Street has been vacated, such vacation was clearly initiated by the City of Minneapolis for LRT, a public project. Therefore, under Xcel's argument and under the terms of Rule 7819.3100, Xcel must pay for relocation. The only way this rule supports reimbursement is if the Franchise Agreement constitutes an agreement that Xcel need not pay for relocation. Of course, that is the very proposition that Xcel seeks to prove in this lawsuit. This circular reasoning does not convince the Court that Section 7 constitutes an agreement to create a new, special type of vacation that applies only to the Franchise Agreement between Minneapolis and Xcel. Rather, the Court finds that the record and the totality of circumstances support the view that "vacation," as that term is used in Section 7, refers to the traditional process spelled out in the City Charter and which has been well established in the cases. *See* Minneapolis, MN, Charter Ch. 8, § 3; *McCuen*, 263 N.W.2d at 66; *Hull*, 204 N.W. at 537; *Lamm*, 47 N.W. 451. Under these criteria, Fifth Street clearly has not been vacated. The street has not been turned over to a private party, but to a governmental entity. Moreover, the City of Minneapolis will re-take possession of Fifth Street after LRT becomes operational. Fifth Street will continue to function as a public right-of-way over which cars and pedestrians, as well as LRT, will traverse. Absent the City of Minneapolis truly vacating Fifth Street, Section 7 of the Franchise Agreement does not entitle plaintiff to relocation costs.

As the Court noted in its May 2001 Order, the remainder of the Franchise Agreement is silent on the issue of relocation costs, and the other pertinent sections, Sections 1 and 2 support the argument that Xcel must pay for relocation. *See Northern*

*States Power*, 2001 WL 1618532 at **8-9. Xcel's argument on this motion focuses primarily on Section 7, but the Court nevertheless finds its reasoning on the other sections relevant, and incorporates them herein by reference.

Consequently, even beginning with Xcel's premise that the Franchise Agreement is enforceable and controlling, the Court finds that no reasonable jury could conclude that Xcel is entitled to reimbursement. The Court therefore determines as a matter of law that Xcel is responsible for relocation costs associated with the LRT project.

**B. Xcel's Constitutional Claims**

Counts Two through Five of Xcel's Complaint allege due process, equal protection, and takings clause violations. Xcel first claims that MnDOT's refusal to pay for Xcel's utility relocation constitutes a taking of private property without just compensation, and a deprivation of property without due process of law. This argument is premised on the notion that the Franchise Agreement bestowed upon Xcel a "right to reimbursement" that is a cognizable property right.

In support, Xcel cites cases in which courts found that a franchise agreement created a property right in the franchisee. *See, e.g., New York Elec. Lines Co. v. Empire City Subway Co.*, 235 U.S. 179, 190 (1914); *Village of Blaine v. Independent Sch. Dist. No. 12*, 138 N.W.2d 32, 37 (Minn. 1965). *See also Wisconsin Pub. Serv. Corp. v. Marathon County*, 249 N.W.2d 543 (Wis. 1977) (holding that a franchise agreement between utility company and local government was in substance a property interest). Although these cases may establish that Xcel has a property interest in its franchise with the City, they are inapposite, since Xcel is not claiming deprivation of its rights in the

franchise agreement. In fact, Xcel's franchise with the City remains undamaged; Xcel merely had to move its facilities from one portion of the street to another, and such regulation is well within the state's police powers. *See New Orleans Gaslight*, 197 U.S. at 458-59; *City of Owatonna*, 450 N.W.2d at 313. Rather, Xcel argues that MnDOT's actions constituted a taking of its **property right to reimbursement**, a right Xcel claims was created by the Franchise Agreement. (*See* Xcel Mem. at 23.) None of Xcel's citations support its contention that the Franchise Agreement created a property right to reimbursement. Indeed, as the Court has already held, no reasonable jury could hold that the Franchise Agreement creates a right of reimbursement in Xcel. Therefore, because Xcel does not allege a taking or deprivation of its franchise rights, but rather seeks to protect unsubstantiated "reimbursement rights," the Court must hold that Xcel's due process and takings claims are unfounded.

Xcel also asserts an equal protection claim, arguing that it was treated differently from the City of Minneapolis, which also owns utility facilities in the Fifth Street corridor but was reimbursed for its relocation expenses. To prevail on this claim, Xcel must first demonstrate that it and the City were similarly situated, but were treated differently by the government. *Hosna v. Groose*, 80 F.3d 298, 304 (8th Cir. 1996). Xcel claims that although it is a private company and the City is a municipality, they are similarly situated because the City operates its utilities as a "proprietary function." This argument misses the mark. Xcel cites two cases to support its "proprietary function" argument. Both of these cases recognize that in some instances, a municipality should be treated simply as another private party rather than a government. *See City of Los Angeles v. Los Angeles*

