**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**FOURTH DIVISION**

---

Northern States Power Co.,
a Minnesota Corporation d/b/a
Xcel Energy,

Plaintiff,

Federal Transit Administration, an
administration of the United States
Department of Transportation;
Minnesota Department of Transportation;
Elwyn Tinklenberg, Commissioner of
Transportation, individually and officially;
Minnesota Metropolitan Council; and the
State of Minnesota;

Defendants.

Civil File No. 01-295 (JRT/FLN)

**DEFENDANTS MINNESOTA DEPARTMENT OF TRANSPORTATION; COMMISSIONER OF TRANSPORTATION; STATE OF MINNESOTA;AND METROPOLITAN COUNCIL'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ITS COUNTERCLAIM UNDER MINN. R. 8810.3300**

---

## INTRODUCTION

Rather than comply with the reasonable request of the Minnesota Department of Transportation ("MnDOT") to remove utilities located within the Fifth Street corridor to make way for construction of the Hiawatha Light Rail Transit ("LRT") project, Plaintiff Xcel Energy ("Xcel") commenced this litigation, asserting federal, state, and common law claims against the federal and state government defendants. Xcel's lawsuit has been decided, and disposed of, on

the merits. This Court granted summary judgment to Defendants on all of Xcel's claims, and the Court's decision has been affirmed by the Eighth Circuit Court of Appeals.

The State of Minnesota through its Commissioner of the Minnesota Department of Transportation ("MnDOT") and Metropolitan Council have asserted a counterclaim against Xcel under Minn. R. 8810.3300, subp. 3, which provides that the State may recover from a utility "damage of any nature whatsoever occasioned by reason of not having removed said utility within the time specified in said notice." The Metropolitan Council, as the administrative arm and agent of the State of Minnesota in the seven-county metropolitan area, and MnDOT are entitled under Subpart 3 to summary judgment on their counterclaim and to recover their damages, namely the attorney's fees paid in defense of Xcel's lawsuit.

**STATEMENT OF UNDISPUTED FACTS**

The LRT project is an 11.6 mile light-rail transit line running from the entertainment district in downtown Minneapolis, through the Minneapolis-St. Paul International Airport, and to the Mall of America in Bloomington. *Northern States Power Co. v. Federal Transit Admin.*, 358 F.3d 1050, 1051-1052 (8th Cir. 2004). MnDOT was responsible for the design and construction of the project. (*Id*. at 1052) Nearly half of the cost of the project was funded by the Federal Transit Administration under the Hiawatha Corridor Light Rail Project Full Funding Grant Agreement. (*Id.*) The Full Funding Grant Agreement provides that the Metropolitan Counsel and MnDOT are partners in management of the LRT project:

> The project management organization is a consortium of local government agencies responsible to develop, build and operate the project. The organization is led by the grantee, the Metropolitan Council/Metro Transit (MC) and includes MnDOT, HCRRA, the Metropolitan Airports Commission (MAC), City of Minneapolis and City of Bloomington.

FFGA, Attachment 2, Marshall Aff., Ex A. Upon completion, the LRT will be owned and operated by the Metropolitan Council, a political subdivision of the State. *Northern States Power Co. v. Federal Transit Admin.*, 358 F.3d 1050, 1051-1052 (8th Cir. 2004) The Metropolitan Council is the "grantee" under the FFGA. (Full Funding Grant Agreement ("FFGA") at 1 (Marshall Aff. Ex. A).)

The LRT was designed to travel along the portion of Fifth Street between Third Avenue and the Metrodome in downtown Minneapolis, commonly known as the Fifth Street corridor. (*Northern States Power Co. v. Fed. Transit Admin.*, No. 01-295, 2002 WL 31026530, p. 1 (D. Minn. September 10, 2002).) Xcel owned underground utilities, which provide electric power to downtown Minneapolis, beneath the Fifth Street corridor. *Northern States Power Co. v. Federal Transit Admin.*, 358 F.3d 1050, 1051 (8th Cir. 2004).

Construction of the LRT system was slated to begin on or about February 1, 2002. Beginning in January 1999, MnDOT held numerous meetings with utility company representatives, including Xcel, to coordinate and plan for utility relocation. (*Northern States Power Co. v. Fed. Transit Admin.*, No. 01-295, 2002 WL 31026530, p. 2 (D. Minn. September 10, 2002), see copy attached to Marshall Aff. and labeled Ex. B.) Utility owners were informed that they must assess their facilities and relocate or protect those that posed a potential conflict with LRT construction in the Fifth Street corridor by February 1, 2002. (*Id.*) Xcel representatives were active participants in these meetings. (*Id.*) On August 18, 2000, Xcel signed a letter of intent with MnDOT agreeing to relocate its utility facilities from the Fifth Street corridor at its own expense. (*Id.*) Despite the letter of intent, Xcel subsequently refused to begin relocating its utilities and opposed paying for its own relocation. (*Id.*)

On November 29, 2000, MnDOT ordered Xcel to assess the impact to its utilities by LRT construction and submit a plan and schedule for relocation within 30 days, by December 29, 2000. (*Id*. at 3) MnDOT extended the deadline until January 19, 2001, but Xcel still refused to comply with the order. (*Id*.)

Rather than comply with the order, Xcel filed this lawsuit, asserting a myriad of constitutional, statutory, and common-law claims against Defendants. As a result, Defendants had no choice but to move this Court for a preliminary injunction requiring Xcel to comply. This Court granted Defendants' motion, ordering Xcel to comply with MnDOT's directives and protect or relocate its facilities that interfere with LRT construction in the Fifth Street corridor east of Nicollet Avenue. *Northern States Power Co. v. Fed. Transit Admin.*, No. 01-295, 2001 WL 1618532 (D. Minn. May 24, 2001). The district court's injunction was affirmed on appeal. *Northern States Power Co. v. Fed. Transit Admin.*, 270 F.3d 586 (8th Cir. 2001).

Pursuant to the injunction, Xcel relocated its utilities in the Fifth Street Corridor east of Nicollet Avenue. Xcel continued with this litigation, however, insisting that the Metropolitan Council and MnDOT pay for the relocation of its utilities. Upon completion of discovery, all Defendants moved for summary judgment. This Court granted Defendants' motions and dismissed all of Xcel's claims. *Northern States Power Co. v. Fed. Transit Admin.*, No. 01-295, 2002 WL 31026530 (D. Minn. Sept. 10, 2002). The Eighth Circuit affirmed the grant of summary judgment in all respects. *Northern States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050 (8th Cir. 2004).

MnDOT and the Metropolitan Council have asserted a joint counterclaim against Xcel under Minn. R. 8810.3300, subp. 3, to recover damages and attorney's fees caused by having to seek injunctive relief and defend Xcel's claims. To date, MnDOT has incurred $238,642.00 in

attorneys fees (Mueting Aff.) and the Metropolitan Council has incurred $446,264.00 in attorney's fees. (Marshall Aff.) The Metropolitan Council and MnDOT now move this Court for summary judgment and an award of attorney's fees on their counterclaim under Minn. R. 8810.3300, subp. 3.

## ARGUMENT

Minn. R. 8810.3300, subp. 3, provides that the State shall be held harmless from any and all damage caused by a utility owner's failure to remove the utility from the right of way pursuant to an order of the Commissioner of Transportation. MnDOT and the Metropolitan Council, both of which are agents of the State of Minnesota, were forced to incur attorney's fees in seeking an injunction to compel Xcel to move its facilities and defending this lawsuit, both of which were occasioned by reason of Xcel having not removed its utilities from Fifth Street. MnDOT and the Metropolitan Council are, therefore, entitled to summary judgment and an award of attorney's fees on their counterclaim under Rule 8810.3300.

## I. STANDARD FOR SUMMARY JUDGMENT.

The United States Supreme Court has emphasized that courts should look favorably upon motions for summary judgment to establish the just, speedy, and inexpensive resolution of civil litigation. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). One of the principal purposes of a Rule 56 motion for summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the Supreme Court has instructed that the rule should be interpreted in a way that allows it to accomplish this purpose. *Id.* at 323-24.

To defeat a motion for summary judgment, the nonmoving party must produce evidence that would allow a reasonable jury to return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986). The nonmoving party may not

rest on denials or allegations in the pleadings, but must set forth the specific facts sufficient to raise genuine issues for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Evidence sufficient to oppose summary judgment must be in the form of sworn testimony and must be admissible into evidence. Fed. R. Civ. P. 56(e). If the evidence brought forward in opposition to the motion "is merely colorable, or is not significantly probative," summary judgment is appropriate. *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1239 (8th Cir. 1990) (quotation omitted). In other words, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment." *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992). "Instead, the dispute must be outcome determinative under prevailing law." *Id.* (quotation omitted).

All issues relevant to the counterclaim have been resolved by this Court's September 10, 2002 summary judgment order, as affirmed by the Eighth Circuit Court of Appeals and MnDOT and the Metropolitan Council are now entitled to summary judgment on their claims under Minn. R. 8810.3300.

## II. THE METROPOLITAN COUNCIL AND MNDOT ARE ENTITLED TO SUMMARY JUDGMENT AND TO RECOVER ATTORNEY'S FEES UNDER MINN. R. 8810.3300.

The Metropolitan Council and MnDOT have asserted a counterclaim against Xcel under Minn. R. 8810.3300. (Joint Counterclaim of MnDOT pp. 11-14 and of Metropolitan Council ¶¶ 13-22.) That rule provides, in pertinent part:

> If at any time the state of Minnesota, acting through its commissioner of transportation, shall deem it necessary to make any improvements or changes on all or any part of the right-of-way of the trunk highway which affect a utility located on trunk highway right-of-way, then and in such event, the owner of the utility shall within 15 days after written notice from the commissioner of transportation or an authorized agent, proceed to alter, change, vacate, or remove said utility from the trunk highway

> right-of-way so as to conform to said trunk highway changes and as directed by the commissioner of transportation. Such work shall be done without any cost whatsoever to the state of Minnesota except as otherwise provided by law or agreement and shall be completed within the date specified in said written notice, which date shall be reasonable under the circumstances. **The utility shall assume all liability and save the state of Minnesota harmless from any and all claims of damage of any nature whatsoever occasioned by reason of not having removed said utility** within the time specified in said notice.

Minn. R. 8810.3300, subp. 3 (emphasis added).

MnDOT and the Metropolitan Council are now moving for summary judgment on their counterclaim under Minn. R. 8810.3300, under which Xcel must assume all liability and hold the State harmless for any and all damages resulting from Xcel's failure to comply with MnDOT's order to move its utilities. Summary judgment for the moving parties and an award of attorney's fees is appropriate because (1) Rule 8810.3300's provision for recovering "damages of any nature whatsoever" is broad enough to encompass an award of attorney's fees; (2) both MnDOT and the Council are the "State" for purposes of Rule 8810.3300; and (3) by reason of Xcel not having removed its utilities from Fifth Street, MnDOT and the Council were forced to incur costs and substantial attorney's fees to compel Xcel to move its utilities and defend this lawsuit.

**A. Minn. R. 8810.3300, subp. 3, authorizes an award of attorney's fees to MnDOT and the Metropolitan Council.**

Although Minn. R. 8810.3300, subp. 3, does not contain the words "attorney's fees," the language used in the statute, "any and all claims of damage of any nature whatsoever occasioned by reason of not having removed said utility," is broad enough to include attorney's fees.

The general rule in Minnesota is that each party bears its own attorney's fees in the absence of a statutory or contractual exception. *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000). Minnesota courts have, nonetheless, endorsed attorney-fee awards under statutes or

contracts that do not expressly authorize them. *See, e.g.*: *Busse v. Board of County Commissioners,* 241 N.W.2d 794, 798 (Minn. 1976); *Dewey v. Henry's Drive-Ins of Minnesota, Inc.*, 301 Minn. 366, 222 N.W.2d 553 (1974); *Nelson v. Bonnstetter*, 1997 WL 729217 (Minn. App.) (See copy attached to Marshall Aff. and labeled Ex. C.)

In *Busse v. Board of County Commissioners,* 241 N.W.2d 794, 798 (Minn. 1976), the Sibley County Clerk of Court appealed to the district court from the determination by the county board of annual salaries for his deputies. The clerk prevailed in his appeal, and the district court awarded attorney's fees. The Minnesota Supreme Court upheld the award of attorney's fees, even though the statute under which the clerk appealed to the district court, Minn. Stat. § 485.018, subd. 7 (1976), contained no language concerning awards of costs, fees, or disbursements. The Supreme Court created an exception to the general rule regarding attorney's fees for when a county official "engage[s] in litigation in his official capacity for the benefit of the county." *Id*. The Minnesota appellate courts have repeatedly reaffirmed this principle. *See, e.g.*, *Amdahl v. County of Fillmore*, 258 N.W.2d 869, 877 (Minn. 1977); *Besemer v. Bd. of County Comm'rs*, 357 N.W.2d 365, 368 (Minn. Ct. App. 1984).

*Dewey v. Henry's Drive-Ins of Minnesota, Inc.* involved interpretation of a contractual provision, rather than a statute, but the rationale is the same. In *Dewey*, the Minnesota Supreme Court held that a contractual guarantee of a lease allowed for the recovery of attorney's fees, even though the language of the guarantee did not contain a specific reference to attorneys fees. The guarantor was not a party to the actual lease. While the lease did allow the lessor to recover attorney's fees against the lessee, there was no provision for recovery of attorney's fees in the contract between the lessor and the guarantor. Instead, the guarantee allowed recovery of "…all monies and damages to which the lessor would be entitled under said Lease." Looking to the

intent of the agreement, the Minnesota Supreme Court held that the guarantee was "sufficiently broad" to include payment of attorneys fees. *Dewey v. Henry's Drive-Ins of Minnesota, Inc.*, 301 Minn. at 372, 222 N.W.2d at 557.

In *Nelson v. Bonnstetter* the court analyzed two separate provisions of a lease. The first clause provided for recovery of "all expenses" incurred in suits to collect rent. The second clause, which applied only to actions to retake possession of crops, specifically provided for recovery of attorneys fees. The lawsuit involved only a claim under the first clause. Citing the *Dewey* case, the Minnesota Court of Appeals held that the first clause was sufficiently broad to allow for the recovery of attorney's fees. The court also noted that the purpose of the clause was to reimburse the landlord for the expense of a suit to collect rent and that "[a]ttorney's fees are a common expense in a lawsuit and need not be referred to specifically to be recovered." *Nelson v. Bonnstetter*, 1997 WL 729217 at p. 2.

Moreover, courts have specifically interpreted the term "damages," (the term used in Rule 8810.3300, subpart 3) to encompass attorney's fees.[1] In *Natco Limited Partnership v. Moran Towing of Florida, Inc.*, the parties entered into a contract that contained an indemnification provision under which the plaintiff agreed to indemnify the defendant against "any and all loss, *damage* or liability" caused by the defendant's negligence. 267 F.3d 1190, 1193 (11th Cir. 2001) (emphasis added). The defendant prevailed at trial and sought attorney's

---

[1] In fact, courts routinely interpret general terms, including "costs" and "expenses," in indemnity agreements to authorize an award of attorney's fees. *See, e.g.*, *Okla. Fixture Co. v. ASK Computer Sys., Inc.*, 45 F.3d 380, 382 (10th Cir. 1995) ("The contract language 'all reasonable costs' is a broad term, and a common sense reading includes attorney's fees."); *Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 583 (5th Cir. 1986) ("The language 'any consequences' in Coastal's contract is sufficiently broad that it encompasses all general damages including attorney's fees."); *Citizens Suburban Co. v. Rosemont Dev. Co.*, 53 Cal. Rptr. 551, 555 (Ct. App. 1966) (provision concerning "costs and expenses" caused by party's noncompliance includes attorney's fees); *Boshnakov v. Bd. of Educ.*, 753 N.Y.S.2d 774, 774 (App. Div. 2003) (agreement to hold party harmless "from and against all claims or suits" includes attorney's fees); *cf. Duryea v. Third Northwestern Nat'l Bank of Minneapolis*, 606 F.2d 823, 826 (8th Cir. 1979) ("costs of collection" language in promissory note includes attorney's fees).

fees. *Id.* The Eleventh Circuit affirmed the district court's award of attorney's fees to defendant, concluding that the "loss, damage or liability language" was broad enough to cover the attorney's fees that defendant spent in defending the claims brought by the plaintiff and in prosecuting its counterclaim against the plaintiff. *Id.* at 1196.

The Fifth Circuit faced a similar set of facts in *Brown v. Seaboard Coast Line Railroad Co.*, 554 F.2d 1299 (5th Cir. 1977). By contract, the third-party defendant agreed to indemnify the third-party plaintiff for "any and all loss, cost, *damage* and expense." *Id.* at 1304 (emphasis added). On appeal, the court held that such language was "sufficiently broad to encompass attorney's fees and costs of the action" and that the third-party plaintiff was entitled to recover costs and attorney's fees from the third-party defendant. *Id.*

In a recent case in the California Court of Appeals, a tenant and landlord entered into a lease under which upon the tenant's breach, the tenant would be "liable for the 'cost and expense' of reletting the premises and for 'all *damages*' the landlord incurs when it elects to terminate the lease, 'including the cost of recovering the premises.'" *F. Alioto Co. v. City & County of S.F.*, Nos. A098608 & A099537, 2004 WL 45187, at *13 (Cal. Ct. App. Jan. 9, 2004) (emphasis added). The trial court awarded attorney's fees to the plaintiff-tenant,[2] holding that the terms "all damages" and "cost and expense" embraced attorney's fees "because the landlord's right to reenter and recover possession necessarily contemplates litigation to recover the premises. . . . Any such litigation undertaken by the [landlord] would necessarily require attorney's involvement and fees, which are contemplated by the [lease] provisions." *Id.*

---

[2] The plaintiff-tenant in *Alioto* was entitled to attorney's fees because "where a contract affords one party a right to attorney's fees but not the other, [California] Civil Code section 1717 creates a statutory reciprocal right to fees in all parties to the contract." *Alioto*, 2004 WL 45187, at *12.

Minn. R. 8810.3300, subp. 3, is an indemnity provision. If a utility owner fails to comply with an order to remove the utility, it assumes all of the liability and holds harmless the State (in this case, the Metropolitan Council and MnDOT) for any and all damages arising from the failure to comply. Because courts have consistently interpreted the term "damages" in indemnification contracts to encompass attorney's fees, the Court should similarly construe Subpart 3 to authorize an award of attorney's fees. Like the clerk in *Busse*, the Metropolitan Council participated in litigation in its official capacity as did MnDOT. Also, like the clerk in *Busse*, both MnDOT and the Metropolitan Council's legal actions benefited the public entity, in this case the State of Minnesota.

Just as in *Nelson v. Bonnstetter*, it was completely foreseeable that Xcel's failure to promptly comply with the order to move its utilities would cause the MnDOT and the Metropolitan Council to incur attorney's fees to compel Xcel to comply. The damages flowing from Xcel's refusal to obey the State's order to relocate its facilities in the Fifth Street corridor were virtually certain to take one of two forms: 1) the cost of the State relocating Xcel's facilities; or 2) legal fees incurred in forcing Xcel to move its own facilities.[3] It does not make sense to say that Minn. R. 8810.3300 provides for recovery of damages if the State does nothing in response to a utility's failure to obey an order to relocate, but does not allow for the reimbursement of expenses incurred in mitigating the State's damages by compelling the utility to move before more serious damages (e.g. the loss of over $300 million in federal funding) can occur. The moving parties' attorney's fees were certainly an expense that would have been expected to flow from Xcel's refusal to comply with the order to relocate. That is even more evident in this case, where Xcel's followed up its refusal to relocate by filing this lawsuit.

[3] There was also the possibility of Defendants losing federal funding for the project if Xcel's delay tactics pushed construction of the LRT too far behind schedule.

Accordingly, MnDOT and the Metropolitan Council are entitled to recover their attorney's fees under Minn. R. 8810.3300.

**B. As the administrative and executive arm of the State government in the region in which the LRT is located, the Metropolitan Council stands in the place of the State for purposes of Minn. R. 8810.3300.**

The Metropolitan Council is the administrative and executive arm of the State, exercising a broad array of powers, particularly in the area of transportation, within the seven-county metropolitan area. As the administrative and executive arm of the State, the Council stands in the shoes of the State and MnDOT under Rule 8810.3300. Moreover, throughout this litigation, Xcel has acknowledged that the Council is an agent of the State. Xcel is therefore estopped from denying that the Council is an agent of the State for purposes of Rule 8810.3300.

The Metropolitan Council is a political subdivision of the State. Minn. Stat. § 473.123, subd. 1. The Metropolitan Council's mandate to design and construct Minnesota's LRT system came from the Minnesota state legislature in the form of Minn. Stat. §473.399:

> Subdivision 1. **General requirements.** (a) The council shall adopt a plan to ensure that light rail transit facilities in the metropolitan area will be acquired, developed, owned, and capable of operation in an efficient, cost-effective, and coordinated manner in coordination with buses and other transportation modes and facilities. The plan may be developed and adopted in phases corresponding to phasing of construction of light rail. The council may incorporate into its plan appropriate elements of the plans of regional railroad authorities in order to avoid duplication of effort.

Minn. Stat. §473.399 goes on to detail the required cooperation between the Metropolitan Council and MnDOT with respect to construction of the light rail:

> (b) The light rail transit plan or first phase of the plan required by this section must be adopted by the council before the commissioner of transportation may begin construction of light rail transit facilities. Following adoption of the plan, the commissioner of transportation shall act in conformity with the plan. The commissioner shall prepare or amend the final design plans as necessary to make the plans consistent with the light rail transit plan.

***

> Subd. 1a. **Integrated transportation system.** The commissioner of transportation and the Metropolitan Council shall ensure that the light rail transit and commuter rail facilities are planned, designed, and implemented: (1) to move commuters and transit users into and out of, as well as within, the metropolitan area, and (2) to ensure that rail transit lines will interface with each other and other transportation facilities and services so as to provide a unified, integrated, and efficient multimodal transportation system.

Federal and state courts have long recognized that the Metropolitan Council is the administrative and executive arm of the State, exercising broad jurisdiction, particularly with respect to transportation, over the seven-county metropolitan area. *See, e.g.*, *Heisler v. Metro. Council*, 339 F.3d 622, 624 (8th Cir. 2003) ("Met Council is a political subdivision of the State of Minnesota that, among other things, oversees public transportation in Minneapolis and St. Paul."); *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1377 (8th Cir. 1997) ("Certain counties must seek approval for waste management plans and designation plans from the Metropolitan Council, a planning and development agency created by the state legislature for the seven-county Minneapolis-St. Paul metropolitan area."); *Handicraft Block Ltd. P'ship*, 611 N.W.2d 16, 20 (Minn. 2000) (council is "the designated metropolitan planning organization for the Twin Cities metropolitan area"); *Davies v. City of Minneapolis*, 316 N.W.2d 498, 499 (Minn. 1982) (noting council's responsibility to issue bonds to finance construction of sports facilities); *Lifteau v. Metro. Sports Facilities Comm'n*, 270 N.W.2d 749, 751 (Minn. 1978) (same); *City of New Brighton v. Metro. Council*, 237 N.W.2d 620, 623 (Minn. 1975) ("The Council is a political subdivision of the state and is charged by the legislature with responsibility for the orderly development of the Minneapolis-St. Paul metropolitan region."); *Minn. State Bd. of Health v. Governor's Certificate of Need Appeal Bd.*, 230 N.W.2d 176, 178 (Minn. 1975) (noting council's responsibility to recommend whether State should issue "certificates of need"

to nursing homes). In addition, with respect to this lawsuit, the Metropolitan Council is the owner and operator of the LRT system and is the "grantee" under the FFGA.

The reference in Minn. R. 8810.3300, subp. 3, to "the state of Minnesota, acting through its commissioner of transportation" is an acknowledgement that the State acts not alone but through agents, such as the Metropolitan Council, in the area of public improvements. The broad authority that the Metropolitan Council exercises on behalf of the State government, coupled with the Council's unique responsibilities as owner and operator of the LRT, make it appropriate that the Council assume the rights and responsibilities of the State and MnDOT under the rule. Therefore, considering both the language of the rule and the Council's status as the executive and administrative arm of the State, the Metropolitan Council is entitled to damages pursuant to Rule 8810.3300, subpart 3.

Moreover, throughout these proceedings Xcel has maintained that the Metropolitan Council is an agent of MnDOT and the State. For example, Xcel has asserted:

> MnDOT and Met Council have **joint responsibility** for harm inflicted upon Xcel Energy. Met Council is the federal funds grantee and will operate the LRT and own the railbed upon construction completion. MnDOT is charged with construction. But without the money Met Council funnels to MnDOT and without Met Council's intention to conduct mass transit operations, the MnDOT LRT adventure would lack means and a purpose. Simply put, **the agencies are in this together**.

(Pl.'s Mem. in Opp'n to State Defs.' Summ. J. Mot. at 8-9 (citations omitted) (emphasis added).)

> Met Council attempts to avoid paying relocation expenses by distancing itself from MnDOT's coercive relocation tactics. The charade fails because, with regard to LRT, **the two agencies are joined at the hip**. Met Council is the federal fund grantee, and MnDOT is charged with LRT construction. But without the federal dollars that Met Council doles out, the displacement of Fifth Street utilities would not occur. And Met Council's ultimate ownership and operation of the LRT is the cause of the harm being inflicted on Xcel Energy. In fact the operation of the trains on the

> West Segment will block access to the Fifth Street substation. And as the grantee, Met Council has the funds to comply with [Minn. Stat.] § 161.46 utility reimbursement requirements. Met Council has the money and MnDOT has the shovel. Without one or the other LRT would fail. Both Met Council and MnDOT must accede to § 161.46.

(*Id.* at 30 (emphasis added).)

Under Minnesota law, "a party who has assumed a particular position in a judicial proceeding is thereby precluded from thereafter assuming a position inconsistent therewith." *Morehart v. Furley*, 188 N.W. 1001, 1002 (Minn. 1922). Here, Xcel has consistently alleged that, at least with respect to the LRT project, the Metropolitan Council is an alter ego of MnDOT and therefore a State agency. Thus, Xcel is now estopped from denying that the Council is a State agency to escape the liability imposed by Minn. R. 8810.3300, subp. 3.

**C. The attorney's fees incurred by the MnDOT and the Metropolitan Council were foreseeable damages incurred by reason of Xcel's not having removed its utility facilities after receiving written notice to do so from the State.**

Minn. R. 8810.3300, subp. 3, states that, having received written notice from the State to relocate utility facilities, the owner of a utility is liable for "***damage of any nature whatsoever occasioned by reason of not having removed said facility.***" Rule 8810.3300 is clear and unambiguous. The MnDOT and the Metropolitan Council's damages—their attorney's fees spent defending Xcel's lawsuit and securing injunctive relief forcing Xcel to comply—were occasioned, or caused, by Xcel's intransigence. Xcel would not have moved its utilities had the MnDOT and the Metropolitan Council not paid $672,381 in attorney's fees to compel them to comply with the order.

Early on, the Commissioner of Transportation gave utility owners such as Xcel notice of the construction required by the LRT project and that utilities under the Fifth Street corridor may have to be located. Xcel initially acknowledged its obligation to pay its own relocation costs, but

then changed its mind. Because of Xcel's recalcitrance, an agreement on relocating the utilities was never reached. Rather than comply with the order to relocate its utilities, Xcel commenced this lawsuit and required MnDOT and the Metropolitan Council to incur hundreds of thousands of dollars in attorney's fees. Xcel's conduct in the relocation negotiations and its filing of a preemptive lawsuit instead of complying with the order[4] demonstrate that Xcel would not have relocated its utilities by the deadline contained in the MnDOT notice and order had the Council not forced Xcel to comply. Therefore, MnDOT and the Metropolitan Council are entitled to summary judgment on their counterclaim and are entitled to recover their attorney's fees as damages.

## CONCLUSION

Under Minn. R. 8810.3300, subp. 3, Xcel must reimburse MnDOT for damages caused by its intransigence in complying with the order to move its utilities in the Fifth Street corridor. In addition, the Metropolitan Council is an agent of the State for purposes of this lawsuit and Rule 8810.3300, and MnDOT's and the Council's damages are the attorney's fees incurred in requiring Xcel to act. Therefore, MnDOT and the Metropolitan Council respectfully requests

[4] In proceedings on Defendants' motions for summary judgment, Xcel argued that the MnDOT notice and order was not "reasonable," citing the Minnesota Court of Appeals' decision in *N. States Power Co. v. Minn. Dep't of Transp.*, No. CX-02-287, 2002 WL 2004718 (Minn. Ct. App. Sept. 3, 2002). This Court concluded that this decision has "no bearing upon the issues in this case" and that "Xcel never raised any issues of 'reasonableness' in its federal Complaint." *Northern States Power Co. v. Fed. Transit Admin.*, No. 01-295, 2002 WL 31026530, at *10 (D. Minn. Sept. 10, 2002). The "reasonableness" of MnDOT's order, therefore, is no longer at issue in this proceeding under the law-of-the-case doctrine. *See UniGroup, Inc. v. Winokur*, 45 F.3d 1208, 1211 (8th Cir. 1995); *Peterson v. BASF Corp.*, 675 N.W.2d 57, 65 (Minn. 2004).

that the Court grant their motion for summary judgment on their counterclaim and an award of their attorney's fees incurred in defending this action.

**BASSFORD REMELE**
***A Professional Association***

Dated: October 5, 2004 By s/Andrew L. Marshall

Lewis A. Remele, Jr. (License #90724)
Andrew L. Marshall (License #176849)
David A. Turner (License #0333104)
Attorneys for Defendant Metropolitan Council
33 South Sixth Street, Suite 3800
Minneapolis, Minnesota 55402-3707
(612) 333-3000

Dated: October 5, 2004 Respectfully submitted,

Mike Hatch
Attorney General
State of Minnesota

s/Donald J. Mueting
Donald J. Mueting
Assistant Attorney General
Atty. Reg. No. 75929

445 Minnesota Street, Suite 1800
St. Paul, Minnesota 55101-2134

(651) 296-3369 (Voice)
(651) 282-2525 (TTY)

Attorneys for Defendants the Minnesota Department of Transportation and the State of Minnesota

410294

AG: #1299580-v1