Agreement No. A22829

# HIAWATHA CORRIDOR LIGHT RAIL TRANSIT MASTER PROJECT COOPERATION AGREEMENT

This is a Cooperation Agreement ("Cooperation Agreement"), effective on the date of execution by all of the parties and appropriate state officials, made and entered into by and between the State of Minnesota through its Commissioner of Transportation ("MNDOT"), the Metropolitan Council ("Met Council"), the Metropolitan Airports Commission ("MAC"), the Hennepin County Regional Railroad Authority ("HCRRA"), the City of Minneapolis ("Minneapolis"), and the City of Bloomington ("Bloomington"), collectively referred to as the "Parties."

The purpose of this Cooperation Agreement is to:

1. Set forth the agreements made between and among the Parties on topics and issues with respect to the planning, implementation, design, construction, ownership and operation of the Hiawatha Corridor Light Rail Transit Project ("Hiawatha Corridor LRT Project" or "Project") pursuant to their authority under Minnesota Statutes Chapters 174, 398A, 473; Minnesota Statutes § 471.59 and other applicable statutes; and

2. Set forth the responsibilities agreed to be undertaken by each of the Parties with respect to the Hiawatha Corridor LRT Project; and

3. Set forth a timetable for the planning, design, construction and implementation of the Hiawatha Corridor LRT Project.

## BACKGROUND RECITALS

1. The Minnesota legislature has by Minnesota Statutes § 473.399 directed Met Council and MNDOT to cooperate to ensure that certain light rail transit and commuter rail facilities are planned, designed, and implemented: (1) to move commuters and transit users into and out of, as well as within, the Twin Cities metropolitan area, and (2) to ensure that rail transit lines will interface with each other and with other transportation facilities so as to provide a unified and efficient multimodal transportation system.

2. Further, the Minnesota Legislature in Minnesota Statutes § 473.399, et seq. sets forth certain requirements with respect to the planning, design, construction, funding, implementation and operation of light rail transit.

3. The Hiawatha Corridor Light Rail Transit Project will run from downtown Minneapolis through the Minneapolis-St. Paul International Airport to the Mall of America in Bloomington.

4. Met Council and MNDOT have entered into a Light Rail Master Cooperative Agreement (MNDOT Agreement No. 78311) effective December 30, 1998, which establishes a partnership between MNDOT and Met Council under Minnesota Statutes § 174.02, subd. 6(a) and § 471.59 and broadly sets forth their respective responsibilities for establishment of a light rail system along the Hiawatha Corridor in the Twin Cities metropolitan area, and which establishes a mechanism for transfer of funds from Met Council to MNDOT

Exhibit A

through subsequent funding agreements.

5. Met Council has entered into similar Master Cooperative Funding Agreements with:

a) HCRRA effective January 15, 1999;

b) Minneapolis effective May 25, 1999;

c) Minneapolis Community Development Agency effective May 14, 1999.

Met Council is currently negotiating a Master Cooperative Funding Agreement with MAC.

The purpose of said Agreements is to establish a mechanism for (1) transfer of funds from HCRRA and Minneapolis to Met Council for partial funding of the Project and/or (2) transfer of funds from Met Council to MAC and Minneapolis for payment of Project expenses.

6. The Parties have entered into a non-binding Memorandum of Understanding ("MOU") effective September 27, 1999, which:

a) Sets forth the topics and issues to be included in a subsequent Cooperation Agreement or Agreements with respect to the planning, design, construction, implementation, ownership and operation of the Hiawatha Corridor LRT Project;

b) Generally sets forth the responsibilities agreed to be undertaken by each of the Parties with respect to the Hiawatha Corridor LRT Project as of the date of the MOU; and

c) Sets forth a timetable for completion of the Cooperation Agreement.

7. The Parties to the MOU have now reached agreement on the topics and issues listed in the MOU and have determined that it is in their mutual best interests and in the interests of the public to set forth their agreement in a Cooperation Agreement pursuant to their powers and authority under Minnesota Statutes Chapters 174, 398A, 473, Minnesota Statutes § 471.59 and other applicable statutes.

8. The Parties have passed resolutions or taken action listed as follows authorizing their officials to execute this Cooperation Agreement between and among the Parties which contains the following terms and conditions with respect to the planning, design, construction, implementation, ownership and operation of the Hiawatha Corridor LRT Project.

| Resolutions | Date Passed | Resolution No. |
| --- | --- | --- |
| Met Council | ______________ | ______________ |
| MAC | ______________ | ______________ |

| | | |
|---|---|---|
| HCRRA | 12-14-99 | 75-HCRRA-99 |
| Minneapolis | | |
| Bloomington | | |

AGREEMENT

NOW, THEREFORE, for mutual valuable consideration, the sufficiency of which has been agreed to by the Parties, Met Council, MNDOT, MAC, HCRRA, Minneapolis and Bloomington agree as follows:

I.
REGIONAL AND STATE PLANS
REGIONAL AND LOCAL APPROVALS

A. Met Council has included the Hiawatha Corridor Transitway in its Transportation Policy Plan dated December 1996 and adopted on December 19, 1996. Met Council's Transportation Policy Plan is the Plan required by Minnesota Statutes § 473.399 to ensure that light rail facilities will be acquired, developed, owned and operated cost effectively and coordinated with other modes of transportation.

B. Pursuant to Minnesota Session Laws 1999, Chapter 230, Sec. 45, Met Council, in consultation with the Commissioner of Transportation and the Regional Rail Authorities in the metropolitan area, is developing a regional master plan for transit which Met Council will present to the Legislature by February 1, 2000. The Hiawatha Corridor LRT Project will be included in Met Council's regional master plan for transit.

C. MNDOT has updated the State Transportation Improvement Program to include the Hiawatha Corridor LRT Project and anticipates Federal Transit Administration approval of the updated plan by January 2000.

D. As required by Minnesota Statutes §473.3994, Subdivisions 2 and 3. MNDOT, HCRRA and Hennepin County have held public hearings on the physical design component of the preliminary design plans for the Hiawatha Corridor LRT Project. The hearings were held on September 1, 1999. MNDOT, HCRRA and Hennepin County provided appropriate public notice of the hearings, have summarized the proceedings and testimony and have maintained the records of the hearing including any written statements submitted.

E. As required by Minnesota Statutes §473.3994, Subdivision 3, Minneapolis and Bloomington have respectively held public hearings on the physical component of the preliminary design plans for the Hiawatha Corridor LRT Project on September 16, 1999, and September 8, 1999.

1. Minneapolis has approved the preliminary design plans for the Project by Resolution No. 99-R-336 passed by the Minneapolis City Council on September 24, 1999.

2. Bloomington has approved the preliminary design plans for the Project by Resolution No. 99-136 passed by the Bloomington City Council on September 20, 1999.

3. Hennepin County has approved the preliminary design plans for the Project by Resolution No. 99-9-683R2 on September 28, 1999.

F. If the final design plans for the Hiawatha Corridor LRT Project incorporate a substantial change from the preliminary design plans with respect to location, length of termini of the route, general dimension, elevation, or alignment of route and crossings, location of tracks above ground, below ground, or at ground level, or station locations, the Parties agree to follow the procedures as provided for in Minnesota Statutes § 473.3994, Subd. 5.

G. By January 2000, as required by Minnesota Statutes §473.3994, Subd. 7, MnDOT and Met Council anticipate that MnDOT will have submitted the preliminary design plans for the Hiawatha Corridor LRT Project to Met Council; Met Council will have determined the preliminary design plans to be consistent with Met Council's development guide; and Met Council will have approved the plans.

H. MAC has reviewed the preliminary design plans and proposed operational approach for the Hiawatha Corridor LRT Project and has determined that the Project will add significant landside capacity to Minneapolis-St. Paul International Airport ("Airport"), enable the Airport users to move between the Airport terminals and between the Airport and their points of origin or destination without additional demand on roadways and/or Airport parking and will enhance intermodal connectivity.

## II.
## ACQUISITION OF LAND, EASEMENTS, RIGHT-OF-WAY

A. HCRRA

HCRRA has already acquired and now owns certain property interests necessary for the construction and operation of the Hiawatha Corridor LRT Project. HCRRA will convey the property interests to MnDOT and/or Met Council. HCRRA has no responsibility for acquisition of any additional right-of-way for the Hiawatha Corridor LRT Project.

B. MAC

1. MAC owns or controls through statutory designation the property within the boundaries of the Airport (from approximately the fence line on the east to I-494 on the south) and property known as the "Ceridian Ballfields Property." The Ceridian Ballfields Property is more fully described as follows: 8001 – 28th Avenue South, Bloomington, Minnesota, Hennepin County Property Identification No. 01-027-24-14-0004. MAC will convey the necessary property interests to MnDOT and/or Met Council no later than the date by which MnDOT will issue notice to the D/B Contractor to proceed with construction on MAC

property, subject to Federal Aviation Administration (FAA) approval.

2. MAC also has an agreement pursuant to which MAC will become the owner of property known as the "Kelly Property," more fully described as follows: 8201 – 24th Avenue South, Bloomington, Minnesota, Hennepin County Property Identification No. 01-027-24-42-0006, and 8200 – 28th Avenue South, Bloomington, Minnesota, Hennepin County Property identification No. 01-027-24-42-0007. In the event that MAC acquires the Kelly Property prior to construction, it will convey the property interests necessary for construction and operation of the Project to MNDOT and/or Met Council subject to FAA approval. MAC anticipates that it will be in a position to convey necessary property interests on the Kelly Property to MNDOT and/or Met Council no earlier than January 18, 2001.

C. <u>MNDOT</u>

1. MNDOT has already acquired and now owns certain property interests necessary for the construction and operation of the Hiawatha Corridor LRT Project.

2. MNDOT has identified and will acquire the remaining property interests necessary for construction and operation of the Project pursuant to FTA requirements and regulations and in accordance with the following approximate schedule:

| TASK | COMPLETION DATE |
|---|---|
| Order Titles | September 1999 |
| Gather Market Data on Recorded Easements | October 1999 |
| Spot Titles | October 1999 |
| Lay Out New Right-of-Way | November - December 1999 |
| Field Title Reports | November 15 – December 1999 |
| Appraisals | December 1999 – Completed by April 30, 2000 |
| Complete Legal Descriptions | February 15, 2000 |
| Issue Commissioner's Orders | February 15 – March 15, 2000 |
| Prepare Documents | February 15 – March 15, 2000 |
| Direct Purchase | April - May 2000 |
| Relocation | April – August 2000 |
| Prepare Condemnation Petition | May 2000 |
| Eminent Domain Proceeding - 90 Day Notice | June 1, 2000 |

| | |
|---|---|
| Right-of-Entry | No later than October 1, 2000, except Kelly Property |

3. MNDOT and Met Council will enter into a Property Transfer Agreement ("MNDOT Property Transfer Agreement") which will contain terms and conditions and a schedule for transferring MNDOT's property interests or rights to operate the Project within MNDOT's property interests to Met Council. MNDOT will convey its property interests or provide rights to operate the Project to Met Council no later than the date by which MNDOT will issue notice to the D/B Contractor to proceed with construction of the Project.

4. MNDOT has retained a consultant to assist the permanent project management team in determining a possible solution for relocation of all utilities affected by the Project. The Parties agree to cooperate with MNDOT's consultant in preparation of the utility relocation plan and to cooperate with MNDOT and each other in the timely implementation of the utility relocation plan.

D. Minneapolis

1. Minneapolis has street right-of-way necessary for construction and operation of the Project. MNDOT will gain access to street right-of-way via issuance of Commissioners orders. Minneapolis will convey access to or interest in Minneapolis street right-of-way to Met Council necessary for operation and maintenance of the Project.

E. Bloomington

1. Bloomington has some of the street right-of-way on 34th and 28th Avenues necessary for construction and operation of the Hiawatha Corridor LRT Project. MNDOT will gain access to street right-of-way via issuance of Commissioner's Orders. Bloomington will convey the right-of-way interests necessary for operation and maintenance of the Project. to Met Council.

2. Bloomington will contribute information and will help coordinate the right-of-way and/or easement acquisition within its city limits but does not intend to acquire additional right-of-way for the Project.

F. Unless otherwise stated in this Agreement, or unless otherwise required by federal regulations applicable to the Airport, the property transfers described in this Paragraph II of this Cooperation Agreement will be at no cost to the transferee. With respect to property already acquired for this Project, however, the property acquisition costs are included in the Project budget and will be treated as part of the local share, subject to FTA approval.

## III.
## ENVIRONMENTAL REMEDIATION

A. MNDOT has completed a Phase I environmental assessment for the entire Hiawatha Corridor LRT Project.

B. Except for the tunnel and station construction done by MAC at the Airport ("MAC Project") as more fully described in a construction agreement to be entered into between MAC, MNDOT and Met Council ("MAC Construction Agreement") and the Yards and Shop Site, the D/B Contractor will be responsible for any Phase II environmental assessments, remediation action plans and governmental approvals necessary for construction of the Project. Except for the MAC Project, the D/B Contractor will be responsible for all necessary cleanup for the entire alignment, including the Yards and Shop Site.

C. The MNDOT Property Transfer Agreement will contain mutually acceptable provisions which address how MNDOT and Met Council will:

a. review and approve the Phase I and Phase II environmental assessments and remediation action plans for the entire Hiawatha Corridor LRT Project alignment, except for the Airport;

b. monitor the cleanup for the entire Hiawatha Corridor LRT Project alignment to determine that the cleanup is done in accordance with the approved remediation action plan, except for the Airport; and

c. provide noise mitigation at the north end of the Yards and Shop Site.

D. MAC will be responsible for any Phase II environmental assessments, remediation action plans, governmental approvals and cleanup necessary for construction of the Project within the boundaries of the MAC Project as described in the MAC Construction Agreement.

## IV.
## FINANCING OF THE HIAWATHA CORRIDOR LRT PROJECT

A. The Budget for the Hiawatha Corridor LRT Project dated September 2?, 1999, ("Project budget") is attached hereto and incorporated herein as Exhibit A. The Parties agree that amendments to the budget will be adopted in accordance with the Project Budget amendment procedure set forth in the Project Management Plan referred to in Paragraph V.B.1. of this Cooperation Agreement.

The Project Budget and any subsequent amendments must be approved by the Federal Transit Administration ("FTA") as part of the Full Funding Grant Agreement ("FFGA").

It will also be the responsibility of Met council, as the grantee in the FFGA, to ensure that subsequent budget amendments and project changes are communicated to the FTA. As

such, it will be the responsibility of Met council to review and inform the federal government of all changes in scope, budget and project. It will be the responsibility of the various Parties to this Agreement to ensure that all amendments are communicated to Met Council in a timely fashion to ensure this compliance with federal regulations.

B. Met Council has developed a Financial Plan, subject to FTA approval, attached hereto as Exhibit B and is responsible for financial management of the Project, including coordination, arrangement for and consolidation of Project funding from federal and local government sources.

The financial management of the Project has two components:

1. Actual Flow of Funds:

a. The State share of the Project will be applied to right-of-way acquisition or paid directly by MnDOT to the D/B Contractor and other contractors in accordance with FTA and State procedures or for MNDOT staffing costs directly incurred for this Project. The MAC share of the Project will be paid directly by MAC to its contractor(s) in accordance with MAC procedures.

b. The HCRRA and FTA funds will be paid to Met Council which will distribute the funds to (1) MNDOT for right-of-way acquisition and expenses, for payment to the D/B Contractor and other contractors and for payment of other Project expenses, all in accordance with the Master Cooperative Funding Agreements; (2) to other Parties for payment of Project expenses in accordance with the Master Cooperative Funding Agreements; and (3) will pay other costs directly, including but not limited to acquisition of rolling stock.

c. Minneapolis will pay for downtown Minneapolis station, light, sidewalk, and roadway enhancements along 5th Street and for "station only" enhancements in Minneapolis outside of the downtown area, said enhancements as identified and requested by Minneapolis. Station area and downtown corridor enhancements will be defined in a construction agreement to be entered into between MNDOT and Minneapolis. Pavement replacement and sidewalk restoration will generally not be considered an enhancement to the Project and outside of the Project Budget.

d. It will be the responsibility of Met council to develop a Master Cash Flow for the Project. This Master Cash Flow will show the annual appropriations needed to support the Project, the mix of funds for the various parts of the Project, and the timing for these funds. The Parties agree to provide funds on this schedule in accordance with the Master Cooperative Funding Agreements.

2. Actual Flow of Fund Information:

a. The Hiawatha Project Office (See Paragraph V.A.8 of this Agreement) has developed and implemented a Project Management Information System ("PMIS"), the sole purpose of which is to allow the Hiawatha Project Office to manage the Project by tracking the Project funds to assure that the funds are on budget.

b. Parties who have made in-kind expenditures to the Project or have made or are making Project expenditures from any source regardless of the source of funds or status of reimbursement will provide the information about those expenditures to the Met Council in the work-breakdown structure required by Met Council accounting staff on the submission timeline established by the Met Council. The Hiawatha Project office will receive these costs from Met Council for the PMIS.

c. Met Council will have the sole responsibility for provision of Project expenditure reporting information to the FTA and the Parties.

d. Met Council, the State Auditor, the Legislative Auditor and the MNDOT Auditor will have responsibility for audit functions.

C. The Parties are anticipating that at least 50% of the Project will be funded through a FFGA with the FTA.

D. Met Council

1. Met Council is the Grantee of the federal funds. As Grantee, Met Council will conduct negotiations with FTA and will submit all components of the grant application to the FTA. As Grantee, Met Council is required, irrespective of the participation of other parties, to ensure that the Hiawatha Corridor LRT Project is carried out in compliance with federal requirements and regulations. Met Council, as Grantee, has the primary responsibility to comply with federal requirements. Accordingly, Met Council will ensure that the Parties comply with applicable federal statutes, regulations and directives.

2. Met Council will be responsible for maintaining the official and complete accounting records for the Project. It will provide to the other Parties the structure for coding and tracking expenditures. This coding will be used for costs incurred for the Project regardless of source of funds or repayment status.

3. Met Council will act as the FFGA Administrator. As Grant Administrator, Met Council has entered into or will enter into Master Cooperative Agreements ("Master Cooperative Funding Agreements") with MNDOT, MAC, HCCRA, Minneapolis, and the Minneapolis Community Development Agency which provide a method of transfer of funds to those Parties through separate Funding

Agreements. Copies of the Master Cooperative Funding Agreements are attached hereto and incorporated herein as Exhibit C.

4. As required by Minnesota Statutes §473.3994, Subd. 9 Met Council has reviewed and evaluated the estimates of the operating subsidy which will be required to operate the Hiawatha Corridor LRT Project in each of its first ten years of operation with regard to the effect of operating the Light Rail Transit facility on the currently available mechanisms for financing transit in the metropolitan area. The Council's evaluation and finding on the operating subsidy is included in the Financial Plan attached hereto as Exhibit B which is subject to FTA approval.

E. MnDOT

The Minnesota State Legislature has approved $100,000,000 as the State share of the Project. This is in addition to the State's in-kind contribution of $17,300,000.

F. MAC

1. As a result of the benefits the light rail line will provide to the Airport, MAC has allocated funding toward the Project. It is expected that a significant number of riders will come to and from the Airport stations and will use the line as a means of riding between the two Airport stations. Funding by MAC would be limited to the two stations, portions of the civil construction elements of the tunnel under the runways and terminal, the provision of right-of-way through Airport property including the Ceridian Ballfields Property and the Kelly Property, and public utility relocation within the boundaries of the Airport and private utility relocation within the boundaries of the MAC Project at a cost of up to $70,000,000.

2. In order to provide this level of funding for implementation of the Hiawatha Corridor LRT Project, FAA review and approval to ensure compliance with FAA revenue diversion requirements has been requested. The funding previously identified by MAC would come from general Airport revenues; neither federal aid nor Passenger Facility Charges would be used to fund the Project. MAC's obligation to fund the Project is limited to Project elements and costs the FAA deems eligible for the use of general airport revenues.

G. HCRRA

1. Pursuant to 51-HCRRA-99, HCRRA approved an expenditure of up to $70,000,000 for the design and construction of the Hiawatha Corridor LRT Project with $2,250,000 approved in 1998, constituting the initial appropriation. This is in addition to $17,000,000 attributable to HCRRA for prior right-of-way acquisition and engineering. A portion of the HCRRA contribution will come from cash reserves.

2. The balance of the HCRRA commitment will be supported by future property tax levies. The total annual levy capacity of HCRRA in 1999 is $29,500,000.

Although a maximum levy could fulfill the HCRRA commitment in three years, HCRRA is considering both cash payments and bonding of the non-cash portion. Bond pay back could be accomplished without increasing the current annual levy of $4,700,000.. HCRRA set its maximum property tax levy at $4,700,000 for 2000 on August 31, 1999.

## V.
## CONSTRUCTION AND OPERATION OF THE HIAWATHA CORRIDOR LRT PROJECT

A. MNDOT

1. MNDOT has prepared the preliminary design plan and the preliminary engineering and, except for the tunnel and station construction done by MAC at the Airport, which construction is more fully described in the MAC Construction Agreement, MnDOT has the responsibility to prepare the final design and engineering plans and obtain the local approvals and permits deemed necessary by the Parties all as required by Minnesota Statutes §473.3993 and §473.3994. Where compliance with building, mechanical, electrical, elevator, fire or other construction code is required by the laws of the State of Minnesota, and the enforcement has been delegated by the State of Minnesota to another Party, MNDOT and/or its D/B Contractor will prepare permit applications, and pay, for any and all permits normally required by the Party for work regulated by the code(s).

   a. Except for the Airport, MNDOT, or its D/B Contractor will acquire elevator/escalator permits for all stations with elevators or escalators. MNDOT, or its D/B Contractor will also acquire any building permits required by the State of Minnesota for the Platform canopies and the vehicle maintenance building. MNDOT, or its D/B Contractor will submit plans of these structures to the permitting agency for review. MNDOT, or its D/B Contractor will not prepare local building permit applications for state-owned buildings located in Bloomington or Minneapolis, except as required above.

   b. MNDOT, or its D/B Contractor, will acquire building permits for structures that are built on privately-owned land. The only structure to which this clause applies is the skyway structure between the Mall of America station and the Mall of America parking ramp.

   c. MAC and its contractors will acquire all permits necessary for construction on MAC-owned property.

2. MNDOT has updated the environmental documentation required by state and federal law and has submitted the documentation to the FTA.

3. Except for the tunnel and station construction done by MAC at the Airport, (as more fully described in the MAC Construction Agreement.) the Hiawatha Corridor

LRT Project will be designed and built by a D/B Contractor under contract to MNDOT. The Project will be designed and built in accordance with the schedule attached hereto and incorporated herein as Exhibit D. The schedule is subject to FTA approval.

4. Except for the tunnel and station construction done by MAC at the Airport, as more fully described in the MAC Construction Agreement, the D/B Contractor will design and build any and all physical structures, elements and components of the system, which include, but are not limited to, light rail trackway (*e.g.* rail, ties, ballast, trackbeds and drainage facilities), roadways, communications systems, overhead contact system, bike lanes, signals, lighting, sidewalks, passenger stations, structures, certain public utilities set forth in this Agreement, soundwalls and landscaping, public art and artist designed aesthetic enhancements. During construction, MNDOT will ensure that the D/B Contractor maintains all construction facilities within the Project limits. Tunnel and station construction at the Airport and related issues will be handled in the MAC Construction Agreement between Met Council, MNDOT and MAC.

5. MNDOT will include in the final Project design plans, necessary and appropriate, as determined by the Fire/Safety Committee established by the Parties in Paragraph V.D of this Agreement, safety features, such as security fences, for the station platform, skyway and electrical substation structures.

6. The design/build contract awarded by MNDOT for the construction of the Project shall include clauses that will include all federal and state required contract clauses including but not limited to FTA third party contracting requirements of FTA Circular No. 4220.1D.

7. MNDOT is responsible for project management. MNDOT has retained Parsons, Brinckerhoff, Quade & Douglas, Inc. ("Project Manager") to provide management services for the successful final design and construction the Project.

8. The Parties have established a Hiawatha Project Office which is staffed by the Parties to accomplish and ensure successful construction and implementation of the Project in accordance with the construction schedule attached hereto as Exhibit D.

   a. The Hiawatha Project Office organization chart and key staff is attached hereto and made a part hereof as Exhibit E.

9. The Parties agree to coordinate and cooperate with MNDOT, the Project Manager and the D/B Contractor in the design and construction of the Project.

B. <u>Met Council</u>

1. Met Council has prepared the initial Project Management Plan ("PMP") which must be approved by FTA. The Parties agree that the PMP and any subsequent

amendments to the PMP adopted in accordance with the amendment procedure set forth in the PMP, the provisions of which are fully incorporated in this Agreement, sets forth the decision-making structure for the Project. The Parties further agree to cooperate with Met Council and the Project Manager in the implementation of the Project Management Plan.

2. Met Council will purchase the rolling stock in accordance with the schedule set forth in Exhibit D. Met Council has issued a Solicitation Package for twenty-two (22) low-floor light rail vehicles, option vehicles, materials and services.

3. Upon acceptance of the work done under the Design/Build Contract in accordance with its terms and the terms of this Cooperation Agreement, Met Council will become the owner and retain custody and control of all Project facilities except that MAC will retain ownership of all MAC funded elements and will become the sole beneficiary of all contractor supplied warranties and guarantees pertinent to such facilities.

4. The MNDOT Property Transfer Agreement will contain terms and conditions and a schedule for transfer of the ownership of the Project facilities, warranties and guarantees from MNDOT to the Met Council.

5. The MNDOT Property Transfer Agreement will contain terms and conditions and a schedule for system testing and the transition from construction to operation of the Project.

6. Met Council will conduct system testing and other procedures necessary for the transition from the completion of construction to the start-up and operation of the Project.

7. Met Council will operate the Hiawatha Corridor LRT. Met Council will plan and implement activities normally associated with operations such as establishing fare policies, operating policies, practices and standards, employee training and marketing and customer relations.

8. Met Council will enter into individual operation and maintenance cooperative agreements with the Parties to this Agreement and other parties, including Hennepin County, to define the operational and maintenance responsibilities of each party including security and signal preemption, to ensure the safety of passengers, pedestrians, vehicles and the light rail system itself.

   a. Met Council anticipates entering into individual operation and maintenance cooperative agreements with MAC, Minneapolis, Bloomington, Hennepin County, the General Services Administration, the Department of Veterans Affairs, the U.S. Air Force/Air Guard, and the U.S. Navy.

C. MAC

1. The tunnel and stations at the Airport will be designed and built by contractor(s) under contract to MAC. The tunnel and stations will be designed and built in accordance with the terms and conditions of the MAC Construction Agreement to be entered into between MAC, MNDOT and Met Council with respect to design and construction of the tunnel and stations at the Airport and in accordance with the schedule attached as Exhibit D. The schedule is subject to FTA approval.

2. Unless required by federal or state law, MAC agrees that any construction contracts let by MAC for construction of the tunnel and stations shall be pursuant to MAC's standard contracting procedures.

3. MAC will own all the items and structures on which Airport revenue is expended, including but not limited to the tunnel structure going under the Airport and the loading platforms, canopies, barrier, railing, escalators, pedestrian access/walkways, special handicapped access facilities, lighting, and all functional and architectural features of the Lindbergh Terminal Station and HHH Terminal Station, all as more fully described the MAC Construction Agreement and/or the Operation and Maintenance Agreement between MAC and Met Council to be entered into between MAC, MNDOT and Met Council. The station boundaries will include road barriers and will extend up to the edge of the trackway.

D. Fire/Life Safety Committee

1. The Parties have established a Fire/Life Safety Committee ("FLSC") to facilitate the interchange of information between and among Met Council and the other fire and police service providers along the Hiawatha LRT Corridor. The charter of the FLSC is attached hereto and incorporated herein as Exhibit F. The FLSC will:

   a. Provide comments on all fire, safety, and security plans/procedures.

   b. Review documentation relative to the LRT facilities and systems for compliance with fire/life safety standards and all other federal, state and local regulations.

   c. Promulgate and maintain fire/life safety criteria.

   d. Support the inspection of transit system elements for compliance with established fire/life safety criteria.

   e. Participate in the planning, performance, and evaluation of emergency simulations on the system.

   f. Resolve fire/life safety issues.

2. The FLSC will continue to meet throughout the design, construction, testing, startup and operation of the Hiawatha LRT Line.

3. Members of the FLSC include representatives of MNDOT, Met Council, Minneapolis, City of St. Paul, Bloomington, MAC, the Minnesota State Patrol and Hennepin County.

## VI.
## OTHER ISSUES

A. Litigation – The Master Cooperation Funding Agreements, copies of which are attached to this Agreement as Exhibit C contain provisions with respect to litigation.

B. Transit – Oriented Development

1. The Parties agree to cooperate with each other in order to facilitate transit-oriented development in such areas as the Downtown East Station, Franklin Avenue Station, Hiawatha and Lake Street Stations, and the Yards and Shops Site.

2. Met Council has set aside $5,000,000 dedicated to land assembly to achieve transit oriented development. This $5,000,000 is outside of the Project budget.

3. Minneapolis has approved $4,000,000 to support redevelopment initiative around the Hiawatha Corridor LRT stations, including land acquisition of public improvements and amenities in close proximity to stations within Minneapolis. This $4,000,000 is outside of the Project budget.

C. Conflict Resolution - If a dispute should arise between or among the Parties to this Agreement with respect to this Agreement or any of its provisions, the Parties involved agree to attempt to settle such dispute through the use of a mediator mutually acceptable to the Parties involved in the dispute prior to initiation of the dispute resolution procedure in Minnesota Statutes 473.3994, Subd. 13 or any legal action on the part of any of the Parties involved in the dispute with respect to this Agreement, any of its provisions and/or its enforcement. The costs of such mediation shall be shared in accordance with an amendment to this Agreement entered into prior to mediation which specifically addresses the responsibility of each Party for the expenses of such mediation.

D. Master and Subsequent Agreements – The Parties to this Cooperation Agreement have entered into and will enter into the following sets of Agreements:

1. Met Council has entered into or will enter into Master Cooperative Funding Agreements with MNDOT, MAC, HCRRA, Minneapolis and Minneapolis Community Development Agency, attached as Exhibit C.

2. MNDOT, Met Council, MAC, HCRRA, Minneapolis and Bloomington have entered into this Master Cooperation Agreement.

3. MNDOT and Met Council, jointly, will, at the same time as or subsequent to the Master Cooperation Agreement, enter into individual agreements with MAC, HCRRA, Minneapolis and Bloomington to supplement the terms of the Master Cooperation Agreement as they apply to MAC, HCRRA, Minneapolis and Bloomington individually.

   a. If a conflict arises between this Master Cooperation Agreement and the individual supplementary agreement or agreements, the terms of the individual supplementary agreement will prevail, provided, however, that the method outlined in Paragraph VI.C. of this Master Cooperation Agreement to resolve conflicts will be the method used to resolve the conflict between the terms of the Master Agreement and the terms of the supplementary agreement.

   b. A list of the individual supplementary agreements is attached to and made a part hereof as Exhibit G.

4. Subsequent to this Master Cooperation Agreement and to the individual supplementary agreements, two or more Parties will enter into agreements on such topics as construction and property transfer. A list of these subsequent Agreements to the Master cooperation Agreement is attached hereto and made a part hereof as Exhibit G.

5. The Parties anticipate that MNDOT may enter into a joint powers agreement with one or more of the Parties which will contain terms and conditions with respect to issuance of building permits for the Project.

E. Insurance. – The various Property Transfer Agreements and Construction Agreements entered into pursuant to this Master Cooperation Agreement will contain terms and conditions for provision of adequate insurance coverage for the Parties during construction of the Project.

## VII.
## GENERAL COOPERATION

The parties to this Cooperation Agreement agree that their overall goal is the successful design, construction, implementation and operation of the Hiawatha Corridor LRT Project, and to that end each Party agrees to cooperate with all other Parties and their consultants and to cooperate and coordinate with the Project Manager, Design Construction Committee and the Hiawatha LRT Board in order to ensure timely completion of this Project.

## VIII.
## GENERAL PROVISIONS

A. Employees – All employees of each Party and all persons engaged by each Party in the performance of any work or services required or provided for herein to be performed by

each Party shall not be considered employees of any other Party and that any and all claims that may or might arise under the Worker's Compensation Act or the Unemployment Compensation Act of the state of Minnesota on behalf of said employees while so engaged, and any and all claims made by any third parties as a consequence of any act or omission on the part of said employees while so engaged, on any of the work or services provided to be rendered herein, shall in no way be the obligation or responsibility of any other Party.

B. Applicable Provisions of Law – The Parties agree to comply with applicable provisions of Minnesota state law, federal law and regulations and of any applicable local ordinances which shall be considered a part of this Agreement as though fully set forth herein.

C. Entire Agreement – It is understood and agreed that the entire Agreement between the Parties is contained herein and that this Agreement supersedes all oral agreements and negotiations between the Parties relating to the subject matter hereof. All items referred to in this Agreement are incorporated or attached and are deemed to be part of this Agreement. Any alterations, variations, modifications, or waivers of provisions of this Agreement shall only be valid when they have been reduced to writing as an amendment to this Agreement signed by the parties hereto.

D. Severability – The provisions of this Agreement shall be deemed severable. If any part of this Agreement is rendered void, invalid, or unenforceable, such rendering shall not affect the validity and enforceability of the remainder of this Agreement unless the parts which are void, invalid or otherwise unenforceable shall substantially impair the value of the entire Agreement with respect to the Parties. One or more waivers by said Party of any provision, term, condition or covenant shall not be construed by the other Parties as a waiver of a subsequent breach of the same by other Parties.

E. Governing Law – This Agreement is entered into in and under the laws of the state of Minnesota and shall be interpreted in accordance therewith.

F. Notices – Any notice or demand, which may or must be given or made by a Party hereto, under the terms of this Agreement or any statute or ordinance, shall be in writing and shall be sent certified mail or delivered in person to the other Parties as follows:

| | |
|---|---|
| MnDOT<br>Metro Division Engineer<br>1500 West County Road B-2Roseville, MN 55143 | HCRRA<br>Executive Director of HCRRA<br>A2300 Hennepin County Government Center<br>Minneapolis, MN 55487 |

MET COUNCIL
Regional Administrator
Metropolitan Council
230 East Fifth Street
St. Paul, MN 55101

MINNEAPOLIS
Director of Public Works
203 City Hall
Minneapolis, MN 55415

MAC
Executive Director
Metropolitan Airports Commission
6040 28th Avenue South
Minneapolis, MN 55450

BLOOMINGTON
City Manager
2215 West Old Shakopee Road
Bloomington, MN 55431

G. Contract Administration – In order to coordinate the activities of the Parties so as to accomplish the purposes of this Agreement, the following individuals, or their designees or successors shall manage this Agreement on behalf of the Parties.

MNDOT

Director, Metro Office of Rail Transit
1500 West County Road B-2
Roseville, MN 55113

HCRRA
Executive Director of HCRRA
A2300 Hennepin County
Government Center
Minneapolis, MN 55487

MET COUNCIL
General Manager
Metro Transit
Heywood Office
560 Sixth Avenue North
Minneapolis, MN 55411

MINNEAPOLIS
Director of Public Works
203 City Hall
Minneapolis, MN 55415

MAC
Deputy Executive Director
Planning and Environment
Metropolitan Airports Commission
6040 – 28th Avenue South
Minneapolis, MN 55450

BLOOMINGTON
City Manager
2215 West Old Shakopee Road
Bloomington, MN 55431

H. Availability of Records – The Parties agree that each Party hereto, the Legislative Auditor, the State Auditor, or any of their duly authorized representatives at any time during normal business hours, and as often as they reasonably deem necessary, shall have access to and the right to examine, audit, excerpt, and transcribe any books, documents, papers, or records, which are pertinent to the accounting practices and procedures of the other party hereto and involve transactions relating to this Agreement for a minimum of six years from the expiration of this Agreement.

I. Data Privacy – The Parties agree to abide by all applicable state and federal laws and regulations and confidential information concerning individuals and/or data including, but not limited to, information made non-public by such laws or regulations.

J. This Agreement shall take effect upon execution by all of the Parties hereto and by proper state officials and shall remain in effect until the FFGA is closed out by the FTA.

K. The Parties to this Agreement may mutually agree to cancel this Agreement prior to its termination pursuant to Paragraph VIII.J. of this Agreement.

**IN TESTIMONY WHEREOF,** the Parties hereto have caused this Agreement to be executed by their respective duly authorized representatives.

MINNESOTA DEPARTMENT OF TRANSPORTATION

By__________________

Its__________________

Date__________________

HENNEPIN COUNTY REGIONAL RAILROAD AUTHORITY

By [signature]

Its Vice Chair

Date 12/14/99

By [signature]

Its Executive Director

Date 12/14/99

Approved as to Execution:
Date:__________________

__________________
Assistant Hennepin County Attorney

Approved as to Form:
Date: 12/14/99

[signature]
Assistant Hennepin County Attorney

OFFICE OF THE ATTORNEY GENERAL

By____________________

Its____________________

Date____________________

METROPOLITAN COUNCIL

By [signature]

Its Regional Admin

Date 12-16-99

Approved as to form:

____________________

Associate General Counsel

METROPOLITAN AIRPORTS COMMISSION

By [signature]

Its Chairman

Date 12-20-99

DEPARTMENT OF ADMINISTRATION

By____________________

Its____________________

Date____________________

CITY OF MINNEAPOLIS

By____________________
Its Mayor

Attest____________________
Its Assistant City Clerk

Date____________________

Approved as to form:

[signature]
Office of City Attorney

CITY OF BLOOMINGTON

By [signature]

Its____________________

Date____________________

Approved as to form:

[signature]
Office of City Attorney

# EXHIBIT A

PROJECT BUDGET

# EXHIBIT B

FINANCIAL PLAN

# EXHIBIT C

MASTER COOPERATIVE FUNDING AGREEMENTS

# EXHIBIT D

PROJECT SCHEDULE

NOTE: THIS EXHIBIT IS THE SCHEDULE INCLUDED IN THE D/B PHASE I RFP

# EXHIBIT E

HIAWATHA PROJECT OFFICE ORGANIZATION CHART

# EXHIBIT F

FIRE/LIFE SAFETY COMMITTEE CHARTER

# EXHIBIT A

## PROJECT BUDGET – SEPTEMBER 29, 1999

| | |
|---|---|
| **Guideway Elements** | **113,806,098** |
| **Stations** | **60,750,747** |
| **Yard and Shops** | **30,436,475** |
| **Special Conditions** | **16,300,048** |
| **Systems** | **56,433,999** |
| **Vehicles** | **82,653,100** |
| **Right-of-Way** | **16,825,074** |
| **Soft Costs** | **87,098,011** |
| **Escalation** | **39,994,129** |
| **In-kind Contributions** | **34,257,319** |
| | **548,555,000** |

# EXHIBIT G

## LIST OF FUTURE AGREEMENTS TO BE ENTERED INTO BETWEEN AND AMONG THE PARTIES TO THIS COOPERATION AGREEMENT

LIST OF INDIVIDUAL SUPPLEMENTARY AGREEMENTS TO BE ENTERED INTO BETWEEN AND AMONG MNDOT, MET COUNCIL AND INDIVIDUAL PARTIES

1. MNDOT, Met Council and MAC
2. MNDOT, Met Council and HCRRA
3. MNDOT, Met Council and Minneapolis
4. MNDOT, Met Council and Bloomington

Anticipated Date of Execution of the above agreements – By December 31, 1999

## I. MAC AGREEMENTS

### A. MAC Property Transfer Agreement

a. Parties – MAC, MNDOT, and Met Council

b. Provisions - Terms and conditions including insurance coverage provisions and a schedule for conveyance of the right-of-way interests necessary for construction and operation of the Project to MNDOT and Met Council.

c. Anticipated Date of Execution – By March 31, 2000

### B. MAC – MNDOT – Met Council – Construction Cooperation Agreement

1. Parties – MAC, MNDOT, Met Council

2. Provisions - Terms and conditions including a schedule for construction of the Project at the Airport, for public utility relocation within the airport and coordination of private utility relocation within the boundaries of the MAC Project, provisions on how MAC will perform and Met Council will review and approve the Phase II environmental assessments and remediation action plans that are required at the Airport and insurance coverage provisions with respect to construction of the Project, including the MAC Project, within the Airport property.

3. Anticipated Date of Execution – By January 31, 2000

C. **MAC – Met Council Master Cooperative Funding Agreement**

1. Parties – MAC and Met Council

2. Provisions – Terms and conditions including a mechanism for transfer of funds, from Met Council to MAC.

3. Anticipated Date of Execution – By January 31, 2000

## II MNDOT AGREEMENTS

A. **MNDOT Property Transfer Agreement**

1. Parties – MNDOT, Met Council

2. Provisions

   a. Terms and conditions including insurance coverage provisions and a schedule for either a transfer to Met Council of MNDOT's right-of-way interests or a provision for transfer to Met Council of operating rights within MNDOT's right-of-way necessary for operation of the Project.

   b. Provisions which address how MNDOT and Met Council will review and approve the environmental assessments and remediation action plans and monitor the cleanup for the entire Project alignment, including the Yard and Shops Site.

   c. Assignment of MNDOT's rights in the HCRRA eminent domain proceeding and the escrow balance to the Met Council.

   d. Terms and conditions and a schedule for system testing and the transition from construction to operation of the Project.

3. Anticipated Date of Execution – By March 31, 2000

B. **Hennepin County – MNDOT Construction Agreement**

1. Parties – Hennepin County, MnDOT

2. Provisions – Terms and conditions including insurance coverage provisions related to Hennepin County traffic signals

3. Anticipated Date of Execution – By January 31, 2000

## III. HCRRA AGREEMENTS

### A. HCRRA Property Transfer Agreement

1. Parties – HCRRA, MNDOT, Met Council

2. Provisions - Terms and conditions including insurance coverage provisions and a schedule for conveyance of necessary HCRRA property interests to MNDOT and/or Met Council for construction and operation of the Project.

3. Anticipated Date of Execution – By March 31, 2000

### B. HCRRA Assignment Agreement

1. Parties – HCRRA, MNDOT

2. Provisions - Assignment of HCRRA's rights and obligations in the eminent domain proceeding to MNDOT.

3. Anticipated Date of Execution – By December 31, 1999

## IV. MINNEAPOLIS AGREEMENTS

### A. Minneapolis Transfer Agreement

1. Parties – Minneapolis, Met Council

2. Provisions – Terms and conditions including insurance coverage provisions and a schedule for transfer to Met Council of an interest in the Minneapolis right-of-way or for a grant of access to Minneapolis right-of-way necessary for operation of the Project.

3. Anticipated Date of Execution – by March 31, 2000

### B. Minneapolis - MNDOT Construction Agreement

1. Parties – Minneapolis, MNDOT

2. Provisions

   a. Terms and conditions including insurance coverage provisions and a schedule for construction by Minneapolis of the enhancements to stations, etc. and provisions and schedule for payment of the enhancements by Minneapolis.

b. Terms and conditions and a schedule for physical relocation of utilities and traffic signals throughout the alignment in Minneapolis.

3. Anticipated Date of Execution – January 31, 2000

## V. MET COUNCIL OPERATION AND MAINTENANCE AGREEMENTS

1. Parties – Met Council and MAC;
Met Council and Minneapolis
Met Council and Bloomington
Met Council and Federal General Services Administration
Met Council and U.S. Department of Veterans Affairs
Met Council and U.S. Air Force/Air National Guard
Met Council and U.S. Navy
Met Council and Hennepin County

2. Provisions - Terms and conditions to define the operational and maintenance responsibilities of each party, including signal preemption, and the Airport tunnel, to ensure the safety of passengers, pedestrians, vehicles and the LRT system itself. Issues to be addressed will include maintenance of the stations, sidewalks and lighting, traffic signals, train frequency, emergency preemption of the system, protocol for utility emergency situations and insurance coverage.

3. Anticipated Dates of Execution – July 1, 2000

## VI. PARKING AGREEMENT

1. Parties – Minneapolis, MNDOT, Met Council, Hennepin County

2. Provisions – Terms and conditions with respect to issues of replacement of handicapped parking near the Metrodome and protection of residential areas and parking of local businesses from impacts of light rail patron parking. This agreed upon protection, possibly including a form of permit parking, shall be in place prior to opening of the Project for revenue service.

3. Anticipated Date of Execution – By July 1, 2000

## VII. JOINT POWERS AGREEMENTS FOR BUILDING PERMITS

1. Parties – MNDOT, MAC, Minneapolis, Bloomington

2. Provisions – Terms and conditions with respect to issuance of building permits.

3. Anticipated Date of Execution – By July 1, 2000.

T&PW – Your Committee, having under consideration the Hiawatha Corridor Light Rail Transit Project and execution of agreements setting forth the terms and conditions of cooperation between the City and various parties associated with the implementation of the project, now recommends that the proper City officers be authorized to execute the following:

a) The Hiawatha Corridor Light Rail Transit Master Project Cooperation Agreement (as contained in Petn No 265447 on file in the Office of the City Clerk) between the Minnesota Department of Transportation, the Metropolitan Council, the Metropolitan Airports Commission, the Hennepin County Regional Railroad Authority, the City of Minneapolis and the City of Bloomington; and

b) The Hiawatha Corridor Light Rail Transit Supplementary Project Cooperation Agreement (as contained in Petn No 265447 on file in the Office of the City Clerk) between the Minnesota Department of Transportation, the Metropolitan Council and the City of Minneapolis.

Adopted. Yeas, 13; Nays none.
Passed December 17, 1999.
Approved December 23, 1999.
S. Sayles Belton, Mayor.
Attest: M. Keefe, City Clerk.

# HIAWATHA CORRIDOR LIGHT RAIL TRANSIT SUPPLEMENTARY PROJECT COOPERATION AGREEMENT MET COUNCIL, MNDOT & MINNEAPOLIS

This is a Cooperation Agreement ("Cooperation Agreement"), made and entered into by and between the State of Minnesota through its Commissioner of Transportation ("MNDOT"), the Metropolitan Council ("Met Council") and the City of Minneapolis ("Minneapolis"), collectively referred to as the "Parties."

The purpose of this Cooperation Agreement is to supplement the Master Project Cooperation Agreement ("Master Cooperation Agreement") by setting forth the specific responsibilities agreed to be undertaken by each of the Parties with respect to the Hiawatha Corridor Light Rail Transit Project ("Hiawatha Corridor LRT Project" or "Project").

## AGREEMENT

For mutual valuable consideration, the sufficiency of which has been agreed to by the Parties, Met Council, MNDOT and Minneapolis agree as follows:

## I
## LOCAL APPROVALS

As required by Minnesota Statutes §473.3994, Subdivision 3, Minneapolis has held a public hearing on the physical component of the preliminary design plans for the Hiawatha Corridor LRT Project on September 16, 1999. Minneapolis has approved the preliminary design plans for the Project by Resolution No. 99-R-336 passed by the Minneapolis City Council on September 24, 1999.

## II
## ACQUISITION OF LAND, EASEMENTS, RIGHT-OF-WAY

1. Minneapolis has right-of-way necessary for construction and operation of the Project.

   a. Minneapolis and Met Council will enter into a Transfer Agreement ("Minneapolis Transfer Agreement") which will contain terms and conditions and a schedule for transferring access to or interest in Minneapolis right-of-way to Met Council for operation and maintenance of the Project.

   b. The Minneapolis Transfer Agreement will provide that such transfer to Met Council of rights in or access to Minneapolis rights-of-way for operation and maintenance of the Project will be without payment to Minneapolis of any fee or any other kind of payment for the rights or access and will occur prior to the date by which MNDOT will issue notice to the D/B Contractor to proceed with construction of the Project.

   c. The Minneapolis Transfer Agreement will further provide that if the Project does not proceed as planned, for any reason, Minneapolis' obligation to convey the

interests in or grant of use of Minneapolis' right-of-way will terminate or the already conveyed rights will revert back to Minneapolis.

2. Minneapolis is not responsible for acquiring any additional right-of-way for the Project. Minneapolis may, however, acquire the entire block bounded by Park Avenue, 4th Street, Kirby Puckett Place and 5th Street in order to facilitate development of that block and in order to ensure that appropriate underground construction is completed prior to the Downtown East Station being built and the LRT tracks being constructed. If so, Minneapolis, Met Council and/or MNDOT will enter into an agreement for the ultimate ownership of the above-described block and, if owned by Minneapolis, Minneapolis will agree to transfer the necessary property interests to MNDOT and/or Met Council for construction and operation of the Project.

   a. The above provision does not preclude MNDOT and/or Met Council from acquiring by October 1, 2000, the property interests necessary for construction and operation of the Project.

3. MNDOT will coordinate the physical relocation of the private utilities outside the boundaries of the MAC Project as defined in the MAC, MNDOT and Met Council Construction Agreement within the time frame required by MNDOT's D/B Contractor. As more fully defined in the construction agreement to be entered into between MNDOT and Minneapolis pursuant to Paragraph IV.5. of this Agreement, Minneapolis will assist MNDOT in coordinating the private utility relocation, including issuing orders to private utilities to relocate. Minneapolis will retain the right to approve the new location of the relocated utilities and traffic signals on Minneapolis City street right-of-way.

4. Minneapolis will be responsible for the design and physical relocation of the public utilities, *i.e.* water, storm sewer, and sanitary sewer within the City of Minneapolis. Unless Minneapolis requests an enhancement, the aforementioned relocation of public utilities by Minneapolis, will be at no cost to Minneapolis. As more fully defined in the construction cooperation agreement to be entered into between MNDOT and Minneapolis pursuant to Paragraph IV.5 of this Agreement, Minneapolis will coordinate the relocation of its public utilities with MNDOT in order to complete the relocation when required by MNDOT's D/B Contractor. The D/B Contractor will be responsible for relocation of traffic signals. However, Minneapolis, at no cost to Minneapolis, will make all electrical and/or communications connections to the City's traffic signal control system.

5. MNDOT has retained a consultant to assist the permanent project management team in determining a possible solution for relocation of all utilities affected by the Project. Minneapolis agrees to cooperate with MNDOT's consultant in preparation of the utility relocation plan and agrees to cooperate with MNDOT and its agents in the timely implementation of the utility relocation plan.

6. The Construction Agreement to be entered into between MNDOT and Minneapolis pursuant to Paragraph IV. 5. of this Agreement will contain mutually agreed upon terms and conditions, a schedule for physical relocation of all public and private utilities and a liquidated damages clause by which Minneapolis will incur damages should the Project

be delayed and incur added cost due to the fault of Minneapolis and its employees, agents and contractors in failing to complete the relocation of its public utilities on time when the circumstances and conditions would have reasonably permitted such completion. Minneapolis will retain ownership of the modified or relocated Minneapolis utilities and traffic signals after construction is complete. In accordance with the operation and maintenance agreement to be entered into between Minneapolis and the Met Council pursuant to Paragraph IV.7, Met Council will operate, maintain and accomplish any future modification and reconstruction of the LRT in a manner that protects Minneapolis' public utilities and traffic signals at no cost to Minneapolis.

## III
## FINANCING OF THE HIAWATHA CORRIDOR LRT PROJECT

1. The Met Council has entered into Master Cooperative Funding Agreements with:

   a) Minneapolis effective May 25, 1999.

   b) Minneapolis Community Development Agency effective May 14, 1999.

2. Minneapolis will pay for station area and downtown corridor enhancements, which are over and above what is included in the Project and outside of the Project budget. Station area and downtown corridor enhancements will be defined in the Construction Cooperation Agreement to be entered into between MNDOT and Minneapolis. Pavement replacement and sidewalk restoration will generally not be considered an enhancement to the Project and outside of the Project budget.

3. Minneapolis and Met Council will develop a finance plan to underwrite the capital costs and operation of the Downtown Circulator Bus System, which is to be ready for operation at or before the opening of the Project.

4. Minneapolis will pay the local share of preliminary engineering costs for the reverse flow bus lane on 6th Street in Minneapolis, which is necessary to allow operation of Light Rail Transit on 5th Street. The remainder of the cost of the reverse flow bus lane may be paid for by federal funding previously designated for Central Corridor Preliminary Engineering, matched by Project funds or other Met Council funds if so determined under subsequent agreement by the Parties.

## IV
## CONSTRUCTION AND OPERATION OF THE HIAWATHA CORRIDOR LRT PROJECT

1. Minneapolis may request additional work outside the Project to enhance the stations, lights, sidewalks, and roadways, along 5th Street in downtown Minneapolis and, if the D/B Contractor performs the enhancements, Minneapolis will pay the differential cost of the enhancements directly to Met Council, as provided for in the Parties' Master Cooperative Funding Agreement.

2. Minneapolis may request and pay for "station only" enhancements within its jurisdiction and, if the D/B Contractor performs the enhancements, Minneapolis will pay the net additional cost of the "station only" enhancements directly to Met Council as provided for in the Parties' Master Cooperative Funding Agreement.

3. Minneapolis agrees to fund the electric power utilized during the operation of traffic signals that fall under the jurisdiction of Minneapolis and that involve Minneapolis public roadways. Met Council agrees to fund the electric power utilized during the operation of the railroad gated protection.

4. Met Council will be the primary agency responsible for LRT security systems and security operations. Minneapolis agrees to respond to requests for service at stations or for accidents along the tracks that are within Minneapolis city limits. Minneapolis will provide input on the security systems such as lighting, alarms, video surveillance, and communication methodology to Minneapolis police and fire via the Fire/Life Safety Committee as established in the Master Cooperation Agreement.

5. MNDOT and Minneapolis will enter into a construction cooperation agreement which will set forth terms and conditions and a schedule for the relocation of traffic signals, city watermains, storm sewers and sanitary sewer and construction by Minneapolis of the enhancements requested by Minneapolis. The construction cooperation agreement will also contain provisions and a schedule for payment for the enhancements to be built by the D/B Contractor.

6. MNDOT agrees to submit the conceptual design of the architectural elements for LRT station areas, architectural elements of electrical substations, architectural elements of the Yards and Shops structures and landscaping, and LRT overpass plans at Lake Street to the Minneapolis City Council for approval. Substantive differences between the City Council and MNDOT will be negotiated by the parties. It is understood by the parties that following good faith discussions, a decision by the Commissioner of Transportation will be final.

7. Minneapolis will enter into an operations and maintenance agreement with Met Council on such issues as maintenance of the stations, sidewalks and lighting, traffic control, traffic signal controls, train frequency, LRT emergency vehicle signal control protocol, conditions under which LRT headways may be reduced under 7½ minutes, the conditions the railroad style LRT preemption plan, the conditions under which light rail vehicle horns may be sounded, emergency preemption of the system, and protocol for utility emergency situations and LRT train control and traffic signal control issues and coordination.

## V
## CONFLICT RESOLUTION

This Cooperation Agreement represents the specific understanding between the Parties as it relates to the construction and operation of the Hiawatha Corridor LRT Project in the City of Minneapolis. Should a conflict arise between this Cooperation Agreement and the Master

Cooperation Agreement the provisions of this Agreement shall govern, provided, however, that the method outlined in Paragraph VI.C of the Master Cooperation Agreement to resolve conflicts will be the method used to resolve the conflict between the terms of the Master Cooperation Agreement and the terms of the Supplementary Agreement.

## VI
## GENERAL PROVISIONS

1. Employees – All employees of each Party and all persons engaged by each Party in the performance of any work or services required or provided for herein to be performed by each Party shall not be considered employees of any other Party and that any and all claims that may or might arise under the Worker's Compensation Act or the Unemployment Compensation Act of the state of Minnesota on behalf of said employees while so engaged, and any and all claims made by any third parties as a consequence of any act or omission on the part of said employees while so engaged, on any of the work or services provided to be rendered herein, shall in no way be the obligation or responsibility of any other Party.

2. Applicable Provisions of Law – The Parties agree to comply with applicable provisions of Minnesota state law, federal law and of any applicable local ordinances which shall be considered a part of this Agreement as though fully set forth herein.

3. Entire Agreement – It is understood and agreed that the entire Agreement between the Parties is contained herein and that this Agreement supersedes all oral agreements and negotiations between the Parties relating to the subject matter hereof. All items referred to in this Agreement are incorporated or attached and are deemed to be part of this Agreement. Any alterations, variations, modifications, or waivers of provisions of this Agreement shall only be valid when they have been reduced to writing as an amendment to this Agreement signed by the parties hereto.

4. Severability – The provisions of this Agreement shall be deemed severable. If any part of this Agreement is rendered void, invalid, or unenforceable, such rendering shall not affect the validity and enforceability of the remainder of this Agreement unless the parts which are void, invalid or otherwise unenforceable shall substantially impair the value of the entire Agreement with respect to the Parties. One or more waivers by said Party of any provision, term, condition or covenant shall not be construed by the other Parties as a waiver of a subsequent breach of the same by other Parties.

5. Governing Law – This Agreement is entered into in and under the laws of the state of Minnesota and shall be interpreted in accordance therewith.

6. Notices – Any notice or demand, which may or must be given or made by a Party hereto, under the terms of this Agreement or any statute or ordinance, shall be in writing and shall be sent certified mail or delivered in person to the other Parties as follows:

MNDOT
Director, Metro Office of Rail Transit
1500 West County Road B-2
Roseville, MN 55113

Minneapolis
Director of Public Works
203 City Hall
Minneapolis, MN 55415

MET COUNCIL
Regional Administrator
Mears Park Center
230 East Fifth Street
St. Paul, MN 554101

7. Contract Administration – In order to coordinate the activities of the Paties so as to accomplish the purposes of this Agreement, the following individuals, or their designees or successors shall manage this Agreement on behalf of the Parties.

MNDOT
Director, Metro Office of Rail Transit
1500 West County Road B-2
Roseville, MN 55113

Minneapolis
Director of Public Works
203 City Hall
Minneapolis, MN 55415

MET COUNCIL
General Manager
Metro Transit
560 6th Avenue North
Minneapolis, MN 55411-4398

8. Availability of Records – The Parties agree that each Party hereto, the Legislative Auditor, the State Auditor, or any of their duly authorized representatives at any time during normal business hours, and as often as they reasonably deem necessary, shall have access to and the right to examine, audit, excerpt, and transcribe any books, documents, papers, or records, which are pertinent to the accounting practices and procedures of the other party hereto and involve transactions relating to this Agreement for a minimum of six years from the expiration of this Agreement.

9. Data Privacy – The Parties agree to abide by all applicable state and federal laws and regulations and confidential information concerning individuals and/or data including, but not limited to, information made non-public by such laws or regulations.

10. This Agreement shall take effect upon execution by all the Parties hereto and by proper state officials and shall remain in effect until the full Funding Grant Agreement is closed out by the Federal Transit Administration.

11. The Parties to this Agreement may mutually agree to cancel this Agreement prior to its termination as provided for in Paragraph V.10. of this Agreement.

**IN TESTIMONY WHEREOF**, the Parties hereto have caused this Agreement to be executed by their respective duly authorized representatives.

**MINNESOTA DEPARTMENT OF TRANSPORTATION**

By________________________

Its________________________

Date________________________

**CITY OF MINNEAPOLIS**

By________________________
Its Mayor

Attest________________________
Assistant City Clerk

Countersigned________________________
Its Finance Officer

Approved as to form:

Corey M. Conover
Office of City Attorney

**OFFICE OF THE ATTORNEY GENERAL**

By________________________

Its________________________

Date________________________

**DEPARTMENT OF ADMINISTRATION**

By________________________

Its________________________

Date________________________

**METROPOLITAN COUNCIL**

By [signature]

Its Regional Admin

Date 12-16-99

Approved as to form:

[signature]
Associate General Counsel

**EXHIBIT A**

**PROJECT SCHEDULE**

**EXHIBIT B**

**FUTURE AGREEMENTS**

A. **Minneapolis Transfer Agreement**

1. Parties – Minneapolis, Met Council

2. Provisions – Terms and conditions and a schedule for transfer to Met Council of an interest in the Minneapolis right-of-way or for a grant of access to Minneapolis right-of-way necessary for operation of the Project.

3. Anticipated Date of Execution – by March 31, 2000

B. **Minneapolis - MNDOT Construction Agreement**

1. Parties – Minneapolis, MNDOT

2. Provisions

   a. Terms and conditions including insurance coverage provisions and a schedule for construction by Minneapolis of the enhancements to stations, etc. and provisions and schedule for payment of the enhancements by Minneapolis.

   b. Terms and conditions including insurance coverage provisions and a schedule for physical relocation of utilities and traffic signals throughout the alignment in Minneapolis.

3. Anticipated Date of Execution – January 31, 2000

C. **Minneapolis - Met Council Operation and Maintenance Agreement**

1. Parties – Met Council and Minneapolis

2. Provisions - Terms and conditions to define the operational and maintenance responsibilities of each party, including signal preemption. Issues to be addressed will include maintenance of the stations, sidewalks and lighting, traffic signals, train frequency, emergency preemption of the system and protocol for utility emergency situations, insurance coverage.

3. Anticipated Dates of Execution – July 1, 2000

D. **PARKING AGREEMENT**

1. Parties – Minneapolis, MNDOT, Met Council, Hennepin County

2. Provisions – Terms and conditions with respect to issues of replacement of handicapped parking near the Metrodome and protection of residential areas and parking of local businesses from impacts of light rail patron parking. This agreed upon protection, possibly including a form of permit parking, shall be in place prior to opening of the Project for revenue service.

3. Anticipated Date of Execution – By July 1, 2000

E. **Joint Powers Agreement for Building Permits**

1. Parties – MNDOT, MAC

2. Provisions – Terms and conditions with respect to issuance of building permits.

3. Anticipated Date of Execution – by July 1, 2000

# OFFICE OF THE CITY ATTORNEY
# CITY OF MINNEAPOLIS

**COREY MORSE CONOVER**
Assistant City Attorney
300 Metropolitan Centre
Minneapolis, Minnesota 55402-2453
Phone: (612) 673-2182
Fax: (612) 673-3362
E-Mail: corey.conover@ci.minneapolis.mn.us

TO: Scott Anderson

OF: Bassford, L, ...

Fax #: 333-8829

Date: 5/10/01 NO. OF PAGES: ______

COMMENTS:

______________________________

______________________________

______________________________

( ) CHECK IF ATTORNEY-CLIENT PRIVILEGED INFORMATION