OMB Approval No. 0348-0043

# APPLICATION FOR FEDERAL ASSISTANCE

**2. DATE SUBMITTED** September 27, 2000

Applicant Identifier

**1. TYPE OF SUBMISSION:**

Application
- [x] Construction
- [ ] Non-Construction

Preapplication
- [ ] Construction
- [ ] Non-Construction

**3. DATE RECEIVED BY STATE**

State Application Identifier

**4. DATE RECEIVED BY FEDERAL AGENCY**

Federal Identifier

**5. APPLICANT INFORMATION**

Legal Name: Metropolitan Council

Organizational Unit: Metro Transit

Address (*give city, county, State, and zip code*):
230 East Fifth Street
St. Paul, MN 55101

Name and telephone number of person to be contacted on matters involving this application (*give area code*)
Julie Johanson
(612)349-7514

**6. EMPLOYER IDENTIFICATION NUMBER** (*EIN*): 41-6008898

**7. TYPE OF APPLICANT:** (*enter appropriate letter in box*) N

A. State | H. Independent School Dist.
B. County | I. State Controlled Institution of Higher Learning
C. Municipal | J. Private University
D. Township | K. Indian Tribe
E. Interstate | L. Individual
F. Intermunicipal | M. Profit Organization
G. Special District | N. Other (Specify) Regional

**8. TYPE OF APPLICATION:**

- [ ] New
- [ ] Continuation
- [x] Revision

If Revision, enter appropriate letter(s) in box(es) A

A. Increase Award B. Decrease Award C. Increase Duration
D. Decrease Duration Other(*specify*):

**9. NAME OF FEDERAL AGENCY:**
Federal Transit Administration

**10. CATALOG OF FEDERAL DOMESTIC ASSISTANCE NUMBER:** 20-500

TITLE: Section 5309 New Starts

**11. DESCRIPTIVE TITLE OF APPLICANT'S PROJECT:**
Design, Engineer & Construct the Hiawatha Corridor Light Rail Transit Line

**12. AREAS AFFECTED BY PROJECT** (*Cities, Counties, States, etc.*):
Hennepin County, MN

**13. PROPOSED PROJECT**

Start Date: 1/04/99
Ending Date: 12/31/04

**14. CONGRESSIONAL DISTRICTS OF:**

a. Applicant: Fourth
b. Project: Third, Fifth

**15. ESTIMATED FUNDING:**

| | | |
|---|---|---|
| a. Federal | $ | 334,277,500 .00 |
| b. Applicant | $ | .00 |
| c. State | $ | 92,000,000 .00 |
| d. Local | $ | 57,277,500 .00 |
| e. Other | $ | 142,000,000 .00 |
| f. Program Income | $ | .00 |
| g. TOTAL | $ | 625,555,000 .00 |

**16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS?**

a. YES. THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE ORDER 12372 PROCESS FOR REVIEW ON:

DATE ______________

b. No.
- [x] PROGRAM IS NOT COVERED BY E. O. 12372
- [ ] OR PROGRAM HAS NOT BEEN SELECTED BY STATE FOR REVIEW

**17. IS THE APPLICANT DELINQUENT ON ANY FEDERAL DEBT?**

- [ ] Yes If "Yes," attach an explanation.
- [x] No

**18. TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL DATA IN THIS APPLICATION/PREAPPLICATION ARE TRUE AND CORRECT, THE DOCUMENT HAS BEEN DULY AUTHORIZED BY THE GOVERNING BODY OF THE APPLICANT AND THE APPLICANT WILL COMPLY WITH THE ATTACHED ASSURANCES IF THE ASSISTANCE IS AWARDED.**

a. Type Name of Authorized Representative: Arthur T. Leahy
b. Title: General Manager
c. Telephone Number: (612)349-7510
d. Signature of Authorized Representative: Arthur T. Leahy
e. Date Signed: September 27, 2000

Previous Edition Usable
Authorized for Local Reproduction

Exhibit B

Standard Form 424 (Rev. 7-97)
Prescribed by OMB Circular A-102

# Project Budget

**Grantee:** Metropolitan Council, St. Paul, Minnesota
**Project #:** MN-03-0066-01

| | | | | Federal Amount | Total Amount |
|---|---|---|---|---|---|
| **Scope:** | **131-00** | **New Start Rolling Stock** | | | |
| | Activity: | 13.13.20 | Light Rail Vehicles | $63,332,186 | $79,165,233 |
| | Quanity: | 26 | | | |
| **Scope:** | **132-00** | **New Start Design,** Construction & Installation | | | |
| | Activity: | 13.20.00 | Construction | $173,100,564 | $241,425,255 |
| | Activity: | 13.72.04 | Public Utility - Constr. Mgmt | $244,943 | $322,205 |
| | Activity: | 13.75.95 | Public Utility Relocation | $7,646,106 | $10,057,886 |
| | Activity: | 13.42.11 | MOW Equipment | $2,090,707 | $2,750,170 |
| | Activity: | 13.33.06 | Fare Collection Equipment | $2,943,554 | $3,872,027 |
| | Activity: | 13.75.91 | ROW Acquisition | $15,422,635 | $20,287,000 |
| | Activity: | 13.75.91 | Donated ROW | - | $27,727,090 |
| **Scope:** | **137-00** | **Support Services** | | | |
| | Activity: | 13.71.01 | Preliminary Engineering - 3rd Party | $8,505,229 | $11,188,000 |
| | Activity: | 13.71.01 | Preliminary Engineering - Donated | - | $6,530,229 |
| | Activity: | 13.79.01 | Preliminary Engineering - Project Administration | $1,529,543 | $2,012,000 |
| | Activity: | 13.71.02 | Intellectual Property D/B Proposals | $760,210 | $1,000,000 |
| | Activity: | 13.71.03 | Project Management 3rd Party | $25,978,504 | $34,172,800 |
| | Activity: | 13.72.03 | Project Management Force Account | $1,298,925 | $1,708,640 |
| | Activity: | 13.79.00 | Project Management Project Administration | $3,012,682 | $3,962,960 |
| | Activity: | 13.71.05 | Insurance - 3rd Party | $4,648,349 | $6,114,559 |
| | Activity: | 13.73.00 | Project Contingency | $17,879,148 | $23,518,696 |
| | Activity: | 13.70.02 | Rail Activiation & Testing | $2,083,165 | $2,740,250 |

| | | | | |
|---|---|---|---|---|
| Activity: | 13.79.00 | Financing Costs | $2,280,630 | $3,000,000 |
| Activity: | 13.93.04 | Public Art | $1,520,420 | $2,000,000 |
| | | Federal Program Total | $334,277,500 | $483,555,000 |
| | | MAC Segment | - | $142,000,000 |
| | | Hiawatha Light Rail Project Total | $334,277,500 | $625,555,000 |

U.S. Department of Transportation
Federal Transit Administration

Deputy Administrator

400 Seventh St., S.W.
Washington, D.C. 20590

JAN 16 2001

Jay Lindgren
Regional Administrator
Metropolitan Council
230 East 5th Street
St. Paul, Minnesota 55101-1626

Re: MN-03-0066-01 Full Funding Grant Agreement Approval

Dear Mr. Lindgren:

I am pleased to advise you that your application for a Full Funding Grant Agreement (FFGA) to support final design and construction of the Hiawatha Corridor Light Rail Transit Project has been approved. This Full Funding Grant Agreement provides a maximum Federal commitment of 49 U.S.C. Section 5309 funds, in the amount of $334,277,500 subject to the appropriation of funds by Congress.

Enclosed are four counterparts of the Full Funding Grant Agreement executed on behalf of this Administration. Instructions which you should follow, in executing these counterparts, also are enclosed.

If you have any questions on the enclosed grant materials, please contact Mr. Joel P. Ettinger, Regional Administrator at (312) 353-2789.

Sincerely,

Nuria I. Fernandez
Acting Administrator

Enclosures

FEDERAL TRANSIT ADMINISTRATION GRANT AGREEMENT

# HIAWATHA CORRIDOR LIGHT RAIL PROJECT

## METROPOLITAN COUNCIL

## FULL FUNDING GRANT AGREEMENT

## MN-03-0066-01

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL TRANSIT ADMINISTRATION
WASHINGTON, D.C. 20590

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**GRANT AGREEMENT**
**(FTA G-7, October 1, 2000)**

Upon execution of this Grant Agreement by the Grantee named below, the Grantee affirms the U.S. Department of Transportation, Federal Transit Administration (FTA) Award covering the Project described below and enters into this Grant Agreement with FTA. The following documents are incorporated by reference and made part of this Grant Agreement:

(1) "Federal Transit Administration Master Agreement," FTA MA(7), October 1, 2000 [Internet Address: http://www.fta.dot.gov/library/legal/agreements/2001/ma.html]; and
(2) Any Award notification containing special conditions or requirements, if issued.

FTA OR THE FEDERAL GOVERNMENT MAY WITHDRAW ITS OBLIGATION TO PROVIDE FINANCIAL ASSISTANCE IF THE GRANTEE DOES NOT EXECUTE THIS GRANT AGREEMENT WITHIN NINETY (90) DAYS AFTER THE OBLIGATION DATE OF THE FTA AWARD.

FTA AWARD

FTA hereby awards a Federal grant as follows:

**Project No.:** MN-03-0066-01

**Grantee:** Metropolitan Council

**Citation of Statutes Authorizing the Project:** 49 U.S.C. § 5309(a)(1)

**Maximum Federal Financial Contribution:** $334,277,500

**Estimated Total Eligible Cost:** $483,555,000

**Amount of Section 5309 Funds Approved [Including All Amendments]:** $60,777,190

**Amount of This FTA Award:** $0

**Maximum Percentage(s) of FTA Participation:** 69%

**Dates of U.S. Department of Labor Certifications of Transit Employee Protective Arrangements:**

| Original Project (or Amendment) Numbers | Certification Dates |
| --- | --- |
| MN-03-0058 | Sept. 30, 1998 |
| MN-03-0058 (Amendment #1) | April 21, 1999 |
| MN-03-0058 (Amendment #2) | Feb. 4, 2000 |
| MN-03-0066 | June 9, 2000 |

**Project Description:** The Hiawatha Corridor Light Rail Transit project will operate in an 11.6 mile corridor, extending from downtown Minneapolis, travelling south along Hiawatha Avenue (TH-55) to the Minneapolis-St. Paul International Airport (Airport), and terminating further south at the Mall of America in Bloomington, Minnesota. The line will consist of 17 stations. The Metropolitan Council plans to purchase approximately 26 light rail vehicles to operate on the system. The Metropolitan Airport Commission will be responsible for building the segment of the project which tunnels under Airport runways including 2 stations at the Airport.

**Revenue Operation Date:** December 31, 2004

**Special Requirement:** The Grantee agrees to comply with applicable Federal statutory provisions prohibiting the use of Federal assistance funds for activities designed to influence Congress or a State legislature on legislation or appropriations, except through proper, official channels.

**Obligation Date:** JAN 17 2001

**Signature:** [signature]
**Nuria I. Fernandez**
**Acting Administrator**
**Federal Transit Administration**

# TABLE OF CONTENTS

## PART I


| | | Page |
|---|---|---|
| Grant Agreement | | |
| Section 1 | Definitions | 2 |
| Section 2 | Purposes of Agreement | 4 |
| Section 3 | Previous Federal Documents and Grants | 5 |
| Section 4 | Obligation to Complete the Project | 6 |
| Section 5 | Revenue Operation Date | 6 |
| Section 6 | Net Project Cost | 7 |
| Section 7 | Estimated Net Project Cost | 7 |
| Section 8 | Limitations of the Federal Funding Commitment | 7 |
| Section 9 | MAC Financial Contribution and Interrelated Activities | 8 |
| Section 10 | Federal Funding—Other Sources | 8 |
| Section 11 | Local Financial Commitment-Capital Costs | 8 |
| Section 12 | Authorization to Advance Project Without Prejudice | 9 |
| Section 13 | Local Financial Commitment-Operating and Maintenance Costs | 9 |
| Section 14 | Baseline Cost Estimate | 10 |
| Section 15 | Baseline Schedule | 10 |
| Section 16 | Project Management Oversight | 11 |
| Section 17 | Environmental Protection | 11 |
| Section 18 | Labor Protection | 11 |
| Section 19 | Government Actions | 12 |
| Section 20 | Remedies | 12 |
| Section 21 | Contents of Agreement | 13 |
| Section 22 | Simultaneous Creation of Electronic Agreement | 13 |
| Section 23 | Amendments to Agreement | 13 |
| Section 24 | Attachments - Incorporation | 13 |
| Section 25 | Notices | 14 |
| Section 26 | Applicable Law | 14 |
| Section 27 | Execution of Agreement | 14 |
| Certification by Attorney | | 16 |

**Attachments:**

| | |
|---|---|
| Attachment 1: | Scope of the Project |
| Attachment 2: | Project Description |
| Attachment 2A: | MAC Interrelated Activities |
| Attachment 3: | Baseline Cost Estimate |
| Attachment 3A: | Project Budget |
| Attachment 4: | Baseline Schedule |
| Attachment 5: | Prior Grants and Related Documents |
| Attachment 6: | Schedule of Federal Funds for the Project |
| Attachment 7: | Measures to Mitigate Environmental Impacts |

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL TRANSIT ADMINISTRATION

PART I

# FULL FUNDING GRANT AGREEMENT

**THIS FEDERAL TRANSIT ADMINISTRATION GRANT AGREEMENT** (Agreement) is entered into by the Metropolitan Council (Grantee) and the United States of America, acting through the United States Department of Transportation, Federal Transit Administration (FTA or Government).

**WHEREAS,** the Grantee has determined through the local planning process that construction of an 11.6 mile Light Rail Transit (LRT) system extending from downtown Minneapolis southward along Hiawatha Avenue through the Minneapolis/St. Paul International Airport and terminating in proximity to the Mall of America (hereafter, the "Project") will effectively and efficiently serve transportation needs in the Minneapolis/St. Paul metropolitan area.

**WHEREAS,** the Grantee has developed a Financing Plan, as defined herein, using a combination of local, State and Federal funds to finance the cost of the Project and, in accordance with its plan, has requested a Grant, as defined herein, of Federal financial assistance in the Project.

**WHEREAS,** the Government has previously provided $60,777,190 in capital new starts funds for the development of the Project, and has determined to execute this Agreement and support final design and construction of the Project up to a Maximum Federal Financial Contribution of $334,277,500 in capital new starts funds, subject to all the terms and conditions set forth in this Agreement.

**WHEREAS,** the Metropolitan Airports Commission (MAC) has agreed to provide up to $87,000,000 in airport revenue to financially assist on-airport portions of the Project that will not be assisted with Federal Transit funds (the "MAC Interrelated Activities"); these MAC Interrelated Activities are critical both to the success of the Project and to alleviation of ground-side congestion and enhancement of mobility at the airport; it is critical that these MAC Interrelated Activities be completed by the Revenue Operations Date established by this Agreement; and these MAC Interrelated Activities will not be subject to FTA procurement rules and certain specified FTA requirements.

**WHEREAS,** the Grantee has submitted in its request for Federal assistance (the Application) and the Government has accepted all assurances, certifications and other documents required as conditions precedent to a Grant of assistance by the Government for the Project; and, in its submissions, the Grantee has demonstrated justification for the Project, has demonstrated its financial, organizational, and technical capacity as is necessary to complete the Project within

the maximum level of Federal assistance set forth in this Agreement, and has demonstrated the capability to secure non-Federal funds as may be necessary for such completion.

**WHEREAS,** the Government has determined that the Project is based on the results of an alternatives analysis and preliminary engineering; is justified on a comprehensive review of its mobility improvements, environmental benefits, cost effectiveness, and operating efficiencies; and is supported by an acceptable degree of local financial commitment, including evidence of stable and dependable financing sources to construct, maintain, and operate the Project.

**WHEREAS,** the Government and the Grantee have agreed that their respective duties and responsibilities as related to the completion of the Project shall be determined by and under the terms and conditions of this Agreement and have agreed that this Agreement shall be recognized as the sole understanding between the Government and the Grantee in consideration of the mutual promises as set forth in this Agreement.

**THEREFORE,** in consideration of the above and the parties' mutual promises as set forth in this Federal Transit Administration Grant Agreement, the Grantee and the Government agree to the specific terms, conditions and provisions set forth in this entire Agreement including, in particular, the specific terms of the following Sections and Attachments:

## SECTION 1 DEFINITIONS

"**Agreement**" means this Federal Transit Administration Full Funding Grant Agreement (FFGA) and consists of all parts and documents listed in the Contents of Agreement, Section 21 of this Part I, and will include all future addenda, substitutions, modifications and amendments as and when legally executed and effective. (This definition supersedes the definition of "Grant Agreement" set forth in Section 1(j) of the Federal Transit Administration Master Agreement (Master Agreement), Part II of this Agreement.)

"**Airport**" means the Minneapolis-St. Paul International Airport.

"**Application**" means those documents and written submissions filed by or on behalf of the Grantee pursuant to its request for Federal financial assistance for support of the Project and accepted by the government as satisfaction of the legal and policy requirements of Grant award. The Application includes all explanatory, supporting, or supplementary documents related to the Project that the government relied upon in its determination to obligate and award Federal funds for the Project. (This definition is intended to supplement the definition set forth in Section 1(a) of the Master Agreement, Part II of this Agreement.)

"**Baseline Cost Estimate**" means the Application document described in Section 14 of this Agreement and set forth in Attachment 3. The requirements of the Baseline Cost Estimate are set forth in FTA Circular 5200.1, "Full Funding Grant Agreement Guidance "(July 2, 1993).

"**Complete the Project**" means to accomplish all of the scope and activities of the Project as described in Attachment 1, Scope of the Project, and Attachment 2, Project Description, and Attachment 2A, MAC Interrelated Activities.

"**Cooperation Agreement**" means the Hiawatha Corridor Light Rail Transit Supplementary Project Cooperation Agreement, dated February 22, 2000, entered into by MC, MAC, and the State of Minnesota.

"**Date of this Agreement**" means the date the Government executes the award of this Full Funding Grant Agreement.

"**Estimated Net Project Cost of the Total Project**" means the total anticipated cost of the Project as of the Date of this Agreement, including amounts budgeted for contingencies. The Estimated Net Project Cost of the Total Project is set forth in Section 7 of this Agreement and is the Baseline Cost Estimate, Attachment 3 of this Agreement, less the cost that can reasonably be financed from the Grantee's revenue.

"**Federal Transit Laws**" means the statutes codified at 49 U.S.C. Chapter 53.

"**Financing Agreement**" means the Light Rail Transit Financing Agreement between the Metropolitan Council and MAC, dated October 10, 2000.

"**Financing Plan**" means the plan accepted by the Government as part of the Application process describing the Grantee's financial condition and capability to Complete the Project and to maintain and operate the Project together with its existing transit system. It includes all explanatory, supporting and supplementary documents, commitments, and agreements accepted or approved by the Government.

"**Government**" means, in Part I of this Agreement, the United States of America, acting through the Federal Transit Administration of the United States Department of Transportation.

"**Grantee**" means the Metropolitan Council.

"**Grant(s)**" means, in singular and plural forms, the obligation and award of Federal financial assistance by the Government pursuant to the Federal Transit Laws.

"**Grant Agreement**" means the first cover page of this Part I where the FTA sets forth the maximum Federal funds obligated and awarded for expenditure on the Project and sets forth the funding ratio of Federal and local funds to be expended for the Project.

"**Local Share**" means that portion of the Grantee's local financial commitment that is the Grantee's legally required share of the Net Project Cost.

"**MAC**" means the Metropolitan Airport Commission.

"**MAC Construction Agreement**" means the Agreement, dated June 13, 2000, for the Construction of a Light Rail Transit System on and near the Minneapolis-St. Paul International Airport entered into by the MC, MAC, and the State of Minnesota.

**"MAC Interrelated Activities"** means those design and construction activities located on MAC property which are to be funded and carried out by the MAC, as specified in the MAC Construction Agreement; the Cooperation Agreement; and the Financing Agreement; and are not funded with Federal capital new starts assistance under this Agreement. The MAC Interrelated Activities are more specifically described in Attachment 2A.

**"Master Agreement"** means the standard terms and conditions applicable to recipients of Federal financial assistance from the Government. It is updated and published annually. It is included as Part II of this Agreement and identified in Federal Fiscal Year 2001 by FTA Form MA(7) (October 1, 2000).

**"Maximum Federal Financial Contribution"** means the limit of Federal capital new starts financial participation in the Project. (The amount of the "Maximum Federal Financial Contribution" is set forth in Section 8, Limitations of the Federal Funding Commitment and is only a portion of the Total Federal Financial Contribution to the Project.)

**"Maximum Federal Funds Approved"** means the amount of Federal funds obligated for the Project and available to the Grantee. (The amount is set forth in the Grant Agreement.)

**"MC"** means the Metropolitan Council.

**"MC/MAC Agreements"** means the MAC Construction Agreement, the Cooperation Agreement, the Financing Agreement, and the O&M Agreement.

**"Net Project Cost"** means the cost of the Project that cannot reasonably be financed from the Grantee's revenues.

**"O&M Agreement"** means the Operation and Maintenance Agreement, dated October 9, 2000, between the MC and MAC.

**"Project"** means the transit/transportation improvements the Grantee has promised to implement. A description of the Project is contained in Attachment 1, Project Scope. Activities to carry out the project scope are depicted in Attachment 2, Project Description.

**"Project Costs"** means all costs eligible for Federal financial participation under the terms of this Agreement and consistent with the cost principles set forth in the Master Agreement, Section 9, "Payments."

**"Revenue Operation Date"** means the date certain upon which the Grantee shall commence revenue operation of the Project as defined in Attachment 1, Project Scope.

## SECTION 2 PURPOSES OF AGREEMENT

Pursuant to 49 U.S.C. § 5309, the purposes of this Agreement are to:

(a) provide Federal financial assistance to the Grantee in the form of this Grant and possible

future Grants as is and may be awarded under this Agreement and under the Federal Transit Laws for purposes which are consistent with the Federal Transit Laws, implementing regulations, and other applicable laws and regulations;

(b) describe the Project and to set forth the mutual understandings, terms and conditions, rights and obligations of the parties related to implementing the Project, the future management and operation of the Project and the manner in which the Project real property and equipment will be used;

(c) establish the Maximum Federal Financial Contribution in the Project, and the manner in which all future Federal funds for the Project, if any, will be awarded and released to the Grantee;

(d) establish the Grantee's financial commitment to the Project including its obligation to fund the Local Share, its obligation to Complete the Project with a specified amount of Federal assistance, its obligation to achieve revenue operation of the Project by a specified date, its obligation to pay all costs necessary to Complete the Project that are in excess of the Estimated Net Project Cost of the Total Project, and its obligation to finance the future maintenance and operational costs of the Project; and,

(e) facilitate timely and efficient management of the Project.

**SECTION 3 PREVIOUS FEDERAL DOCUMENTS AND GRANTS**

(a) The Government laws, policies and procedures require the completion of a project development process and environmental review prior to the execution of this Agreement. Prior Grants of Federal assistance awarded by the Government for this Project development process described in Attachment 5 of this Agreement. These Grants (and any other documents that are described in Attachment 5, including Letters of No Prejudice) are incorporated herein, except for the terms and conditions specifically superseded by this Agreement. Further, in executing this Agreement, the Grantee assures that the certifications and assurances (made by or on behalf of the Grantee or by a third party) upon which the Government relied in these prior actions were made to the Government in good faith to the best of the Grantee's knowledge and belief, and that the Grantee has no present knowledge of facts or circumstances substantially affecting the continued validity of these certifications and assurances that the Grantee has not formally conveyed to the Government prior to the Government's execution of this Agreement.

(b) This Agreement does not discharge or rescind any of the terms, conditions or obligations established under the documents set forth in Attachment 5 unless specifically stated otherwise herein. Further, the terms, conditions and obligations of this Agreement take precedence over the provisions of all prior agreements related to the Project between the Grantee and the Government and will be controlling for all actions related to the Project taken after the Date of this Agreement, unless specifically stated otherwise herein.

(c) No amendments will be sought or approved to increase the amount of funds in the prior Grants listed in Attachment 5 beyond the amounts described in this Agreement as available to

the Project.

**SECTION 4 OBLIGATION TO COMPLETE THE PROJECT**

The Government has no obligation to provide any financial assistance for the Project beyond the Maximum Federal Financial Contribution. If the total Federal financial assistance provided under Section 8, Limitations of Federal Funding Commitment, is insufficient to achieve revenue operation of the Project and the subsequent activities necessary to Complete the Project, the Grantee agrees to Complete the Project and accepts sole responsibility for the payment of any additional costs (overruns). The Grantee promises that it will secure and provide such additional resources as are necessary to pay these additional costs (overruns) and expeditiously Complete the Project without further Federal financial assistance from the capital new starts program. The Grantee further agrees to notify the Government when the total project cost is expected to exceed the funds available and identify the source of funds to cover any shortfall.

**SECTION 5 REVENUE OPERATION DATE**

(a) The Grantee agrees and promises to achieve revenue operation of the Project on or before December 31, 2004 (Revenue Operation Date), in accordance with the terms and conditions of this Agreement.

(b) The Revenue Operation Date (ROD) is a significant term of this Agreement. The Grantee's failure to achieve the operational functions of the Project on or before the ROD will constitute a breach of this Agreement. Upon the Grantee's request, the Government may determine at its sole discretion to waive a breach, or an anticipatory breach and to extend the ROD if there is an unavoidable delay in achieving the operational goals of the Project resulting from an event or circumstance beyond the control of the Grantee or if the Government determines that allowing the delay is in the best interest of the Government and the success of the Project. Requests by the Grantee for waiver of a breach or anticipatory breach and extension of the ROD for the reasons set forth herein shall be submitted promptly (with appropriate documentation) to the Government. In the exercise of its discretion to waive the breach and extend the ROD, the Government will take into consideration the actions and measures taken by the Grantee to ensure adherence to its promise to achieve the operational goals of the Project on or before the scheduled ROD.

(c) Delays in appropriations of funds from Congress shall not constitute a basis for extension of the ROD.

(d) The Government's consent to extend the ROD pursuant to Paragraph (b) of this Section does not constitute a basis for additional Federal financial assistance beyond the Maximum Federal Financial Contribution.

(e) The Grantee's obligations under this Section include completion of the MAC Interrelated Activities by the ROD.

## SECTION 6 NET PROJECT COST

(a) This Grant is to assist in the payment of actual Project Costs, less any amount that can reasonably be financed from revenues of the Grantee. If the funds awarded under this grant exceed the amount necessary to fund the Federal share, the excess funds are not available to the Grantee for payment of costs beyond the scope of this Grant.

(b) In accordance with 49 U.S.C. § 5309(h), a refund or reduction of the Grantee's Local Share of the Net Project Cost requires a refund to the Government of a proportional amount of the Federal financial assistance provided under this Agreement.

(c) The portion of Net Project Cost that may be financed by the Government may not exceed the amount of the Maximum Federal Financial Contribution in this Project as stated in Section 8 of this Agreement, Limitations of the Federal Funding Commitment.

## SECTION 7 ESTIMATED NET PROJECT COST

(a) The Government's determination to provide financial assistance for the Project is based, in significant part, upon the Grantee's estimated costs as set forth in the Baseline Cost Estimate, Attachment 3 of this Agreement. The Estimated Net Project Cost of the Total Project reported in Attachment 3 is $483,555,000.

(b) The Estimated Net Project Cost financed with the execution of this Agreement is limited by the amount of the Maximum Federal Funds Approved. The amount of the Estimated Net Project Cost and the amount of the Maximum Federal Funds Approved are stated in the Grant Agreement. The amount reimbursable by the Government is limited to the lesser of either the amount of the Maximum Federal Funds Approved or the maximum percentage of Federal participation permitted by Federal law and regulations. Additional funds will not be available for participation and reimbursement unless or until a Grant amendment is executed awarding additional funds and amending the Grant Agreement.

## SECTION 8 LIMITATIONS OF THE FEDERAL FUNDING COMMITMENT

(a) The sources of Federal financial assistance for the Project are set forth in the Approved Project Budget. These funds are in addition to all previous Federal financial commitments to the development of the Project as set forth in the schedule of Prior Grants and Related Documents, Attachment 5 of this Agreement. The Government is not obligating and awarding any Federal capital new starts funds for the Project with the execution of this Agreement.

(b)(1) With the execution of this Agreement, the Government acknowledges its intent to provide Federal capital new starts assistance for the Project in an amount that will not exceed $334,277,500. The anticipated sources of Federal financial assistance in this amount are listed in Attachment 6 of this Agreement, Schedule of Federal Funds for the Project. All Federal capital new starts funds obligated pursuant to this Paragraph will be subject to all the terms, conditions and obligations set forth in this Agreement. Accordingly, it is expected that the award of additional funds will be processed as amendments to this Agreement.

(2) The award by the Government of additional Federal financial assistance to the Project under Paragraph (b)(1) of this Section is subject to the following limitations:

(A) the availability of appropriated funds; and

(B) the Grantee's continued performance under the terms and conditions of this Agreement.

(c) The Maximum Federal Financial Contribution in this Project under the capital new starts category of funds is limited to $334,277,500 which is the sum of the amounts set forth in Paragraphs (a) and (b)(l) of this Section.

## SECTION 9 MAC FINANCIAL CONTRIBUTION AND INTERRELATED ACTIVITIES

(a) The MAC Interrelated Activities are being funded, designed, constructed, and operated in accordance with the MC/MAC Agreements.

(b) The MC/MAC Agreements established the MAC financial commitment to the MAC Interrelated Activities, and describes and identifies the MAC Interrelated Activities. In addition, the MC/MAC Agreements establish the respective rights and duties of the Grantee and the MAC relative to funding; engineering and construction; ownership of real and personal property; operation and maintenance; oversight and control by the Grantee regarding the MAC Interrelated Activities; security and safety; environmental issues; insurance; and dispute resolution.

(c) The agreements described in paragraph (a) above and any subsequent amendments thereto, are hereby incorporated into this Agreement by reference.

(d) The Government acknowledges that the MAC Interrelated Activities will not be assisted by FTA funding, thus, they will not be governed by FTA Circular 4220.1D (Third-Party Contracting Guidelines) or the terms and conditions of the FTA Master Agreement.

## SECTION 10 FEDERAL FUNDING — OTHER SOURCES

The Maximum Federal Financial Contribution specified in Section 8 of this Agreement does not include funds other than from the capital new starts program under the Federal Transit Laws. Should such other Federal funds be provided for the Project in addition to the amount of 49 U.S.C. Section 5309 New Starts funds set forth in Attachment 6 of this Agreement, the limitation on the Federal funding commitment set forth in Section 8 of this Agreement shall not apply to those funds. Accordingly, such additional funds shall be excluded from the calculation of Maximum Federal Financial Contribution. Funds awarded pursuant to this Section will be subject to all other terms, conditions and obligations set forth in the Agreement.

## SECTION 11 LOCAL FINANCIAL COMMITMENT - CAPITAL COSTS

(a) As a condition of the Government's execution of this Agreement, the Grantee has developed and adopted a Financing Plan for financing all Project Costs necessary to Complete the Project.

In addition to the amount of Federal funds requested, the Financing Plan includes a statement of the State, local and private sources of funding and the amount of funds available for and committed to the Project from each such source. This Financing Plan, as accepted by the Government, with the supporting documentation (including formal funding agreements and commitments) is hereby incorporated by reference and made a part of this Agreement.

(b) The Grantee hereby commits and certifies that it will provide funds in an amount sufficient, together with the Federal contribution (acknowledging the limitations as set forth in this Agreement), to assure timely and full payment of the Project Costs necessary to Complete the Project.

(c) The Grantee hereby commits and certifies that the Local Share portion of its financing commitment will be provided from funding sources other than: Federal funds (except as may otherwise be authorized by Federal statute), receipts from the use of Project facilities or equipment (except as may otherwise be authorized by Federal statute) or revenues of the public transit system in which such facilities or equipment are used.

(d) Given the Estimated Net Project Cost of the Total Project, as set forth in Section 7 of this Agreement, the Grantee's financial commitment to the Net Project Cost is estimated to total $149,277,500. This amount constitutes the Local Share needed to match the Maximum Federal Financial Contribution to the Project. In the event that the actual Federal financial contribution in the Project is reduced or is increased or the funding percentage as set forth in the Grant Agreement is changed, the portion of the Grantee's financial contribution to the Project that is identified as Local Share shall be adjusted accordingly.

(e) The Grantee agrees to notify the Government of any change in circumstances or commitments which adversely affects the Grantee's plan to fund the Project Costs necessary to Complete the Project as set forth in the Financing Plan. In its notification, the Grantee shall advise the Government of what actions it has taken or plans to take to ensure adequate funding resources and shall reaffirm its commitment to the Government as set forth in Paragraph (b) of this Section.

**SECTION 12 AUTHORIZATION TO ADVANCE PROJECT WITHOUT PREJUDICE**

The Grantee may incur costs or expend local funds for all phases of the Project as is reasonably necessary to advance the Project prior to an award of Federal funding assistance without prejudice to possible future Federal participation in or reimbursement of the Project Costs to the extent that such costs are incurred in accordance with all applicable Federal requirements and this Agreement. It is understood that the authority conferred on the Grantee to advance the Project without prejudice does not constitute a legal commitment by the Government to obligate and award Federal funds.

**SECTION 13 LOCAL FINANCIAL COMMITMENT-OPERATING/MAINTENANCE COST**

(a) As a condition of the Government's execution of this Agreement, the Grantee has developed

and adopted a Financing Plan for financing the future operation and maintenance of the Project that also takes into consideration the Grantee's continuing financial responsibilities to operate, maintain and reinvest in its existing transit system. This Financing Plan, as accepted by the Government, and the supporting documentation (including specific funding commitments) evidencing stable and dependable funding sources is an essential part of the Grantee's Application and is made a part of this Agreement by incorporation of the Application.

(b) With the execution of this Agreement, the Grantee assures that it has stable and dependable funding sources, sufficient in amount and in degree of commitment, to operate and maintain its entire mass transit system at an adequate and efficient level of service, including the future operation and maintenance of the Project without additional Federal assistance beyond the amounts set forth in the Financing Plan. The foregoing assurance does not preclude the Grantee from altering service through contracts with private providers of mass transportation services.

(c) The Grantee will notify the Government of any change in circumstances or commitments that adversely affects the Grantee's plan to fund the maintenance and operating costs of the Project as set forth in the Financing Plan. In its notification, the Grantee will advise the Government of actions it has taken or plans to take to ensure adequate funding resources and will reaffirm to the Government its assurance as set forth in Paragraph (b) of this Section.

**SECTION 14 BASELINE COST ESTIMATE**

(a) In its Application, the Grantee submitted to the Government a Baseline Cost Estimate for the activities comprising the Project. The Baseline Cost Estimate is accepted by the Government and is Attachment 3 of this Agreement. It is derived from cost estimates of the individual contracts that, in sum, comprise the Project. The Baseline Cost Estimate reflects appropriate escalation and Project schedule dates.

(b) The Government intends to use the Baseline Cost Estimate to monitor the Grantee's compliance with certain terms and conditions of this Agreement. As the measure of cost estimates as of the Date of this Agreement, the Baseline Cost Estimate established in Attachment 3 should not be amended or modified during the implementation of the Project.

(c) The Grantee will submit cost reports on the implementation of the Project as required by this Agreement and in a format consistent with the units set forth in the Baseline Cost Estimate so that the Government can, with reasonable diligence, reconcile the Grantee's reports with the Baseline Cost Estimate.

**SECTION 15 BASELINE SCHEDULE**

(a) In its Application, as approved, the Grantee submitted a Baseline Schedule for the Project that demonstrates how the Grantee intends to implement the Project and achieve the Revenue Operation Date. This submission has been accepted by the Government and is Attachment 4 of this Agreement.

(b) The schedule for the Project may be modified from time to time at the discretion of the

Grantee. However, the Baseline Schedule is not to be modified since it is to be used as a basis for comparing planned to actual project implementation. The Grantee will notify the Government when a Project schedule modification has the potential to change the Revenue Operation Date and action planned to recover the schedule. The Government's acquiescence of such notice will not be deemed approval by the Government of an extension of a Revenue Operation Date unless an extension is expressly granted, in writing, by the Government.

**SECTION 16 PROJECT MANAGEMENT OVERSIGHT**

The Project is a "Major Capital Project" as described in the Federal Transit Laws and defined in the Government's Project Management regulations at 49 C.F.R. § 633.5. Accordingly, the Grantee agrees that all of the requirements and conditions set forth in such regulations (49 C.F.R. Part 633) apply to the Project activities and MAC Interrelated Activities consistent with the provisions in Section 9(d). Noncompliance with the regulatory requirements shall constitute a breach of this Agreement, unless the Government formally waives the regulatory requirement.

**SECTION 17 ENVIRONMENTAL PROTECTION**

(a) As a condition precedent to this Agreement, the environmental impacts of the Project have been assessed as required by law. The results of that assessment and the adopted mitigation measures are described in the environmental documents listed in Attachment 7 of this Agreement. These documents together with related agreements and supporting documentation are hereby incorporated and made a part of this Agreement. To assist the Government in monitoring the implementation of the adopted mitigation measures, these measures are specifically described in Attachment 7 of this Agreement. It is understood and agreed that the description in Attachment 7 shall not supersede or in any way result in a circumvention of the requirements set forth in the formal environmental documents.

(b) Certain terms and conditions of this Agreement as related to the Grantee's responsibility to ensure protection of the environment are set forth in the Master Agreement, Section 25, "Environmental Requirements." Under that provision at Paragraph (l), the Grantee is required, among other actions, to undertake all environmental mitigation measures that are identified in environmental documents prepared for the Project. Accordingly, the Grantee understands that it shall not withdraw or substantially change any of the adopted mitigation measures as described in the Record of Decision without the express written approval of the Government.

(c) This Section is intended only to supplement the provisions set forth in the Master Agreement, Section 25, "Environmental Requirements."

**SECTION 18 LABOR PROTECTION**

The Grantee will carry out the Project in conformance with the terms and conditions determined by the Secretary of Labor to be fair and equitable to protect the interests of employees affected by the Project and meet the requirements of 49 U.S.C. § 5333(b), and Department of Labor (DOL) Guidelines, 29 C.F.R. Part 215. These terms and conditions are identified in the letter(s) of certification from the DOL to the Government on the date(s) set forth in the Grant Agreement.

The Grantee will carry out the Project in compliance with the conditions stated in the DOL certification letter(s). The letter(s) and any documents cited in the letter(s) are incorporated herein by reference and made part of this Agreement.

**SECTION 19 GOVERNMENT ACTIONS**

(a) In all cases where the Government's review, approval or concurrence is required under the terms and conditions of this Agreement, the Government will provide its response within sixty (60) calendar days of receipt from the Grantee of all materials reasonably necessary for the formulation of the Government's response.

(b) If the Government determines that its position cannot be finalized within the sixty (60) day period, the Government will notify the Grantee, in writing, within thirty (30) days of receipt of the Grantee's submission that the Government's response will be delayed and advise the Grantee of the Government's anticipated time period for response.

(c) Whenever Government approval or concurrence is needed on any matter under this Agreement, such approval or concurrence will not be unreasonably withheld.

**SECTION 20 REMEDIES**

(a) Substantial failure of the Grantee to Complete the Project in accordance with the Application and this Agreement will be a default of this Agreement. In the event of default, the Government will have all remedies at law and equity, including the right to specific performance without further Federal financial assistance, and the rights to termination or suspension as provided by the Master Agreement, Section 11, "Right of the Government to Terminate." The Grantee recognizes that in the event of default, the Government may demand all Federal funds provided to the Grantee for the Project be returned to the Government. Furthermore, a default of this Agreement will be a factor considered before a decision is made with respect to the approval of future Grants requested by the Grantee.

(b) Under the provisions of Section 16 of this Agreement, Project Management Oversight, and under the terms and conditions of the Master Agreement, the Government will review performance by the Grantee to determine whether satisfactory progress is being made to Complete the Project. In the event that the Government determines that the Grantee is in breach of this Agreement, the Government may withhold its approvals of further funding and suspend drawdown of funds, under the provisions of Section 11, "Right of the Government to Terminate," of the Master Agreement until any necessary corrective action, which may be required by the Government, is accomplished. Any breach of this Agreement that is not corrected within a reasonable period of time will be a default of this Agreement. The Government in its discretion may permit the cost of such corrective action to be deemed a Project Cost, provided that such cost is an allowable cost under the requirements of the Master Agreement, Section 9 (c), "Costs Reimbursed," and so long as it remains within the limits of the Maximum Federal Financial Contribution set forth in Section 8 of the Agreement, Limitations of the Federal Funding Commitment.

(c) In the event of a breach of this Agreement by the Grantee and before the Government takes action contemplated by this Section, the Government will provide the Grantee with ninety (90) days written notice that the Government considers that such breach has occurred and will provide the Grantee a reasonable period of time to respond and to take necessary corrective action.

## SECTION 21 CONTENTS OF AGREEMENT

This Agreement consists of this Part I of II, "Grant Agreement and Federal Transit Administration, Full Funding Grant Agreement", including the Approved Project Budget and the Attachments to this Part I; Part II of II, "Federal Transit Administration Master Agreement", FTA Form MA(7) (October 1, 2000), as may be revised from time to time; the Application; the Reevaluation of the Final Environmental Impact Statement, the Environmental Assessment, the Record of Decision and related agreements; and prior Grant Agreements for the Project referenced in Attachment 5 of this Agreement. Should the Federal assistance award letter include special conditions for the Project, that letter is incorporated herein by reference and made a part of this Agreement. Any inconsistency between the Application and the terms and conditions of this Part I will be resolved according to the clear meaning of the provisions of this Part I and Attachments hereto.

## SECTION 22 SIMULTANEOUS CREATION OF ELECTRONIC AGREEMENT

This Agreement is being awarded and accepted simultaneously by electronic means. To the extent any discrepancy may arise between the electronic and written versions of this Agreement, the electronic version will prevail concerning the obligation amounts and the dates for award and execution of this Agreement; in all other respects the written version will prevail. Should the Electronic Notification of Award include special conditions for the Project, those conditions are incorporated herein by reference and made a part of this Agreement.

## SECTION 23 AMENDMENTS TO AGREEMENT

Amendments to any of the documents referred to in Section 21, Contents of Agreement, will be made in accordance with the requirements and procedures set forth in FTA Circular 5010.1C, "FTA Project Management Guidelines," (October 1, 1998), as may be amended from time to time, and FTA Circular 5200.1 "Full Funding Grant Agreement Guidance" (July 2, 1993), as may be amended from time to time.

## SECTION 24 ATTACHMENTS – INCORPORATION

Each and every Attachment to this Agreement is incorporated by reference and made a part of this Agreement.

**SECTION 25 NOTICES**

Notices required by this Agreement will be addressed as follows:

As to the Government:

Mr. Joel P. Ettinger
Regional Administrator
Federal Transit Administration
200 West Adams, Suite 2410
Chicago, Illinois 60606-5253

As to the Grantee:

Mr. Jay Lindgren
Regional Administrator
Metropolitan Council
230 East 5th Street
St. Paul, Minnesota 55101-1626

**SECTION 26 APPLICABLE LAW**

If neither Federal statute nor Federal common law govern the interpretation of the provisions of this Agreement, the state law of the State of Minnesota will apply. This provision is intended only to supplement the Master Agreement, Section 2(c), "Application of Federal, State, and Local Laws and Regulations."

**SECTION 27 EXECUTION OF AGREEMENT**

This Agreement is comprised of several identical counterparts, each to be fully executed by the parties and each deemed to be an original having identical legal effect. When signed by the Government, this instrument will constitute an award that should be executed by the Grantee within ninety (90) days of the Government's execution of the Agreement. The Government may withdraw its award of financial assistance and obligation of funds if this Agreement is not executed within the ninety (90) day period. Upon full execution of this Agreement, the effective date will be the date the Government executed its award.

The Government has executed this award as of JAN 17 2001.

BY: [signature]
Nuria I. Fernandez
Acting Administrator
FEDERAL TRANSIT ADMINISTRATION
U.S. DEPARTMENT OF TRANSPORTATION

The Grantee, by execution of this Agreement, ratifies and adopts all statements, representations, warranties, covenants and materials submitted by it; accepts the Government's award of financial assistance; and, agrees to all of the terms and conditions of this Agreement.

EXECUTED THIS 19TH DATE OF JANUARY, 2001.

| | | |
|---|---|---|
| AUTHORIZED OFFICIAL: | | |
| TITLE: | TED MONDALE<br>CHAIR | JAY LINDGREN<br>REGIONAL ADMINISTRATOR |
| ORGANIZATION: | METROPOLITAN COUNCIL | METROPOLITAN COUNCIL |

ATTESTED BY:

NILS F. GROSSMAN
GENERAL COUNSEL
METROPOLITAN COUNCIL

## CERTIFICATION BY ATTORNEY

I, Nils F. Grossman, acting as Attorney for the Grantee, certify that I have examined this Agreement and the proceedings taken by the Grantee relating to it. As a result of this examination I find that the execution of the Agreement by the Grantee has been duly authorized by the Grantee's action, in the form of a resolution, dated 01/17/01 , (a copy of which is certified as true and conforming and is submitted to the Government along with this executed Agreement). Also, I find that in all respects the execution of this Agreement and of the authorizing resolution are due and proper and in accordance with applicable State and local law. Further, in my opinion, this Agreement constitutes a legal and binding obligation of the Grantee in accordance with the Agreement terms. Finally, I certify that to the best of my knowledge there is no legislation or litigation pending or threatened which might affect the full implementation of the Project in accordance with the terms of this Agreement.

Dated this 19th day of January, 2001

SIGNATURE: Nils F. Grossman

TITLE: General Counsel

ORGANIZATION: Metropolitan Council

METROPOLITAN COUNCIL
Mears Park Centre, 230 East 5th Street, St. Paul, Minnesota
55101

## CERTIFICATION

I hereby certify that the following resolution, pertaining to the Hiawatha Light Rail Project, was approved by the Metropolitan Council at its meeting of January 17, 2001:

**Be it Resolved:**

**That the Metropolitan Council acknowledges the Federal Transit Administration's signing of the Full Funding Grant Agreement for the Hiawatha Light Rail Project on January 16, 2001, and authorizes the Council Chair and Regional Administrator to take all steps necessary to fully execute the Full Funding Grant Agreement.**

Dated this 18 day of January 2001.

Sandra Lindstrom

Sandra Lindstrom, Council Recording Secretary

# ATTACHMENT 1

## SCOPE OF PROJECT

Metro Transit and the Metropolitan Council, in cooperation with the Minnesota Department of Transportation (MnDOT), Hennepin County and the Metropolitan Airports Commission (MAC), will design and construct an 11.6 mile Light Rail Transit (LRT) line along the Hiawatha Avenue Corridor. The LRT will operate on the Hiawatha Avenue/Trunk Highway 55 (TH55) Corridor linking downtown Minneapolis, the Minneapolis-St. Paul (MSP) International Airport, and the Mall of America (MOA) in Bloomington. A combination of light rail signal preemption and traffic signal priority for at-grade intersections and for pedestrian access to stations will be constructed everywhere along the alignment except in the downtown Minneapolis Central Business District (CBD), where there is no preemption nor signal priority.

The entire LRT mainline will be double-track. From North to South, the alignment will run from the Entertainment District Station in the Minneapolis CBD to just south of the Veterans Affairs Medical Center, where an elevated viaduct structure will carry the alignment over TH55 and TH62 into the Ft. Snelling area. The track alignment then curves towards the Minneapolis-St. Paul International Airport, where a tunnel, approximately 8,000 feet long will carry the LRT line under the airport runways and main terminal. The line terminates at the Mall of America Station.

A total of 17 stations will be constructed. Two of the stations will be at the MSP Airport - see Attachment 2A. Thirteen of the off-airport stations will be at-grade with the other two being elevated. Station enhancements/artwork will be provided at the 15 off-airport stations. The Mall of America Station will be connected to the Mall of America with a covered skyway, which crosses 24th Avenue and connects to the Mall through the Mall's eastside parking ramp. Approximately twenty-six low-floor light rail vehicles will be purchased along with other appropriate maintenance vehicles. The Project also includes construction of an Operations and Maintenance Facility to be located on a twenty-acre site bordered by Hiawatha Avenue, I-94, Franklin Avenue and Cedar Avenue South.

# ATTACHMENT 2

## PROJECT DESCRIPTION

### PROJECT ITEM: PE - PRELIMINARY ENGINEERING

A contract was entered for the preliminary engineering of the Hiawatha Corridor LRT. Designs and drawings were produced to an approximate 30% level of design. Staff of Metropolitan Council/Metro Transit and the Minnesota Department of Transportation was used to facilitate community involvement in the early planning stage. In addition, the Hennepin County Regional Rail Authority (HCRRA) commissioned consultant services related to the early development of the project following completion of the alternative analysis study.

### PROJECT ITEM: IP - INTELLECTUAL PROPERTY

This activity provides for the securing of the intellectual property rights of proposals submitted by the unsuccessful design/build teams during Phase II of the design/build procurement process.

### PROJECT ITEM: PM - PROJECT MANAGEMENT

The project management organization is a consortium of local government agencies responsible to develop, build and operate the project. The organization is led by the grantee, the Metropolitan Council/Metro Transit (MC) and includes MnDOT, HCRRA, the Metropolitan Airports Commission (MAC), City of Minneapolis and City of Bloomington.

The Third Party line item provides for a contract to establish a Hiawatha Project Office (HPO) which is responsible for assisting in the management of design and construction activities for the project and for developing management tools and organizational structure to achieve the performance, schedule and budget objectives of the grantee. In addition, a contract was entered into to assist owner staff in the development of a two-phase process in the selection of a design/build contractor.

The Force Account line item provides for MnDOT staff to provide technical oversight of the design/build contractor during construction.

The Project Administration line item provides for staff of MC and MnDOT to fill functional roles for finance, engineering and construction contract administration, public relations, operations and maintenance, rail car procurement oversight, and environmental compliance within the HPO.

**PROJECT ITEM: PU - PUBLIC UTILITIES**

This represents a utility relocation agreement with the City of Minneapolis to relocate water and sewer utilities in downtown Minneapolis and along Hiawatha Avenue to 54th Street. City of Minneapolis forces will provide construction management services.

**PROJECT ITEM: ROW - ROW ACQUISITION**

Right-of-way consists of the acquisition of various properties from a number of military organizations, the Veterans Administration, the General Services Administration, the Metropolitan Airports Commission, the Star-Tribune newspaper, and small parcels from private entities.

Right of Way costs also include in-kind donations of right-of-way by the Minnesota Department of Transportation (MnDOT) and the Hennepin County Regional Rail Authority (HCRRA).

MnDOT acquisitions include parcels purchased beginning in the 1960's when the Hiawatha Avenue/Trunk Highway 55 corridor linking downtown Minneapolis and the Minneapolis-St. Paul International Airport was envisioned as an eight-lane divided freeway. In the 1985 FEIS the project was changed to a four-lane at-grade arterial with an adjacent LRT. MnDOT will donate the parcels acquired for the freeway project, with non-federal funds, which lie within the LRT corridor.

The HCRRA will donate land it began acquiring 1987 with non-federal funds for the LRT following the 1985 FEIS. This includes the 20 acre parcel for the yards and shops.

**PROJECT ITEM: IN - INSURANCE**

The Owner Controlled Insurance Program (OCIP) will permit MnDOT to provide certain construction insurance at no cost to the design/build contractor. The OCIP will include the following:

- Statutory Workers' Compensation and Employer's Liability Insurance;
- Commercial General Liability Insurance;
- Umbrella/Excess Liability;
- Professional Liability Insurance;
- Contractors Pollution Liability (can be a stand-alone policy);
- Railroad Protective Liability Insurance (can be a stand-alone policy); and
- Builders' Risk Property Insurance (insured in State Risk Management Fund).

**PROJECT ITEM: CN - CONTINGENCY**

The purpose is to cover costs that exceed the base line cost estimates.

**PROJECT ITEM: LRV - LIGHT RAIL VEHICLES**

This contract covers the purchase and acceptance of approximately 26 low-floor light rail vehicles.

**PROJECT ITEM: MOWV - MAINTENANCE OF WAY VEHICLES**

Contracts will cover the purchase of maintenance of way vehicles. These vehicles will be used to provide system maintenance during system testing and revenue operations.

**PROJECT ITEM: FCE - FARE COLLECTION EQUIPMENT**

This contract will provide for the procurement and installation of stationary Ticket Vending and validation Machines and procurement of mobile Ticket Office Machines for extraordinary passenger volumes during special events.

**PROJECT ITEM: DBC - DESIGN/BUILD CONTRACT 1**

This contract will be for the services of a design/build contractor who will be responsible for final design and construction of the Hiawatha light rail transit project (excluding the airport activities described in Attachment 2A). The design/builder will be responsible for:

- Preparation of design documents and final drawings;

- Developing Urban Design and Landscaping and Art in Transit concepts and design aesthetics in accordance with the owners requirements;

- Civil construction, including reconstruction, in the areas where the tracks are on roadways, of the curbs, gutters, drainage, sidewalks and roadways, for trackbed in the following four non-airport project segments:

| Phase | Segment Designator | Name/Location |
|---|---|---|
| 1a | B | Downtown |
| 1a | C | Test Track |
| 1a | D | Lake Street to Ft. Snelling |
| 1b | F | Airport to Mall of America |

- Construction of an Operations and Maintenance Facility, including a covered storage yard capable of housing up to 24 vehicles.

- Construction of the 15 off-airport LRT stations, in compliance with all ADA requirements, at the following locations:

  - Entertainment District Station (at-grade center platform);
  - Nicollet Mall Station (at-grade center platform);

- Government Station (at-grade side platforms);
- Downtown East Station (at-grade side platforms);
- Cedar-Riverside Station (at-grade center platform);
- Franklin Avenue Station (elevated center platform);
- Lake Street Station(elevated center platform);
- 38th Street Station (at-grade center platform);
- 46th Street Station (at-grade side platforms);
- 50th Street/Minnehaha Park Station (at-grade side platforms);
- V.A. Medical Center Station (at-grade center platform);
- Fort Snelling Station (at-grade center platform);
- 80th Street Station (at-grade, split side platforms);
- South Bloomington Station (at-grade center platform); and
- Mall of America Station (at-grade center platform with skyway connection);

- Purchase and installation of 11.6 miles of mainline double track and special trackwork to be positioned within the Hiawatha corridor right-of-way;

- Installation of Traction Electrification System consisting of 14 Traction Power Substations and Overhead Contact Systems;

- Installation of Signal systems and Communication/Central Control systems, including gated barriers at at-grade street crossings;

- Perform testing of signals and systems during start-up;

- Provide as-built documentation, Operations and Maintenance (O&M) Manuals and O&M training of Metro Transit personnel;

- Perform preventive maintenance and corrective maintenance through final acceptance, and warranty services as specified in the design/build contract.

Note 1: This contract will include additional work elements for the Hiawatha Corridor Improvements Project identified below; however these elements will not be paid for by Section 5309 New Starts funds.

- ❑ Construction of three new elevated structures and rehabilitation of four existing railroad bridges:

  New Elevated Guideways:
  - Over the new Trunk Highway 55/62 interchange (Bridge 27264)
  - Over Lake Street and Hiawatha Avenue (Bridge 27262)
  - Over the Third Street Ramp Overpass (Bridge 27263)

  Rehabilitated Bridge Structures:
  - Trunk Highway 122 (Bridge 27884)
  - I-35W (Bridge 27878)
  - Franklin Avenue (Bridge 6664)
  - Cedar Avenue (Bridge 6663)

- ❑ Construction of parking facilities.

**PROJECT ITEM: RATT - RAIL ACTIVATION, TESTING & TRAINING**

This unit represents grantee activity for operations staff training (drivers, mechanics and maintenance) and pre-revenue systems operation testing.

**PROJECT ITEM: FC - FINANCING COST**

Since the actual annual amount of Federal Section 5309 New Starts appropriations cannot be accurately determined at this time, there will be financing costs associated with borrowing to match cash flow needs for the project. Financing costs would include locally funded interest costs, fees and professional services.

**PROJECT ITEM: PA – PUBLIC ART**

This unit will cover artwork as part of construction of the 15 off-airport LRT stations.

# ATTACHMENT 2A

## METROPOLITAN AIRPORTS COMMISSION (MAC) INTERRELATED ACTIVITIES

## MAC SEGMENT

The Metropolitan Airports Commission (MAC) will construct the Hiawatha LRT facilities at the Minneapolis-St. Paul International Airport, including the LRT tunnel; two airport passenger stations (Lindbergh Terminal and Humphrey Terminal: some station signage, artwork associated with the Hiawatha Project at the Airport; and certain ancillary facilities (i.e., lighting and power, ventilation, dry standpipe, and drainage) specific to the airport tunnel.

The work at the Airport can be divided into five major areas:

**Tunnel Structure**

MAC will be responsible for the entire design and civil construction of the tunnel on the Airport property. In addition, MAC will be responsible for providing permanent lighting, including Blue Lights; installation of the fire protection system in the tunnel; installation of all system conduits; construction of vent shafts; provision of fans and housing; and provision of sump and pump systems in the tunnel.

**At-Grade Station**

MAC will be responsible for the civil construction of an at-grade station at the Humphrey Terminal.

**Underground Station**

MAC will be responsible for the design and construction of an underground station at the Lindbergh Terminal including, but not limited to, stations finishes; stand-by power; installation of a smoke/fire detection system; installation of a fire suppression system; installation of telephones; installation of lighting; and installation of sump systems and sump pumps.

**Utility Relocation**

MAC will be responsible for all public utility protection and relocation on MAC property associated with the LRT Project.

**Project Management**

MAC will be responsible for project management including design and construction schedules and construction cost estimating; final design; project management oversight; construction management; and insurance for all elements of civil construction for which MAC is responsible.

# ATTACHMENT 3

## HIAWATHA CORRIDOR LIGHT RAIL PROJECT
## BASELINE COST ESTIMATE

| Project Item: | Contract Unit: | 1999 Cost Estimate | Start Date | Midpoint (Months) | Finish Date | Duration (Months) | Escalation[1] Factor | Construction Estimate |
|---|---|---|---|---|---|---|---|---|
| PE | **Preliminary Engineering** | 18,281,392 | 1/11/99 | 8 | 5/26/00 | 16 | 0.00% | 18,281,392 |
| | Preliminary Eng'g - Third Party | 9,739,163 | 1/11/99 | 8 | 5/26/00 | 16 | 0.00% | 9,739,163 |
| | Preliminary Eng'g - Project Admin. | 2,012,000 | 1/18/99 | 8 | 5/26/00 | 16 | 0.00% | 2,012,000 |
| | Preliminary Eng'g - In-kind Contribution | 6,530,229 | 1/19/99 | 8 | 5/26/00 | 16 | 0.00% | 6,530,229 |
| IP | **Intellectual Property** | 1,000,000 | 1/31/00 | 3.5 | 8/17/00 | 7 | 0.00% | 1,000,000 |
| | DB Proposals - Third Party | 1,000,000 | 1/31/00 | 3.5 | 8/17/00 | 7 | 0.00% | 1,000,000 |
| PM | **Project Management** | 38,687,700 | 7/6/99 | 33 | 12/31/04 | 66 | 6.79% | 41,293,237 |
| | Third Party Contract | 32,000,000 | 7/6/99 | 33 | 12/31/04 | 66 | 6.79% | 34,172,800 |
| | Force Account | 1,600,000 | 11/17/99 | 31 | 12/31/04 | 62 | 6.79% | 1,708,640 |
| | Project Administration | 5,087,700 | 11/17/99 | 31 | 12/31/04 | 62 | 6.79% | 5,411,797 |
| PU | **City of Minneapolis Public Utilities** | 9,470,022 | 9/29/99 | 9 | 3/30/01 | 18 | 9.61% | 10,380,091 |
| | Construction Mgmt - Force Account | 293,956 | 9/29/99 | 9 | 3/30/01 | 18 | 9.61% | 322,205 |
| | ROW-Utility Relocation | 9,176,066 | 9/29/99 | 9 | 3/30/01 | 18 | 9.61% | 10,057,886 |
| ROW | **Right-of-Way** | 48,014,090 | 9/1/99 | 6.5 | 9/29/00 | 13 | 0.00% | 48,014,090 |
| | ROW - Acquisition | 20,287,000 | 9/1/99 | 6.5 | 9/29/00 | 13 | 0.00% | 20,287,000 |
| | Donated ROW | 27,727,090 | 9/1/99 | 6.5 | 9/29/00 | 13 | 0.00% | 27,727,090 |
| IN | **Insurance** | 5,578,468 | 10/3/00 | 24 | 10/15/04 | 48 | 9.61% | 6,114,559 |
| | Insurance - Third Party | 5,578,468 | 10/3/00 | 24 | 10/15/04 | 48 | 9.61% | 6,114,559 |
| CN | **Contingency** | 24,040,796 | 10/3/00 | 24 | 10/15/04 | 48 | 0.00% | 24,040,796 |
| | Contingencies | 24,040,796 | 10/3/00 | 24 | 10/15/04 | 48 | 0.00% | 24,040,796 |
| LRV | **Light Rail Vehicles** | 79,165,233 | 4/19/99 | 29 | 2/5/04 | 58 | 0.00% | 79,165,233 |
| | LRV Procurement | 79,165,233 | 4/19/99 | 29 | 2/5/04 | 58 | 0.00% | 79,165,233 |
| MOWV | **Maintenance of Way Vehicles** | 2,300,949 | 1/2/01 | 14.5 | 5/21/03 | 29 | 9.61% | 2,522,070 |
| | MOW Equipment Procurement | 2,300,949 | 1/2/01 | 14.5 | 5/21/03 | 29 | 9.61% | 2,522,070 |
| FCE | **Fare Collection Equipment** | 3,264,325 | 10/2/00 | 21 | 4/8/04 | 42 | 9.61% | 3,578,027 |
| | Construction - Fare Collection Equipme | 3,264,325 | 10/2/00 | 21 | 4/8/04 | 42 | 9.61% | 3,578,027 |
| DBC | **Design/Build Contract** | 220,681,220 | 8/17/00 | 25 | 10/15/04 | 50 | 9.40% | 241,425,255 |
| | FTA-Funded Portion | 220,681,220 | 8/17/00 | 25 | 10/15/04 | 50 | 9.40% | 241,425,255 |
| RATT | **Rail Activation Testing & Training** | 2,500,000 | 3/25/03 | 9.5 | 10/30/04 | 19 | 9.61% | 2,740,250 |
| | Testing & Training | | 3/25/03 | 9.5 | 10/30/04 | 19 | 9.61% | 2,740,250 |
| FC | **Financing Costs** | 3,000,000 | 1/1/02 | 16.5 | 9/30/04 | 33 | 0.00% | 3,000,000 |
| PA | **Public Art** | 2,000,000 | 8/29/00 | 25 | 10/15/04 | 50 | 0.00% | 2,000,000 |
| | **Total Capital Costs** | 457,964,195 | | | | | | 483,555,000 |
| | **MAC Segment**[*] | 130,060,450 | 1/3/00 | 28 | 9/13/04 | 56 | 9.18% | 142,000,000 |
| | Hiawatha Corridor Improvements | 48,118,695 | 10/24/00 | 17 | 8/15/03 | 34 | 3.14% | 49,875,000 |
| | **Hiawatha Light Rail Project Total** | 634,143,340 | | | | | | 673,430,000 |

[1] Different escalation rates for different line items (Average 3.0%/yr)

[*] Total includes a contingency amount of $8 million.

# ATTACHMENT 3A

HIAWATHA CORIDOR LIGHT RAIL PROJECT
PROJECT BUDGET

| FTA line Item | Contract Unit: | Federal Sec. 5309 New Starts | Local Match | MnDOT ACTIVITIES CMAQ Fed Funds | MnDOT ACTIVITIES CMAQ Local Funds | MnDOT ACTIVITIES STP Fed Funds | MAC ACTIVITIES MAC Funds | MAC ACTIVITIES Local Funds | Total Amount |
|---|---|---|---|---|---|---|---|---|---|
| | **Preliminary Engineering** | | | | | | | | |
| 13.71.01 | Preliminary Eng'g - Third Party | 7,403,809 | 2,335,354 | | | | | | 9,739,163 |
| 13.79.00 | Preliminary Eng'g - Project Admin. | 1,529,543 | 482,457 | | | | | | 2,012,000 |
| 13.71.01 | Preliminary Eng'g - In-kind Contrib. | - | 6,530,229 | | | | | | 6,530,229 |
| | **Intellectual Property** | | | | | | | | |
| 13.71.02 | DB Proposals - Third Party | 760,210 | 239,790 | | | | | | 1,000,000 |
| | **Project Management** | | | | | | | | |
| 13.71.03 | Project Management - Third Party | 25,978,504 | 8,194,296 | | | | | | 34,172,800 |
| 13.72.03 | Project Management - Force Account | 1,298,925 | 409,715 | | | | | | 1,708,640 |
| 13.79.00 | Project Management - Project Admin. | 4,114,102 | 1,297,695 | | | | | | 5,411,797 |
| | **City of Minneapolis Public Utilities** | | | | | | | | |
| 13.72.04 | Construction Mgmt - Force Account | 244,943 | 77,262 | | | | | | 322,205 |
| 13.75.95 | ROW-Utility Relocation | 7,646,108 | 2,411,780 | | | | | | 10,057,886 |
| | **ROW** | | | | | | | | |
| 13.75.91 | ROW - Acquisition | 15,422,635 | 4,864,365 | | | | | | 20,287,000 |
| 13.75.91 | Donated ROW | - | 27,727,090 | | | | | | 27,727,090 |
| | **Insurance** | | | | | | | | |
| 13.71.05 | Insurance - Third Party | 4,648,349 | 1 466,210 | | | | | | 6,114,559 |
| | **Contingency** | | | | | | | | |
| 13.73.00 | Contingencies | 18,276,054 | 5,764,742 | | | | | | 24,040,796 |
| | **Light Rail Vehicles** | | | | | | | | |
| 13.13.20 | LRV Procurement | 63,332,186 | 15,833,047 | | | | | | 79,165,233 |
| | **Maintenance of Way Vehicles** | | | | | | | | |
| 13.42.11 | MOW Equipment Procurement | 1,917,303 | 604,767 | | | | | | 2,522,070 |
| | **Fare Collection Equipment** | | | | | | | | |
| 13.33.08 | Construction - Fare Collection Equipment | 2,720,052 | 857,975 | | | | | | 3,578,027 |
| | **Design/Build Contract** | | | | | | | | |
| 13.20.00 | FTA-Funded Portion | 173,100,564 | 68,324,691 | | | | | | 241,425,255 |
| | **Rail Activation Testing & Training** | | | | | | | | |
| 13.70.00 | Testing & Training | 2,083,165 | 657,085 | | | | | | 2,740,250 |
| 13.79.00 | Financing Costs | 2,280,630 | 719,370 | | | | | | 3,000,000 |
| 13.93.04 | Public Art | 1,520,420 | 479,580 | | | | | | 2,000,000 |
| | **Total Capital Costs** | 334,277,500 | 149,277,500 | | | | | | 483,555,000 |
| | | | | | | | | | |
| | MAC Segment | | | | | | 87,000,000 | 55,000,000 | 142,000,000 |
| | Hiawatha Corridor Improvements | | | 5,500,000 | 1,375,000 | 43,000,000 | | | 49,875,000 |
| | | | | | | | | | |
| | Hiawatha Light Rail Project Total | 334,277,500 | 149,277,500 | | | | 87,000,000 | 55,000,000 | 675,430,000 |
| | Percent Share of Project Total | 49.5% | 22.1% | 0.8% | 0.2% | 6.4% | 12.9% | 8.1% | 100.0% |




| | | | |
|---|---|---|---|
| rt Date 01OCT98<br>ish Date 31DEC04<br>a Date 31AUG00<br>n Date 25SEP00 18:08 | ADD1<br>LT-45 | Sheet 1 of 2<br>ATTACHMENT #4<br>HIAWATHA LIGHT RAIL TRANSIT PROJECT | *REVENUE OPERATIONS*<br>*DECEMBER 31, 2004* |

© Primavera Systems, Inc.

| Activity ID | Activity Description |
| --- | --- |
| | + DESIGN - BUILD CONTRACT |
| | PROCUREMENT, TEST & STARTUP |
| | + LRV Procurement |
| | + MOW Equipment Procurement |
| | + Construction - Fare Collection Equipment |
| | + Training/Testing |
| | + Financing |
| | + Public Art |
| | + MAC DESIGN & CONSTRUCTION |




| | | |
| --- | --- | --- |
| Start Date 05OCT98<br>Finish Date 31DEC04<br>Data Date 31AUG00<br>Run Date 25SEP00 15:06 | ADD1<br>LT-45<br>Sheet 2 of 2<br>ATTACHMENT #4<br>HIAWATHA LIGHT RAIL TRANSIT PROJECT | *REVENUE OPERATIONS*<br>*DECEMBER 31, 2004* |

© Primavera Systems, Inc.

# ATTACHMENT 5

## PRIOR GRANTS AND RELATED DOCUMENTS

### I. Prior Grants

| *Grant No.* | *Obligation Date* | *Federal Amt.* | *Fund Source* | *Purpose* |
|---|---|---|---|---|
| *MN-03-0058* | 1/4/1999 | $3,872,000 | Sec. 5309 | P.E. |
| *MN-03-0058 Amend. #1* | 7/20/1999 | $6,467,000 | Sec. 5309 | P.E. |
| *Mn-03-0058 Amend. #2* | 6/29/2000 | $16,995,588 | Sec. 5309 | Final Design |
| *MN-03-0066* | 9/28/2000 | $33,442,602 | Sec. 5309 | Final Design |

### II. Related Documents

1. Record of Decision: April 26, 2000
2. Amendment to Record of Decision: September 7, 2000
3. Approval to Initiate Final Design: April 26, 2000
4. Letter of No Prejudice: May 26, 2000

**III.** FFGA Grant History (This section of Attachment 5 is to be updated with each grant approval for this project. All grant actions, including formula and flexible funds included in Attachment 6 should be listed below included.)

| Project No: | Federal Amount | Obligation Date |
|---|---|---|
| MN-03-0066-01 | $0 | |

# ATTACHMENT 6

## SCHEDULE OF FEDERAL FUNDS

Subsection 3030(a)(91) of the Transportation Equity Act for the 21st Century (TEA-21) authorizes FTA to award Federal capital new starts funds for final design and construction of the Minneapolis Hiawatha Light Rail Line (the "Project"). To date, FTA has awarded $60,777,190 in capital new starts funds of a total of $118,963,384 appropriated. In accordance with the Federal Transit Laws, 49 U.S. C. Chapter 53, and FTA Circular 5200.1, Full Funding Grant Agreements Guidance (July 2, 1993), by the execution of this Agreement the Government is limiting its commitment to provide funding for the Project to those funds that have been or may be appropriated under TEA-21. The Government and the Grantee recognize, however, that the period of time necessary to complete the Project may extend beyond the expiration of TEA-21, as evidenced by Attachment 4 to this Agreement (Baseline Schedule).

Currently, the Government and the Grantee anticipate that the Federal capital new starts funds will be provided for the Project as follows:

| Fiscal Year | Federal Section 5309 New Starts | Federal STP and CMAQ Funds | Local* | Total |
|---|---|---|---|---|
| 2000 and Prior | $69,324,757 | | $51,588,507 | $120,913,264 |
| 2001 | $49,532,158 | | $82,081,947 | $132,614,105 |
| 2002 | $50,000,000 | | $72,955,725 | $122,955,725 |
| 2003 | $60,000,000 | | $22,616,896 | $82,616,896 |
| 2004 | $74,980,000 | | ($50,524,990) | $24,455,010 |
| 2005 | $30,440,585 | | ($30,440,585) | $0 |
| Subtotal | $334,277,500 | | $149,277,500 | $483,555,000 |
| Hiawatha Corridor Improvements** | $0 | $48,500,000 | $1,375,000 | $49,875,000 |
| MAC Activities*** | $0 | $0 | $142,000,000 | $142,000,000 |
| Hiawatha LRT Total | $334,277,500 | $48,500,000 | $292,652,500 | $675,430,000 |

* Sources of local funding are the State of Minnesota and Hennepin County and include general obligation bonds, donated land, and in-kind services.

**Hiawatha Corridor Improvements are activities funded with Federal STP and CMAQ funds as indicated in Attachment 3A. The STP funds ($43 million) will fund bridge rehabilitation and overpass construction. (The STP funds are matched with an additional $10.75 million in local funds not included in the Hiawatha LRT project.) The CMAQ funds ($6.875 million) will fund park and ride facilities.

***Airport-related activities funded by the Metropolitan Airport Commission and other local monies.

# ATTACHMENT 7

## MEASURES TO MITIGATE ENVIRONMENTAL IMPACTS

The environmental record for the Hiawatha Light Rail Transit Project includes the alternative analysis, technical considerations, and social, economic and environmental evaluations and determinations found in the following documents:

- *Final Environmental Impact Statement for the Reconstruction of Trunk Highway 55*, February 1985;
- *ROD for the Reconstruction of Trunk Highway 55*, April 1985;
- *FEIS Reevaluation*, September, 1999;
- *Environmental Assessment*, September, 1999;
- *State Environmental Assessment Worksheet*, August, 1999;
- *Negative Declaration*, October, 1999;
- *Finding of No significant Impact Issued, made by the Federal Aviation Administration*, April, 2000.
- *Environmental Assessment*, August, 2000; and
- *Categorical Exclusion*, August, 2000.

The Metropolitan Airports Commission (MAC) will be responsible for constructing the tunnel that runs under the MSP Airport. Specifically, MAC is responsible for construction from the point where the alignment begins its descent from ground level in the Fort Snelling area until the south end of the *Humphrey Terminal Station*. MAC will also be responsible for construction of the *Lindbergh Terminal Station* and the *Humphrey Terminal Station*. MnDOT will be responsible for construction of the rest of the project. Included with this responsibility for construction is the commitment to adhere to the mitigation measures required for the assigned segments. MnDOT and MAC will be responsible for implementing mitigation measures for their assigned segments.

MnDOT and MAC will address all required mitigation measures described in the FEIS Reevaluation and the EA for the Preferred Alternative. These measures include the stipulations set forth in the Programmatic Agreement (PA). The PA complies with

Section 106 of the National Historic Preservation Act. FTA requires as a condition of any grant or grant agreement that all required mitigation measures be implemented in accordance with the requirements identified in the ROD. FTA requires that MnDOT and MAC, via the Metropolitan Council (the Grantee receiving FTA funds for the project), periodically submit written reports on their progress in implementing the required mitigation measures. FTA will monitor this progress through quarterly reviews of final engineering and design, land acquisition required for the project, and construction of the project. A summary of the mitigation measures required to minimize harm are described below:

***Land Acquisition and Displacement*** – Fair market value will be paid for all land rights acquired for the proposed project. MnDOT's Office of Land Management has a relocation assistance program in place. MnDOT will comply with all requirements of the federal Uniform Relocation and Real Property Acquisition Policies Act and its implementing regulations.

Agreements will be reached between MnDOT/Metropolitan Council and several federal property holders to gain easements on land owned by the Veterans Administration, GSA and the U.S. Military on a base located northeast of the Airport. Memorandums of Agreement are currently in negotiation. In addition, MnDOT/Metropolitan Council and MAC will negotiate an agreement to address gaining access to and rights for use of airport owned land.

***Utilities*** – Utility relocation efforts have been underway since the beginning of the preliminary engineering phase of the project. Initial identification of utilities impacted is complete. MnDOT will determine which utilities require relocation and will work directly with the public and private utility companies to formulate the best strategy for relocation.

In the area of 5th Street and Nicollet Mall, the LRT overhead catenary system will be designed to enable cranes to reach the needed location(s) near the existing Northern States Power vaults.

***Joint and Secondary Development*** – MnDOT will encourage potential design/build contractors to consider, and include where appropriate, joint development adjacent, under and over the LRT facilities.

MnDOT will continue to work with the cities of Minneapolis and Bloomington in identifying traction power substation locations. Substations will be located to fulfill the electrical requirements of the system, remain efficiently serviceable and minimize the impact to surrounding land uses. In addition, efforts will be made to locate the substations in areas that will not reduce potential development/redevelopment opportunities while meeting the operational needs of the LRT system.

***Historic Properties*** - To assess and mitigate the effects that LRT will have on historic properties, a PA has been developed which complies with Section 106 of the National Historic Preservation Act. The PA has been signed by the Advisory Council on Historic Preservation (ACHP), FTA, Minnesota State Historic Preservation Office (SHPO), MnDOT, City of Minneapolis, Minneapolis Heritage Preservation Commission, Hennepin County Regional Railroad Authority, MAC, Metropolitan Council and the VA. The PA provides for the review of lighting, amenity and transit station designs near historic properties, recording of original trolley lines and salvage of brick pavers along 5th Street, as well as consultation to assess effects to the Fort Snelling Cemetery, the Fort Snelling Historic District, and to the Minneapolis Warehouse District.

***Contaminated Properties and/or Materials*** – Phase I Environmental Site Assessments (Phase I) have been completed for the entire LRT Hiawatha Corridor. The results of the Phase I assessments are summarized in three separate reports. MnDOT completed a review of the high and medium potential contamination sites in order to evaluate likely impacts of these sites to the LRT Hiawatha Corridor. The review identified four main areas of concern:

- The proposed maintenance area (former 8th Street Coach Yard);
- The fly-over bridge area (former Southtown Rail Yard, CMC Heartland Partners/former grasshopper poison site, and the Green Institute site);
- The Airport area (various petroleum releases and possibly de-icing chemical releases); and
- A grouping of lower impact sites (generally known or potential petroleum releases at various locations along the corridor).

*Phase II/Drilling Investigation Work Plans*

The MnDOT Office of Environmental Services (OES) and MAC, for their respective segments, will develop drilling investigation work plans. The work plans will identify soil boring locations, number and depth of soil samples to be collected, number of groundwater samples to be collected, analytical parameters for soil and groundwater samples and procedures for collecting soil and groundwater samples. The work plans will be developed in coordination with the early LRT design process to ensure that soil and groundwater samples are representative of areas that will be excavated or disturbed during construction. The drilling investigation work plans will be submitted to the MPCA and any other appropriate regulatory agencies for review and approval.

*Phase II/Drilling Investigation*

Once the drilling investigation work plans have been approved by the MPCA and/or other appropriate regulatory agencies, MnDOT and MAC, for their respective segments, will implement the plans. When analytic results are available, they shall be analyzed to identify data gaps (if any) and determine the need for additional sampling. If additional sampling is required, it will be conducted with the approval of the MPCA and any other appropriate regulatory agencies.

*Response Action Plan Development*

When the drilling investigation is complete, identified areas of contamination will be compared to LRT construction plans. The purpose of the comparison is to determine the volumes of contaminated soil that will require excavation and identify areas where contaminated groundwater may be encountered during de-watering activities. MnDOT and MAC will develop response action plans (RAPs), for their respective segments, for managing contaminated soil and groundwater. The RAPs will provide details on the following:

- type and magnitude of contamination present in the soil and/or groundwater;
- requirements for excavation/de-watering of contaminated materials;
- proposed treatment/disposal options for contaminated soil and/or groundwater activities;
- air monitoring requirements for contaminated work zones and areas downwind of contaminated work zones, including establishing critical airborne dust levels that would require mitigation efforts;
- establishing airborne dust mitigation procedures;
- a contingency plan for unexpected contamination issues; and
- the type of documentation that will be provided once the project is complete.

The RAPs will be submitted to the MPCA and any other appropriate regulatory agencies for review and approval.

*RAP Implementation and Oversight*

MnDOT and MAC, for their respective segments, will monitor and document construction activities in contaminated areas to ensure compliance with the MPCA-approved RAPs. The scope of this will include soil and groundwater sampling, air monitoring, excavation observation, coordination with specialty contractors, determining when implementation of dust mitigation efforts is necessary, documentation of soil/groundwater treatment and/or disposal, and periodic updates to the appropriate regulatory agencies. Once construction is complete, formal RAP implementation reports will be developed and provided to the MPCA and any other appropriate regulatory agencies.

***Noise and Vibration***

*Yard and Shop Complex*

To mitigate potential nighttime noise impacts at the Yard and Shop complex (a site bordered by Hiawatha Avenue, I-94, Franklin Avenue and Old Cedar Avenue), the majority of nighttime vehicle maintenance activities, other than trains moving in the yard, shall be performed inside a closed building. Some maintenance activities, such as light

rail vehicle cleaning, may be performed outside the storage shelter. The noise levels produced by these activities are not expected to exceed FTA guidelines or City of Minneapolis ordinance requirements. If they do, however, the Metropolitan Council will work with the surrounding community to identify and implement non-intrusive mitigation measures.

Effective wheel squeal mitigation at the turnaround track at the north end of the complex will include equipping each Light Rail vehicle with bracketry to accommodate either solid-based lubricators or dry-stick friction modifiers and installing wayside applicators suitable for either liquid-based lubricants or friction modifiers. If, after application of the above noted mitigation measures, the noise levels exceed FTA guidelines, the Metropolitan Council will work with the adjoining community to identify and implement non-intrusive mitigation measures.

*38th Street/Mill City Station Bus Transfer Facility*

To minimize noise impacts associated with bus idling, the existing Metro Transit bus idling policy will be enforced. Specifically, when the temperature is over 32 degrees Fahrenheit, bus idling will be limited to a five-minute time period.

*West of Hiawatha Avenue Gap in Berm*

Due to a gap in the existing berm, a residence at 3508 45th Street was found to potentially experience noise impacts from the Hiawatha corridor. MnDOT will construct a continuous noise wall, sometimes in combination with a berm, from 40th Street to 46th Street except for the opening for 42nd Street.

*Lumber Exchange – Vibration*

The LRT crossover tracks in downtown Minneapolis have been modified and will be relocated to avoid passing in front of the Lumber Exchange building, which is located at the northeast corner of 5th Street and Hennepin Avenue. The crossover has been relocated to an adjacent block on 5th Street between Marquette and 2nd Avenue South, a location where less sensitive buildings exist near the crossover area that would not be impacted by vibration.

*Construction Noise Mitigation*

Construction of the Hiawatha LRT line taking place in the cities of Minneapolis and Bloomington will conform with all applicable city noise ordinances and regulations pertaining to allowable hours of construction.

*Air Quality* – Construction specifications will outline methods of eliminating dust and maintaining air quality standards during construction. These specifications will be addressed in construction specification documents to be developed during final design.

***Safety and Security*** - The Hiawatha LRT line will be designed to promote safe operation for passengers, residents, business owners and road users (pedestrians, bicycles, and vehicles) along the corridor. System safety principles, including the latest LRT standards, will be incorporated into the system design.

Section 3.8 of the FEIS Reevaluation document presents in detail the Safety and Security measures that will be implemented as part of the Hiawatha LRT project, including grade crossing safety, safety during construction, tunnel safety, rail safety education, and security measures.

***Economics*** – The Hiawatha LRT Land Use and Community Impacts Committee is responsible for evaluating the potential and planning for transit-oriented development in the Hiawatha Corridor. Local governments including the Metropolitan Council, Hennepin County, the City of Minneapolis, and the City of Bloomington will be responsible for implementing zoning policies and incentives to encourage development in the corridor.

***Traffic***

*Construction Traffic Mitigation*

MnDOT will develop a Traffic Control Plan for the entire corridor during the final design phase of the project.

*Minneapolis Central Business District*

The 5th Street LRT alignment will be converted to a transit mall. With the conversion, traffic, buses and bike routes will be diverted to nearby streets. The impacts of these traffic diversions will be mitigated by the 4th Street contra flow bus lane and minor intersection improvements.

*Federal Properties Segment*

The Fort Snelling Station will eliminate some surface parking spaces at the GSA building. The value of these parking spaces will be replaced with a combination of improvements to the surface parking area, refined access points, and improved vehicle circulation.

*Bloomington Segment*

- There will be no net loss of through-lanes or turning lanes on 34th Avenue. A new traffic signal will be installed where the LRT line is proposed to cross 34th Avenue.
- During the construction of 34th Avenue, traffic will be maintained. There will be short periods of time when traffic will have to be diverted. This diversion will be

further defined in the Traffic Control Plan for the entire corridor, which will be developed during the final design phase of the project.

- MnDOT will evaluate the operation of the ramp meter on the westbound I-494 entrance ramp. If appropriate, MnDOT will take measures to avoid roadway stacking on the at-grade LRT crossing.

***Water Quality*** – MnDOT, through its Design-Build contractor or other means, and MAC will develop erosion control plans as part of final design of their respective segments. These plans will address measures to prevent or reduce the possibility for erosion and will include specific best management practices. A National Pollutant Discharge Elimination System (NPDES) permit will be required for the project from the MPCA, which will address storm water runoff/detention.

***Endangered Species*** –Pegrines are known to nest in the project area. MnDOT staff will coordinate with the Minnesota Department of Natural Resources (MnDNR) regarding the impact on peregrine nesting locations within the project study area. If appropriate, measures to mitigate impacts will be implemented.

***Disposal of Debris and Spoil*** – MnDOT and MAC, for their respective segments, will implement proper on-site collection and off-site disposal of wastes, provisions for removal of sediment from de-watering effluent, and proper precautions in using construction chemicals and oil-based materials to mitigate tunnel-related or other construction impacts.

***Disruption of Businesses During Construction*** – MnDOT will undertake careful coordination with area businesses and federal agencies, throughout the Hiawatha LRT corridor to minimize construction-related impacts.

Metro Transit

**FAX TRANSMITTAL**

Date: 4/9/01 Total Pages: 46 (including this page)

To: Shureen Nyvold VOX:

Company: Legal FAX: 1640

From: Janice Martin VOX: 2518

Department: Exec FAX: 7503

Comments: Shureen - I don't think this one page went through - so sending again

If you have problems concerning this transmittal, please contact:

VOX:

Metro Transit

September 27, 2000

Mr. Joel Ettinger, Regional Administrator
Federal Transit Administration – Region 5
200 West Adams, Suite 2410
Chicago, IL 60606

Re: Revised Hiawatha LRT Project Full Funding Grant Application

Dear Mr. Ettinger:

Enclosed is the original and two (2) copies of a revised Application, including all proposed Attachments for the Full Funding Grant Agreement, by the Metropolitan Council of Minneapolis-St. Paul for a Full Funding Grant under the Section 5309 New Starts program.

The Metropolitan Council is requesting federal support of $334,277,500 under the Section 5309 New Starts program to design, engineer and construct the Hiawatha Corridor Light Rail Transit Project. The Hiawatha LRT Project runs from the Entertainment District in downtown Minneapolis at the north, through the Minneapolis-St. Paul International Airport, to the Mall of America at the southern terminus. The project's cost is estimated to be $625,555,000. The federal share of Section 5309 New Starts funds will be approximately 53 percent of the project cost.

Within the project cost is $142,000,000 for the construction of a tunnel and two stations at the airport. The tunnel and stations will be constructed by the Metropolitan Airports Commission as a separate but related project using general airport revenues and local funds.

Please call Julie Johanson at (612) 349-7614 with any questions you may have regarding this application.

Sincerely,

Arthur T. Leahy

Arthur T. Leahy
General Manager

ATL:jlm
Enclosures: Standard Form 424
FFGA Attachments