*Gas & Elec. Corp.*, 251 U.S. 32 (1919); *City of New York v. New York Tel. Co.*, 14 N.E.2d 831 (N.Y. 1938). Neither of these cases, however, applies the "proprietary function" doctrine in an equal protection context. In each case, the court held that it would be inappropriate to permit the city to exercise its police powers where the city was just another market participant. *Los Angeles Gas & Elec.*, 251 U.S. at 38-39; *New York Tel.*, 14 N.E.2d at 832-33. In the present case, there is no issue of Minneapolis exercising its police powers when it should behave like another corporation. Even though the City does own utilities, that does not mean that it and Xcel are similarly situated in all relevant aspects. Even more damaging to Xcel's argument is the fact that Xcel and the City were not the only two utility owners in the Fifth Street corridor. Other private corporations owned utilities under Fifth Street, and they were treated the same as Xcel. Therefore, because the record shows that defendants treated all private companies alike while treating the City of Minneapolis, a municipality, differently, Xcel cannot show that it was similarly situated with the City of Minneapolis. Its equal protection claim must therefore fail.[8]

### C. Claim against Defendant Tinklenberg

The State defendants claim that all claims against defendant Tinklenberg, the Commissioner of Transportation, must be dismissed pursuant to the doctrine announced

---

[8] In granting the motions for summary judgment, the Court intends for all counts to be resolved. Therefore, although Count One of Xcel's Complaint does not mention defendants other than the FTA, neither does it specifically exclude them. Therefore, to the extent that Count One of Xcel's Complaint purports to state a claim against the Met Council or the State defendants, that claim is also dismissed. *See* Fed. R. Civ. P. 12(b)(6).

in *Pennhurst v. Halderman*, 465 U.S. 89 (1984). Xcel has sued Tinklenberg in his official and individual capacities. The Eleventh Amendment bars suits against state officials when the state is the "real, substantial party in interest." *Id.* at 101 (citation omitted). The "general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Id.* When the state itself is named as the defendant, a suit against a state official that is in fact a suit against the state is barred, regardless of whether it seeks damages or injunctive relief. *Id.* at 101-02. The State Defendants contend that the complaint against Tinklenberg, which seeks injunctive and declaratory relief, must be dismissed because the claim is against Tinklenberg in name only, and really seeks to secure definite action by the State of Minnesota.

Xcel claims that the suit against Tinklenberg should proceed, because it falls under an important exception to the *Pennhurst* rule. The exception is that a state official may be sued personally when the suit challenges the constitutionality of his action. *Id.* *See Ex Parte Young*, 209 U.S. 123 (1908). Xcel contends that because Tinklenberg was sued in his personal capacity, the suit should not be dismissed. Xcel, however, misconstrues the nature of this exception.

To determine whether Tinklenberg was sued in his personal capacity, the Court "must examine the specifics of the conduct involved and not merely look at the caption of the complaint." *Han v. Department of Justice*, 824 F. Supp. 1480, 1491 (D. Hawaii 1993), *aff'd*, 45 F.3d 333 (9th Cir. 1995). The Complaint "must allege more than merely

that state officials were performing their governmental duties when they committed the alleged wrongs." *Id.* at 1490. Rather, Tinklenberg can be sued in his personal capacity if, while acting under the "color of law," he exceeded the scope of his authority, acted pursuant to an unconstitutional statute, or personally deprived the plaintiff of a federal right. *Id.* *See Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir. 1992); *Lincoln v. Tuso*, No. C-96-1297, 1997 WL 227879 at *2 (N.D. Cal. April 29, 1997).

Xcel's Complaint does not allege that Tinklenberg personally exceeded the scope of his authority or deprived Xcel of a federal right. Rather, all of the allegations against Tinklenberg appear to allege that he was merely performing his duty as the head of MnDOT. Throughout the Complaint, in fact, Tinklenberg is listed along with MnDOT as performing all of the alleged actions. The Court finds that Xcel has not sufficiently alleged a case against Tinklenberg in his individual capacity. Therefore, under the *Pennhurst* doctrine, both the individual and official claims against Tinklenberg will be dismissed.

**CONCLUSION**

It is surely fair to raise the question, as Xcel has done, whether the cost of relocating its utilities in Minneapolis' Fifth Street corridor would be borne by Xcel customers or by all Minnesota taxpayers. Indeed, it is obvious that light rail transit will benefit all Minnesotans, not just Xcel's customers. If this question is to be addressed in the future, however, it must be considered by the Legislature, and not this Court. In the Court's view, after careful consideration, the law clearly requires Xcel to pay the

relocation costs of its utilities without reimbursement from the State. Any change in that law is the responsibility of the state policymakers.

As a result, this case is over in this Court.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Federal Transit Administration's Motion to Dismiss or for Summary Judgment [Docket No. 109] is **GRANTED**.

2. State defendants' Motion for Summary Judgment [Docket No. 118] is **GRANTED**.

3. Defendant Minnesota Metropolitan Council's Motion for Summary Judgment [Docket No. 126] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 10, 2002
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge