**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Northern States Power Company,
a Minnesota Corporation, d/b/a Xcel Energy

Plaintiff,

vs.

Federal Transit Administration, an administration of the United States Department of Transportation, Minnesota Department of Transportation, Elwyn Tinklenberg, Commissioner of Transportation, individually and officially, Minnesota Metropolitan Council, and the State of Minnesota.

Defendants.

**Civil No. 01-CV-295 DWF/JSM**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO LRT DEFENDANTS STATE OF MINNESOTA AND MINNESOTA METROPOLITAN COUNCIL'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

---

## INTRODUCTION

Minnesota Department of Transportation (MnDOT) and the Metropolitan Council (Met Council) (collectively LRT Defendants) assert a joint counterclaim against Northern States Power Co. d/b/a Xcel Energy (Xcel Energy) under Minn. R. 8810.3300, subp. 3. By that action the LRT Defendants seek to recover damages and attorneys' fees caused by having to seek injunctive relief and defend against Xcel Energy's lawsuit. (*See* Defs. Mem. at 4 (emphasis added).) With this pronouncement, LRT Defendants herald the demise of their attorneys' fees counterclaim.

Minn. R. 8810.3300, subp. 3, the sole basis for the attorneys' fees claim, only makes utility owners liable for claims of damage "occasioned by reason of not having removed said utility within the time specified in said notice." LRT Defendants warp the facts in order to rationalize their attorneys' fees claim. By LRT Defendants' own admission, they are not seeking

damages occasioned by Xcel Energy's not having met the LRT relocation deadline—LRT Defendants admit that Xcel Energy met the February 1, 2002 relocation deadline. The absence of any delay per force means that no costs were "occasioned by [Xcel Energy's] not having removed said utility within the time specified in said notice." The operative provision of the Rule is actual removal, not removal planning.

LRT Defendants' quest for attorneys' fees rests upon the dubious premise that Xcel Energy must pay all costs associated with a dispute over an unprecedented exercise of police power. This proposition flies in the face of this Court's recognition that "[i]t is surely fair to raise the question, as Xcel Energy has done, whether the cost of relocating its utilities in Minneapolis' Fifth Street corridor would be borne by Xcel Energy customers or by all Minnesota taxpayers." (Affidavit of Thomas J. Basting, Jr. ("Basting Aff."), Ex. A, Docket No. 150 (Sept. 10, 2002) ("Order") at 33.) A fairly raised question does not warrant the imposition of attorneys' fees in the courts of the United States.

## STATEMENT OF FACTS

This dispute arises out of the relocation of Xcel Energy's utility facilities beneath Fifth Street in downtown Minneapolis. (Order at 2.) Fifth Street is a Minneapolis city street—not a state trunk highway. (*Id.* at 20.) Accordingly, Xcel Energy's facilities were placed in Fifth Street pursuant to a franchise agreement with the city. (*Id.* at 4.) In return for being granted the right to place utilities in city rights-of-way, Xcel Energy pays the city over $18 million in annual franchise fees. (*Id.*)

Xcel Energy has maintained utility facilities continuously in Fifth Street since downtown Minneapolis was first electrified. (Affidavit of James F. Kucera ("Kucera Aff.") ¶ 5.) Xcel Energy periodically upgraded the facilities, but the duct banks that LRT Defendants sought to displace had been underneath Fifth Street for decades. (Kucera Aff. ¶ 6.) Moreover, there was



1718542v6

more electrical cables and equipment in that corridor than anywhere else in Xcel Energy's system. This concentration of facilities has occurred because the power supply to the entire central business district is distributed along Fifth Street.

In preparation for the project, MnDOT ordered Xcel Energy to clear the way for LRT construction. (Order at 4.) MnDOT initially ordered Xcel Energy out of the street by February 1, 2002. (*Id.*) As part of its ongoing oversight, however, MnDOT subsequently demanded that Xcel Energy submit a plan for relocation approximately one year prior to the deadline, by February 15, 2001. (*Id.* at 6.)

MnDOT has repeatedly set unreasonable deadlines for utility removal. Despite such autocratic tactics, Xcel Energy attempted to accommodate LRT development by entering into a letter of intent regarding utility relocation. (Basting Aff. Ex. B.) That August 18, 2002 understanding anticipated a significant portion of relocation costs being paid out of the LRT project funding. Moreover, the ultimate relocation budget would be subject to Xcel Energy approval. (*Id.*) Neither of these conditions was satisfied, and a formal relocation agreement was never achieved. (Order at 5.) Again, arbitrary and inconsistent demands by LRT proponents frustrated cooperation. Except for the owners of private utilities, the LRT Defendants strived to accommodate everyone's interest in siting and building the project.

Without consulting Xcel Energy, on November 29, 2000 MnDOT ordered utilities out of the LRT corridor by February 1, 2002. (Order at 6.) When Xcel Energy refused to move without compensation assurances, MnDOT resorted to mandates. On January 30, 2001, MnDOT demanded a relocation plan and schedule by February 15, 2001, decreed that relocation construction begin by February 27, 2001, and charged Xcel Energy with completing the job by February 1, 2002. (Basting Aff. Ex. C at 2.) On January 22, 2002, MnDOT ordered utilities

west of Nicollet out of the way by June 1, 2002 despite Xcel Energy's undisputed conclusion that the work could not be completed until December 31, 2002. (Basting Aff. Ex. D.) The Minnesota Court of Appeals found this process to be unreasonable. *See N. States Power Co. v. Minn. Dep't of Transp.*, No. CX-02-287, 2002 WL 2004718, at *1-*2 (Minn. Ct. App. Sept. 3, 2002).

The right-of-way eviction was resisted because Xcel Energy believed that the franchise agreement required compensation in these circumstances. Xcel Energy also challenged MnDOT's jurisdiction over city streets. To protect downtown's power supply and to avoid incurring unnecessary cost that would be passed on to ratepayers, Xcel Energy sued for a declaratory judgment and injunctive relief. In response MnDOT and Met Council counterclaimed seeking to compel relocation and to recover damages.

LRT Defendants secured injunctive relief requiring Xcel Energy to complete relocation by the original February 1, 2002 deadline. (Order at 6.) The injunction subjected any "delay" to contempt sanction accountability before this Court. Having been told that the job must be done, Xcel Energy complied in all respects with the relocation mandate. (*Id.* at 6-7.) LRT Defendants admit as much: "Pursuant to the injunction, Xcel Energy relocated its utilities in the Fifth Street Corridor east of Nicollet Avenue." (Defs. Mem. at 4.)[1] <u>Tellingly, there is no accusation that Xcel Energy occasioned any project damage by not having removed utilities within the time specified by MnDOT's notice</u>. In fact, the only "delay" was in Xcel Energy's submission of preliminary <u>plans</u>, not in the accomplishment of the relocation.

---

[1]The qualifier "east of Nicollet Avenue" was necessary because LRT Defendants' plans were constantly in flux. Although LRT Defendants attempted to impose the deadlines at issue in this case to utility relocation west of Nicollet, the Minnesota Court of Appeals found those deadlines to be "unreasonable." *See N. States Power Co. v. Minn. Dep't of Transp.*, No. CX-02-287, 2002 WL 2004718, at *1-*2 (Minn. Ct. App. Sept. 3, 2002).

MnDOT's "our way or the highway" approach to managing LRT-related utility relocations resulted in a flurry of litigation. In addition to this case, Xcel Energy sought certiorari review by the Minnesota Court of Appeals regarding MnDOT's permitting authority. *See N. States Power Co. v. Minn. Dep't of Transp.*, Nos. C0-01-1471, C5-01-1918, 2002 WL 555163 (Minn. Ct. App. Apr. 16, 2002). Xcel Energy also pursued an inverse condemnation action against MnDOT and Met Council because the LRT blocked access to Xcel Energy's downtown substation. *See N. States Power Co. v. Minn. Metro. Council*, 667 N.W.2d 501 (Minn. Ct. App. 2003), *rev'd*, 684 N.W.2d 485 (Minn. 2004). MnDOT and Met Council were represented by the same counsel in all cases. (Basting Aff. ¶ 1.) In their request for attorneys' fees, LRT Defendants make no distinctions for fees incurred in these various cases and ignore the fact that none of this litigation was occasioned by Xcel Energy's not having met the relocation deadline.

## ARGUMENT

LRT Defendants deem themselves entitled to summary judgment because 1) their attorneys' fees were related to the removal of utility facilities from Fifth Street; 2) both MnDOT and Met Council may avail themselves of Rule 8810.3300; and 3) Rule 8810.3300 encompasses an award of attorneys' fees. The argument fails on all counts.

First, MnDOT and Met Council acknowledge that attorneys' fees may not be recovered in American litigation unless a statute or a contract so provides. After making this admission, LRT Defendants incredibly fail to identify any statute or contract that creates an exception to the rule against fee-shifting. Nothing in Minn. Stat. § 161.45, the statutory basis for Minn. R. 8810.3300, abrogates the American Rule requiring litigants to pay their own attorneys' fees. Without statutory authorization, fee-shifting cannot be effected through administrative



1718542v6

regulation. Yet, that is exactly what LRT Defendants attempt to accomplish through their distorted interpretation of Minn. R. 8810.3300.

Second, there is no precedent for MnDOT's newly conjured prerogative to assess attorneys fees in utility relocation disputes. This novel interpretation of a rule governing the placement of utilities in state trunk highways would impose a substantive burden on Xcel Energy—namely over $700,000 in attorneys' fees. These charges would be assessed merely because Xcel Energy fairly questioned whether utilities, which had been in place for decades before this fee-shifting gimmick had been dreamt up, could be ordered out of a city street without compensation. Not only is such an interpretation of the Rule new, until LRT legislation was enacted, which occurred long after the utilities installation and franchise agreement, there could be no suggestion that a state trunk highway rule had any application to city streets. Accordingly, the award of attorneys' fees pursuant to Rule 8810.3300 would impose a burden after the conduct that gave rise to the claim took place. Minnesota and federal law prohibit such retroactive application of law.

Third, LRT Defendants admit that Xcel Energy complied with MnDOT's February 1, 2002 relocation edict. Because Xcel Energy timely relocated the Fifth Street facilities, no claims of damage were occasioned by reason of Xcel Energy not having moved Fifth Street utilities within the time specified.

Fourth, the express language of Minn. R. 8810.3300's hold harmless provision only applies to "claims of damage." Hence, the regulation must be read to protect the state against third-party demands (such as a contractor seeking delay damages). Rule 8810.3300 simply does not authorize the LRT Defendants to recover attorneys' fees incurred in defending and prosecuting utility relocation dispute litigation.

Fifth, Met Council may not avail itself of Minn. R. 8810.3300. MnDOT promulgated the rule to govern placement of utilities in state trunk highways. While the Court confirmed MnDOT's authority to exercise trunk highway authority for LRT construction purposes, Met Council is not empowered to base claims upon MnDOT rules. Met Council is not synonymous with the State of Minnesota.

Finally, damages must be determined by the trier of fact. LRT Defendants want to be paid $700,000 in attorneys' fees but refuse to disclose any evidence to support the contention that these costs were occasioned by reason of Xcel Energy's not having removed the utilities within the time specified. Recovery by stealth is not countenanced even for attorneys' fee claims.

## I. <u>STANDARD OF DECISION</u>

Summary judgment is appropriate only if the evidence, viewed in the light most favorable to the non-moving party, shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See Rose-Maston v. NME Hosp. Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *see also Elbe v. Yankton Indep. Sch. Dist. No. 1*, 714 F.2d 848 (8th Cir. 1983); *Cornman v. N.P. Dodge Mgmt. Co.*, 43 F. Supp. 2d 1066, 1069 (D. Minn. 1999). A Rule 56 movant must support each element of the claim; a failure of proof as to any essential element renders all other facts immaterial. *See Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986).

Because LRT Defendants are the movants, the Court must consider the facts in a light most favorable to Xcel Energy. *Evergreen Invs., LLC v. FCL Graphics, Inc.*, 334 F.3d 750, 753 (8th Cir. 2003). In this case, however, the undisputed facts preclude summary judgment. Indeed, Xcel Energy is entitled to judgment in its favor. As a matter of law, Rule 8810.3300 cannot provide a legal basis for the award of LRT Defendants' attorneys' fees. This failure of

authority requires that summary judgment be denied and that LRT Defendants' counterclaims be dismissed.

## II. NO STATUTE AUTHORIZES ATTORNEYS' FEES SHIFTING

Analyzing Minn. R. 8810.3300 as though it were a contract, LRT Defendants anoint themselves with regulatory entitlement to shift their attorneys' fees onto Xcel Energy. The LRT Defendants torture the Rule's language to authorize fee-shifting and then improperly apply a contractual analysis to a regulatory relationship. Unlike an agreement, nothing about the relocation order was consensual. Rule 8810.3300 dominion over the Fifth Street utilities was secured by legislation not negotiation. Thus there is no consideration for the Rule's unilaterally imposed hold-harmless requirement. Furthermore, the enabling legislation says nothing about attorneys' fees. *See* Minn. Stat. §§ 161.45 and 174.35.

In such circumstances, a contractual-intent approach is inapplicable. Moreover, no legislation empowers MnDOT to avoid bearing its own attorneys' fees. Without a fee-shifting statute or a contract, such a result cannot be accomplished. Notably, every case allowing the prevailing party to recover attorneys' fees relies upon a statute or a contract. There is no precedent for the exaction of attorneys' fees by administrative regulation, and fee-shifting authority is never implied from legislation. The language of the statute authorizing the recovery of attorneys' fees must be express to produce that result. *See State Bank of Cokato v. Ziehwein*, 510 N.W.2d 268, 270 (Minn. Ct. App. 1994) ("Ordinarily, a party may not recover attorney fees unless a statute or contract provision expressly allows such recovery.") (emphasis added).

### A. Unless Authorized by Contract or Statute, Litigants Pay Their Own Attorneys' Fees

In the United States, the prevailing party ordinarily is not entitled to collect attorneys' fees from the losing side. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247

(1975). This principle represents a departure from the English tradition, so the policy is widely known as the "American Rule."

Under the American Rule, the burdens of litigation are borne by the respective parties absent contractual or statutory authority permitting fee-shifting. *Id.* at 254-55. In federal courts, a prevailing party is limited to recovery of statutory costs. *Id.* Similarly, in diversity cases, state fee-shifting law must be followed. Minnesota adheres to the restrictive American Rule. *See, e.g., Garrick v. Northland Ins. Co.*, 469 N.W.2d 709, 714 (Minn. 1991) (noting that American Rule has been Minnesota law for over 100 years). Absent contrary contractual or statutory authority, LRT Defendants cannot shift their attorneys' fees to Xcel Energy. *See id.* The LRT Defendants acknowledge this axiomatic principle of federal and state law. (Defs. Mem. at 7.)

**B. No Authority Supports Shifting LRT Defendants' Attorneys' Fees to Xcel Energy**

The LRT Defendants' brief identifies no contract or statute authorizing imposition of their attorneys' fees on Xcel Energy. The reason for this glaring deficiency is simple—no such entitlement exists. A contractual fee-shifting analysis is inapposite because Xcel Energy had no agreement with LRT Defendants regarding utility relocation in Fifth Street. It bears repeating that the placement of utilities in Fifth Street was not subject to Rule 8830.1100, or indeed any MnDOT regulation, when those facilities were installed. As a result, Xcel Energy cannot be deemed to have impliedly consented to being bound by the regulation's requirements. For that reason, the issue of contractual intent is irrelevant.

Further, legislative intent is not an issue; LRT Defendants' sole purported authority for seeking fees is an administrative rule. Nowhere does the moving brief identify any statutory basis for the attorneys' fees claim. Without a statutory authority for fee-shifting, federal courts must follow the American Rule. *See Alyeska Pipeline Serv. Co.*, 421 U.S. at 270. Neither the

federal or state Supreme Courts have recognized administrative regulations to be sufficient authority to create an exception to the American Rule.

**C. MnDOT Lacks Authority To Impose Fee-shifting By Administrative Fiat**

Even if LRT Defendants were correct in their interpretation of Minn. R. 8810.3300 as a fee-shifting mechanism, such interpretation exceeds MnDOT's statutory enablement. An agency only has the authority vested in it by the enabling legislation. *See Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n*, 369 N.W.2d 530, 534 (Minn. 1985) ("Neither agencies nor courts may under the guise of statutory interpretation enlarge the agency's powers beyond that which was contemplated by the legislative body.") (quotation omitted); Minn. Stat. § 14.05 (agency shall act "only pursuant to authority delegated by law").

The promulgation of Minn. R. 8810.3300 generally falls within the ambit of Minn. Stat. § 161.45. The rule and statute both address construction, maintenance, and necessary relocation of utility facilities within the trunk highway system. Thus Rule 8810.3300 and Section 161.45 are consistent with the general common law principle that utilities must relocate facilities within the right-of-way when so directed by the government. *See Norfolk Redevelopment & Housing Auth. v. Chesapeake & Potomac Tel. Co. of Va.*, 464 U.S. 30, 35 (1983) (citing *New Orleans Gaslight Co. v. Drainage Comm. of New Orleans*, 197 U.S. 453 (1905)). (*See also* Order at 18-19.)

Nothing in Minn. Stat. § 161.45 or the common law nullifies the American Rule for litigants involved in a utility relocation disputes. Minn. Stat. § 161.45 grants MnDOT the power to "prescribe and enforce <u>reasonable rules</u> with reference to the placing and maintaining" of utility facilities in trunk highway right-of-way. Pointedly absent from this grant of authority is any reference to fee shifting. That void is significant because the legislature could not have expected that there could be no utility relocation litigation.



1718542v6

Furthermore, neither *Norfolk Redevelopment* nor *New Orleans Gaslight* make any mention of attorneys' fees shifting despite holding that utilities must relocate from the right-of-way when so directed by the roadway authority. In fact, no case involving a utility relocation dispute has ever mentioned the assessment of attorneys' fees against the reluctant utility. It is no oversight that LRT Defendants' brief fails to cite such a precedent because none exists. Hence, LRT Defendants' attempt to vest Rule 8810.3300 with fee-shifting authority is without legal support.

**D. <u>Minn. R. 8810.3300 Cannot Be Retroactively Applied</u>**

The placement of utility facilities in Fifth Street predates MnDOT's promulgation of Minn. R. 8810.3300, and the application of the Rule to city streets by decades. (Kucera Aff. ¶ 6.) Even if Minn. R. 8810.3300's hold-harmless provision could be interpreted to authorize fee-shifting in trunk highway utility removal disputes, such an interpretation cannot retroactively be imposed on the Fifth Street facilities.

Minnesota expressly prohibits retroactive application of laws and administrative rules. *See* Minn. Stat. § 645.21; *see also Smith v. Rosell*, No. C2-88-941, 1989 WL 454, at *2 (Minn. Ct. App. Jan. 10, 1989) (applying § 645.21 to administrative rules). *Landgraf v. USI Film Products, Inc.*, 511 U.S. 244 (1994) provides the seminal retroactivity analysis.

*Landgraf* began by noting that "deciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Id.* at 268. The reviewing court should focus on "whether the new provision attaches new legal consequences to events completed before its enactment." *Id*. at 269-70. Specifically, retroactivity is assessed by "whether [the statute] would [1] impair rights a party possessed when he acted, [2] increase a party's liability for past conduct, or [3] impose new duties with respect to transactions already completed." *Id*. at 280.

LRT Defendants' newfound deployment of Rule 8810.3300 as a fee-shifting device would unquestionably increase Xcel Energy's liability for past conduct to the tune of $700,000. Rule 8810.3300 was published in 1964 and has remained virtually the same since that time. (Basting Aff. Ex. F.) The Fifth Street facilities predate the rule, but as the Court and the Eighth Circuit recognized, the common law requiring the relocation of utilities in public rights-of-way is over a century old. (Order at 18-19.) Thus the application of an administrative rule to require Xcel Energy to clear the way for LRT construction in Fifth Street did not constitute a retroactive application of law.

But legal theories upon which this motion is based are more far-reaching and much less established. MnDOT and Met Council now propose—for the first time in a summary judgment brief, over two years after the facilities were relocated—an unprecedented definition of the cherry-picked word "damages." LRT Defendants interpret that term to authorize the shifting of relocation litigation costs to Xcel Energy.

No utility in the state has ever been subjected to or even threatened with such a sanction. If accepted, this interpretation of governmental relocation authority would inflict a $700,000 cost on Xcel Energy for challenging, yet still <u>complying</u> with the relocation order. This is precisely the type of "new duty" to an "already completed" transaction that *Landgraf* proscribed. Indeed, the LRT Defendants' *post facto* imposition of such a severe penalty without any previously recognized statutory, contractual, or administrative basis violates due process.

Significantly, in the many relocation precedents considered by this Court and the Eighth Circuit and referenced by the parties in their briefs, there has never been a suggestion that an unsuccessful utility should be saddled with the road authority's attorneys' fees. LRT Defendants' failure to cite a single utility relocation case in which fees have been awarded

exposes the frivolity of their request. In the face of a complete lack of notice and the non-existence of precedent, Xcel Energy could not have possibly known that challenging the relocation order would result in fee-shifting consequences.

## III. MINN. R. 8810.3300'S THIRD PARTY INDEMNIFICATION PROVISION HAS NOT BEEN TRIGGERED

Minn. R. 8810.3300, entitled "Permits," provides the regulatory framework for utility placement and relocation on trunk highway rights-of-way. Minn. R. 8810.3300, subp. 1. The regulation, which has yet to be interpreted by a Minnesota court, contains multiple subparts covering subjects such as construction, maintenance, bonds, interstate highways, and orders to make improvements. LRT Defendants crab a sentence fragment from subpart 3 ("any and all claims of damage of any nature whatsoever occasioned by reason of not having removed said utility") to grasp for attorneys' fees. This patent attempt to over-reach fails because the attorneys' fees incurred in defending against Xcel Energy's complaint and in prosecuting the counterclaim are not "claims of damage" against which the rule requires the state to be held harmless.

### A. No Causal Nexus Between Utility Non-Removal And Damage

Rule 8810.3300 provides:

> Such work shall be done without any cost whatsoever to the state of Minnesota except as otherwise provided by law or agreement and shall be completed within the date specified in said written notice, which date shall be reasonable under the circumstances. The utility shall assume all liability and save the state of Minnesota harmless from any and all claims of damage of any nature whatsoever occasioned by reason of not having removed said utility within the time specified in said notice.

(Emphasis added.)

The Rule provides that a utility is only liable for claims of damage "occasioned by reason of not having removed said utility within the time specified . . ." LRT Defendants admit that

their attorneys' fees were incurred in litigating with Xcel Energy; no damages were occasioned by reason of any utilities not being removed. (Defs. Mem. at 2.) Xcel Energy indisputably met the February 1, 2002 deadline. (*Id.* at 4.) Since there was no delay, no claim of damage occasioned by reason of not having removed the utility within the time specified can be made.

To make their argument, LRT Defendants elide the phrase "occasioned by reason of not having removed said utility within the time specified," but this prerequisite to the imposition of liability cannot be read out of the rule. *See Stoebe v. Merastar Ins. Co.*, 541 N.W.2d 600, 602 (Minn. Ct. App. 1995), *aff'd*, 554 N.W.2d 733 (Minn. 1996); *Ebenezer Soc'y v. Minn. Dep't of Human Servs.*, 433 N.W.2d 436, 439 (Minn. Ct. App. 1988) (relying on Administrative Procedure Act and looking to plain meaning of Rule). Without a causal connection between not removing the utility within the specified time and the claim of damage, there is no liability or save harmless for which the Rule would hold the utility responsible.

**1. Fifth Street Utilities Were Timely Removed**

The LRT Defendants' inability to show causation is fatal. Xcel Energy is merely accused of being tardy with planning, not the actual removal of the facilities. (*See* Defs. Mem. at 4 (arguing that "Xcel still refused to comply with the order"—referring to MnDOT's order "to assess the impact to [Xcel's] utilities by LRT construction and submit and plan and schedule for relocation").) LRT Defendants speculate that removal "would not" have been timely completed. (*Id.* at 16.) The facts are otherwise; the removal work was completed on time. Thus none of the attorneys' fees supposedly incurred was occasioned by reason of Xcel Energy "not having removed said utility within the time specified." The plain meaning of the phrase allows no other interpretation. This ineluctable conclusion precludes recovery under any reasonable reading of the Rule.

### 2. Pre-Deadline Costs Cannot Be "Occasioned By" Failure To Remove On Time

Even if Xcel Energy's Fifth Street facilities had not been timely removed, LRT Defendants' claims fail as a matter of chronological logic. MnDOT and Met Council seek recovery of legal fees incurred in obtaining an injunction mandating utility relocation. Such fees obviously were incurred prior to the February 1, 2002 relocation deadline. Costs cannot be "occasioned by reason" of an event if the costs are incurred before the occasioning event.

For example, in *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, the court considered whether contact occurring after the alleged injury could bring the defendant within the long-arm statute, which required that the plaintiff's injury "arise from" the contacts with the District. 116 F. Supp. 2d 98, 106 (D.D.C. 2000). The court concluded that such a result was logically impossible: "The Long Arm statute requires that the claim arise from the contacts alleged. It would be impossible for the injury to arise from a contact occurring months later." *Id.*[2]

Numerous courts have construed the temporal nature of phrases like "arise from" to preclude consideration of factors that are chronologically inconsistent with the operative phrase. *See, e.g.*, *Johnson v. Summa Corp.*, 632 F. Supp. 122, 124-25 (E.D. Pa. 1985) ("In determining whether the cause of action 'arose from' a defendant's activities in the forum state, a court cannot consider those contacts taking place after the date on which the alleged cause of action arose.") (emphasis added); *Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1528

[2]This decision was overturned on the grounds that the district court misunderstood the relevant timing of the contacts, and that plaintiff had alleged contacts that in fact occurred prior to the injury. *See* 296 F.3d 1154, 1169 (D.C. Cir. 2002) ("Both [parties] now agree that the relevant allegation . . . is that [the conspirators] conspired together at a meeting that took place in the District of Columbia in late May 1997 [as opposed to December 1997, as the District Court understood]."). On remand, the district court applied the same analysis and reached the same conclusion. (Basting Aff. Ex. G at 5-6.)

(10th Cir. 1987) (excluding jurisdictional allegation that occurred after the claim "arose"). The same principles apply to Rule 8810.3300's "occasioned by" requirement. A claim of damage can be occasioned by reason of a utility's not having been removed within a specified time only if the damages occurred after the time specified.

**B. <u>An Indemnity Provision Cannot Apply to the Indemnitees' Own Attorneys' Fees</u>**

Rule 8810.3300 is clearly intended to protect the state from third-party claims. The language of the rule reveals this purpose:

> Such work shall be done without any cost whatsoever to the state of Minnesota except as otherwise provided by law or agreement and shall be completed within the date specified in said written notice, which date shall be reasonable under the circumstances. <u>The utility shall assume all liability and save the state of Minnesota harmless from any and all claims of damage of any nature whatsoever</u> occasioned by reason of not having removed said utility within the time specified in said notice.

(Emphasis added.)

LRT Defendants agree that the Rule incorporates prototypical indemnity language. (*See* Defs. Mem. at 11 ("Minn. R. 8810.3300, subp. 3, is an indemnity provision.").) Accordingly, the language must be interpreted merely to require indemnification against claims of third parties; the provision cannot be read to create direct liability between the parties to the indemnification. *See Kaiser v. ConAgra Fertilizer Co.*, No. C0-93-32, 1993 WL 231677, at *1 (Minn. Ct. App. June 29, 1993) (considering whether party had to indemnify other contracting party for cost of settling third-party suit); *see also N. Pac. Ry. v. Thornton Bros. Co.*, 288 N.W. 226 (Minn. 1939). Indeed, the language "save harmless" (or "hold harmless") reveals the intent to indemnify against third-party claims. *See Brunswick Corp. v. Northwestern Nat'l Bank & Trust Co. of Minneapolis*, 8 N.W.2d 333, 334 (Minn. 1943) (construing agreement under which plaintiff

agreed to "assume responsibility for" and "hold [defendant] harmless" in action by plaintiff to recover against bank for check forgery of third party).[3]

In arguing that Minn. R. 8810.3300 encompasses attorneys' fees, LRT Defendants zero in on the term "damage." Isolating this word from all context, LRT Defendants analogize Rule 8810.3300 to agreements that provide indemnification for "any and all loss, damage or liability," "any and all loss, cost, damage and expense," and "all damages." (*See* Defs. Mem. at 9-11.) Since these contractual undertakings have sometimes been held to cover attorneys' fees, LRT Defendants reason that the Rule should be similarly construed. Unlike the contract language upon which LRT Defendants rely, Minn. R. 8810.3300 only applies to "claims of damage." Moreover, there is no agreement between the LRT Defendants and Xcel Energy from which an intent to cover attorneys' fees could be inferred.

### 1. Indemnity Between Contracting Parties Requires Express Language

Courts have repeatedly refused to allow boilerplate indemnity agreements to alter the American Rule on attorneys' fees. *See Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 904-05 (N.Y. 1989). *Hooper* is emphatic: "the court should not infer a party's intention to waive the benefit of the rule [regarding responsibility for its own fees] unless the intention to do so is unmistakably clear from the language of the promise." *Id.* at 905. Notably, *Hooper* found no exception to the American Rule even though the indemnity provision referenced "counsel fees." *See* 548 N.E.2d at 903 n.1.

[3]The United States Court of Claims reviewed substantially similar language in a federal procurement contract. *Fox Valley Eng'g, Inc. v. United States*, 151 Ct. Cl. 228 (1960). Fox Valley sought payment for services rendered pursuant to a procurement contract. *Id.* The government argued that it could not be held liable for payment because the contract provided that the plaintiff waived "any claim against the Government for damages arising out of the performance of the work specified and shall agree to protect and save harmless the Government from any claims from damages . . . ." *Id.* (emphasis added.) The court held that the provision was only intended to immunize the government from third-party damage claims. *Id.*

Such restrictive readings of indemnity provisions are not limited to the New York courts. On the contrary,

> a significant number of courts have . . . determined that the broad language of standard indemnification provisions, although arguably broad enough to encompass attorneys' fees as losses or damages, do not contain specific language to support a finding that the parties intended to include payment of attorneys' fees arising from litigation between the contracting parties.

*In re New Power Co.*, 313 B.R. 496, 512 (Bankr. N.D. Ga. 2004).

Numerous jurisdictions have adopted this analysis. *See, e.g.*, *Bldg. Maint. Serv. Co. v. AIL Sys., Inc.*, 64 Cal. Rptr. 2d 353, 363 (Cal. Ct. App. 1997) (indemnity provision did not indicate that "contracting parties intended to address claims made against each other"); *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, Nos. 98-11-262 & 98-11-144, 2003 WL 139775, at *7 (Del. Super. Ct. Jan. 17, 2003) ("Indemnity clauses such as that found in paragraph 8.7 are commonly found in construction contracts and are <u>clearly intended to protect</u> . . . from suits brought by third parties . . . as opposed to claims among the contracting parties against each other.") (emphasis added) (citation omitted); *Kellers Sys., Inc. v. Transp. Int'l Pool, Inc.*, 172 F. Supp. 2d 992, 999 (N.D. Ill. 2001) ("the court finds the indemnification provisions of the agreement do not encompass fee-shifting for lawsuits filed by the parties to the Agreement").

The absence of a fee-shifting intent is particularly apparent in light of Rule 8810.3300's limiting language. To start with, attorneys' fees and the cost of litigation are never mentioned. Further, the Rule does not call for the recovery of <u>all</u> "costs" or "damage" incurred by the state. Instead, a tardy utility is only required to "assume all liability and save the State of Minnesota harmless from any and all claims of damage of any nature whatsoever." By employing the phrase "<u>claims</u> of damage" instead of just "damages" or something even more expansive the Rule necessarily refers to demands from third parties.

The context of highway construction explains the intent and scope of the Rule. MnDOT routinely contracts for road building and maintenance. If these projects are held up by interfering utilities, the state would likely be subject to "claims of damage" from contractors whose crews and equipment are tied up. Accordingly, the regulation was drafted to protect the state in such circumstances.

**2. <u>The Cited Case Law Is Inapposite Or Contrary</u>**

LRT Defendants seize upon *Nelson v. Bonnstetter*'s interpretation of the phrase "all damage" to support their claim for attorneys' fees. (*See* Defs. Mem. at 11.) That reliance, however, ignores key contract language that is missing from Rule 8810.3300: "the second party agrees to pay all expenses which may be incurred [in the event of a lawsuit]." *See Bonnstetter*, 1997 WL 729217, at *1. In other words, the *Bonnstetter* court was applying an agreement that contained an independent and specific basis for attorneys' fee liability regardless of whether any third party brought any claim. The contractual understanding was not limited to "claims of damage," like the undertaking in Rule 8810.3300. In fact, expenses of a lawsuit were specifically covered by the contract at issue in *Bonnstetter*.

LRT Defendants' reliance on two other Minnesota cases—*Busse v. Board of County Commissioners*, 241 N.W.2d 794 (Minn. 1976) and *Dewey v. Henry's Drive-Ins of Minnesota, Inc.*, 222 N.W.2d 553 (Minn. 1974)—is similarly misplaced. In *Busse*, a clerk of court challenged the county board's setting of deputy clerks' salaries. 241 N.W.2d at 795. The clerk prevailed on the merits, and the district court awarded attorneys' fees. *Id.* at 798. The supreme court affirmed, creating "a narrow exception" to the American Rule "for the statutory appeal procedure here involved." *Id.* The "statutory appeal procedure" was established by Minn. Stat. § 485.018, which enabled a clerk to appeal from county-board budget determinations, and

§ 388.09, which permitted the county board to employ an attorney "when there [wa]s no county attorney" and to "pay such attorney." *Id.* at 797-98 (emphasis added.)

The court explained that a provision could not be sensibly applied in that case "because the clerk's [statutory] appeal attacks a decision of the county board [resulting in a] conflict of interest;" that situation rendered board-authorized representation impractical. *Id.* The court's holding as well as the opinion's consideration of the "public interest" thus were limited to the unusual situation in which two agencies are litigating against one another and the defendant-agency controls the claimant-agency representative's purse. Also, implicit in the court's conclusion was the pragmatic recognition that unless attorneys' fees were awarded, individual clerks of court would effectively be prevented from pursuing the statutory appeal by the cost of such litigation. That factor is not a consideration in this case.

From *Busse*'s unique posture and limited holding, LRT Defendants bootstrap an argument that litigation need only benefit a public entity in order for attorneys' fees to be awarded. (Defs. Mem. at 11.) Beyond the fact that *Busse* plaintiff was an individual bringing a specific type of inter-governmental claim pursuant to a specific statutory regime, this application of *Bussse*'s holding would be susceptible to no limiting principle. Presumably every agency lawsuit is brought to "benefit the public entity," but fee-shifting is not allowed in every action involving an administrative agency simply because the lawsuit is brought or defended for the benefit of a public entity. Yet LRT Defendants' interpretation of *Busse* would require the award of attorneys' fees in every such case—a result that is clearly contrary to the law.

*Henry's Drive-Ins* is even more dubious authority for the revolutionary fee-shifting scheme espoused by LRT Defendants. The commercial tenant in *Henry*'s defaulted, and the court was asked to decide whether the guarantor of the lease was responsible for unpaid rent.

222 N.W.2d at 555-56. Most of the opinion is devoted to the issue of whether the guarantor had been released from its obligations. In the end, the guaranty, which required the guarantor to pay "the rents, all monies and damages," was found to be in force. *Id.*

Contrary to LRT Defendants' broad assertion, the quoted contractual provision was not the basis for the attorneys' fee award. Rather, the court's one-paragraph fee-shifting conclusion relied entirely upon the lease's requirement that the lessee was liable for expenses "together with commissions and attorneys' fees." This language provided the justification for assessing attorneys' fees against the guarantor. *Id.* Because the "lessee's duty to pay attorneys' fees under" the lease was not disputed, the lessor's entitlement to shift fees was a foregone conclusion. The only issue was to whom the fees would be shifted. There is not such express fee-shifting language in Rule 8810.3300.

LRT Defendants' other precedents are equally inapposite. In *Natco Limited Partnership v. Moran Towing of Florida, Inc.*, 267 F.3d 1190 (11th Cir. 2001), the court construed an indemnity agreement pursuant to which the plaintiff was required "to maintain the [tug] for the voyage in a proper and sufficient manner" and agreed to indemnify the defendant against "any and all loss, damage or liability arising out of, or in any way contributed to by, unseaworthiness . . . ." *Id.* at 1193. A crane that was being towed with defendant's tug was lost at sea. *Id.* Plaintiff brought a declaratory judgment action, but the defendant prevailed at trial. *Id.* The court of appeals determined that the indemnity provision allowed defendant "to recover its attorneys' fees not as attorneys' fees *qua* attorneys' fees, but as part of the reasonable expenses incurred in defending against the claims [of unseaworthiness]." *Id.* at 1194 (quotation omitted). The term "damage" was not interpreted to include attorneys' fees incurred by one of the contracting parties.

In *Brown v. Seaboard Coast Line R.R. Co.*, 554 F.2d 1299 (5th Cir. 1977), one defendant agreed to indemnify the other. *Id.* at 1301. A third party had sued, but lost because the plaintiff's comparative fault exceeded that of either defendant. *Id.* The co-defendants then litigated whether the contractual indemnitor was obligated to pay defense costs, even though no judgment had been entered against either defendant. *Id.* Notably, the indemnification had been triggered by an underlying action brought by a third party over whom neither contracting party had control. *See id.* In contrast, no third party has made a claim against the LRT Defendants.[4]

As a result, LRT Defendants have no need of being saved harmless against claims of damage. Rather, LRT Defendants are seeking to recover litigation costs arising from Xcel Energy's "fair" question of whether an unprecedented relocation demand was proper. Such expenses cannot be found to be "claims of damage" occasioned by reason of utilities not being removed within the specified time. No case cited in LRT Defendants' brief allows a contrary conclusion.

### C. <u>The Reasonableness Of The Work Order Has Not Been Established</u>

Rule 8810.3300 mandates that the date specified for the completion of removal "shall be reasonable under the circumstances." In fact, this "reasonableness" provision was noted in the summary judgment decision. (Order at 23.) Nevertheless, the Court declined to rule on this

[4]LRT Defendants' other authority is similarly unpersuasive, because the cases focus on the general meaning of "fees" or "expenses" rather than the structure of the relevant contractual provision and the conditions necessary to trigger the obligation in the first place. (*See* Defs. Mem. 8-9 & n.1.) LRT Defendants have cited no case in which the phrase "claims of damage" have been construed to include attorneys' fees incurred in defending or prosecuting a regulatory dispute.

issue because "Xcel never raised any issue of 'reasonableness' in its federal Complaint." *Id.* at 23.[5]

LRT Defendants now invoke the same Rule as the basis for their of attorneys' fees claim. This time, however, the requirement that the relocation order be reasonable under the circumstances cannot be ignored. While Xcel Energy may have failed to plead the lack of relocation order reasonableness, by seeking damages pursuant to a rule requiring that relocation orders be reasonable under the circumstances, LRT Defendants now are compelled to prove that the order upon which their claim is based was, in fact, reasonable. LRT Defendants' motion does not even acknowledge the necessity of that showing, and no evidence of reasonableness has been proffered. (*See* Defs. Mem.)

Significantly, the deadline for utility relocation west of Nicollet Mall has already been held to be unreasonable. *See N. States Power Co. v. Minn. Dep't of Transp.*, No. CX-02-287, 2002 WL 2004718, at *1-*2 (Minn. Ct. App. Sept. 3, 2002) ("we agree with Xcel that the June 1, 2002, completion date is unsupported by record evidence") (interpreting LRT Defendants' satisfaction with Xcel Energy's incomplete progress west of Nicollet Avenue as an admission

[5] LRT Defendants decree that "reasonableness" is no longer an issue based upon the "law of the case" doctrine. (Defs. Mem. at 16 n.4.) But "law of the case" is "applicable only to final judgments." *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs.*, 48 F.3d 1066, 1070 (8th Cir. 1995). The doctrine does not apply to issues that were not decided. *See Roseman v. Roto-Die, Inc.*, 377 F.3d 897, 900 (8th Cir. 2004). The principle was formulated to prevent re-litigation of settled issues. *See Kan. Pub. Employees Ret. Sys. v. Blackwell, Sanders, Matheny, Weary & Lombardi, L.C.*, 114 F.3d 679, 687 (8th Cir. 1997). That purpose is not implicated on this motion because the question of reasonableness was never decided. Xcel Energy's failure to raise the issue in opposition to MnDOT's relocation order does not excuse LRT Defendants from proving the reasonableness of the order as an element of their counterclaim seeking damages for failure to comply with the order. Even if reasonableness had been determined, however, the doctrine would not bar consideration of the issue at a different stage. *See Burton v. Richmond*, 370 F.3d 723, 728 (8th Cir. 2004) (District Court is "free to reassess" issue on summary judgment that previously had been decided on defendant's motion to dismiss); *Arizona v. California*, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power.").

that the deadline was not "reasonable"). In light of this history, LRT Defendants' failure to prove that the relocation schedule was reasonable is fatal.

**D. <u>MnDOT's Interpretation Of 8810.3300 Is Not Entitled To Deference</u>**

MnDOT tacitly argues that this Court must defer to the agency's invented construction of Minn. R. 8810.3300. (*See* Defs. Mem.) But such an opinion is not entitled to obeisance in these circumstances because the necessary considerations are lacking:

> As a general rule, th[e Minnesota Supreme] court defers to an agency's interpretation [1] when the language subject to construction is so technical in nature that only a specialized agency has the experience and expertise needed to understand it, [2] when the language is ambiguous or [3] when the statutory interpretation is one of long standing. We do not defer when the language employed or the standards delineated are clear and capable of understanding.

*Resident v. Noot*, 305 N.W.2d 311, 312 (Minn. 1981) (emphasis added) (citations omitted). These prerequisites to judicial deference have been the law from the early days of the Administrative Procedure Act. *See Minn. Microwave, Inc. v. Pub. Serv. Comm'n*, 190 N.W.2d 661, 665 (Minn. 1971) ("The statutory language here under consideration is not exceedingly technical in nature, such that only specialized agencies may be thought able to understand it. Instead, the statute is phrased in common terms, and thus affords no good reason for deferring to administrative expertise for its interpretation.") (declining deference).

Courts only defer when the agency is uniquely qualified to offer specialized insight in the interpretive calculus. For example, the *Resident* court declined to defer because all three factors were absent: the "rule [wa]s expressed in clear and common terms"; "the language [wa]s not overly technical or ambiguous"; and the agency "ha[d] not demonstrated its interpretation to be one of long standing." *Id.* at 312-13.

The issue of whether an administratively created indemnity provision can effect fee-shifting is certainly not a matter within the MnDOT's special expertise. Questions of this type are commonly decided by courts without any help from bureaucrats. This Court is far more qualified than an agency charged with building roads to determine whether an indemnification against third-party litigation occasioned by reason of utilities not being removed within the time specified covers the agency's own attorneys' fees. There is no expertise that the agency has to offer on the issue.

Moreover, MnDOT has acknowledged the liability for attorneys' fees inquiry as a pure question of law, which are ordinarily answered by courts. *See St. Otto's Home v. Minn. Dept. of Human Servs.*, 437 N.W.2d 35, 39-40 (Minn. 1989) ("In considering such questions of law, reviewing courts are not bound by the decision of the agency and need not defer to agency expertise.").

Tellingly, this rule has never been interpreted in the way that MnDOT now advocates; certainly MnDOT cannot "demonstrate" that fee-shifting is a "long-standing" interpretation. On the contrary, sticking Xcel Energy with the agencies' lawyers' bills merely represents a agency's "litigation position," which is entitled to no deference. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988) (refusing to defer to new administrative interpretation "contrary to the narrow view . . . advocated in past cases"); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (rejecting "appellate counsel's post hoc rationalizations for agency action"). This Court cannot countenance what amounts to MnDOT's attempt to self-adjudicate its own claims.

## IV. <u>MET COUNCIL'S FEES DO NOT FALL WITHIN THE RULE</u>

LRT Defendants assert that because Met Council is acknowledged to be an agency of the state, Xcel Energy is "estopped from denying that the Council is an agent of the State for purposes of Rule 8810.3300." (Defs. Mem. at 12.) LRT Defendants' illogic presumably would bar Xcel Energy from arguing that all of the other state agencies could not simply rely on each other's regulations to construct a web of administrative fiat. The issue is not whether Met Council is a subdivision of the state, but whether Met Council can enforce MnDOT regulations based upon nothing more than Met Council's status as a state agency.

Met Council has been designated as a political subdivision of the state, but this standing alone does not vest the regional agency with prerogative to invoke MnDOT regulation. The Minnesota Administrative Procedure Act ("APA") regulates the conduct of executive agency affairs. Thus, "[e]ach agency shall adopt, amend, suspend, or repeal its rules in accordance with the procedures specified in sections 14.001 to 14.69, and only pursuant to authority delegated by law and in full compliance with its duties and obligations." Minn. Stat. § 14.05, subp. 1 ("General authority"). In order to adopt a proposed rule, an agency must provide notice, a statement of need and reasonableness, and a public hearing. *See* Minn. Stat. §§ 14.22, 14.23, 14.25. An agency's action that is in excess of statutory authority, at variance with proper procedures, or infected by some other error of law is invalid. *See* Minn. Stat. § 14.69(b)–(d).

Agency compliance with proper procedures is necessary to ensure public input into and control over the administrative process. *See* Minn. Stat. § 14.001. These limitations recognize the fundamental principle that an agency can exercise only the powers deputed by the legislature. *See Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n*, 369 N.W.2d 530, 534 (Minn. 1985). Consistent with this administrative canon, an agency may not assume powers that have been delegated to another agency. *See Quam v. State*, 391 N.W.2d 803, 809 (Minn. 1986).

Met Council's enabling legislation does not empower that agency to avail itself of MnDOT's prerogative to regulate utility placement in roadways. *See* Minn. Stat. § 473.399. Met Council is charged with LRT planning, design, and operations, but the regional agency has no responsibility for construction, which is the issue in this motion. *See* Minn. R. 8810.3200 ("Purpose and scope"). That responsibility is placed on MnDOT and MnDOT, not Met Council, invoked Rule 8810.3300 to order utility removal.

Met Council's attempt to employ a MnDOT rule against Xcel Energy cannot withstand scrutiny. Met Council notes that Rule 8810.3300 refers to "the state of Minnesota, acting through its commissioner of transportation." (Defs. Mem. at 14.) Met Council takes that provision to be "an acknowledgement that the State acts not alone but through agents, such as the Metropolitan Council." (*Id.*) Correct but—for the purpose of Met Council's argument—irrelevant. Rule 8810.3300's reference to the "commissioner of transportation" establishes that for utility relocation purposes the state acts through MnDOT. Met Council is nowhere mentioned. Recognition of the truism point that a political entity such as a state acts through its executives (or agents) does not trump the Rule's specific delegation of utility relocation authority to the "commissioner of transportation." Furthermore, Met Council has cited no case in which one state agency has been allowed to rely upon another state agency's regulation to collect attorneys' fees.

On top of that, Met Council has cited no legislation authorizing that agency to promulgate LRT construction regulations, and Met Council has not even purported to have issued such regulations. Under these circumstances, Met Council can no more commandeer Rule 8810.3300 authority than it can license hazmat carriers based simply on the regulation's inclusion of the word "state."

Moreover, Met Council stoops to fabrication when LRT Defendants' brief asserts that Xcel Energy concedes that Met Council is MnDOT's alter ego in the LRT project. Met Council and MnDOT were accused of being complicit in the scheme to deprive Xcel Energy of its franchise agreement rights. Xcel Energy never, however, recognized Met Council to be MnDOT's agent for utility relocation purposes. In sum, Met Council cannot recover attorneys' fees by piggybacking on a MnDOT rule.

## V. <u>DAMAGES HAVE NOT BEEN SUBSTANTIATED</u>

Even if Minn. R. 8810.3300 could be stretched to encompass attorneys' fees awards, LRT Defendants' summary judgment motion fails because the amount of attorneys' fees are hotly disputed. Damages and causation are generally questions of fact, and therefore, inappropriate for summary disposition. *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 475 (Minn. Ct. App. 1999); *see also Mickman v. Progressive Ins. Group*, No. 02-3615, 2003 WL 21210238, at *2 (D. Minn. May 21, 2003). There is plenty of disagreement regarding the amount and validity of LRT Defendants' attorneys' fees; accordingly, summary judgment on this issue is precluded.

LRT construction in Fifth Street spawned numerous lawsuits between the parties, including two separate petitions for writ of certiorari to the Minnesota Court of Appeals, and an inverse condemnation action commenced in Hennepin County district court. (Basting Aff. ¶ 1.) In all LRT litigation, MnDOT and Met Council were represented by the same attorneys. (*Id.*) These related cases involved substantial legal work, including an appeal to the Minnesota Supreme Court. Yet LRT Defendants make no effort to distinguish fees incurred among the various cases even though the motion is ostensibly limited to the legal costs incurred for this action.

Besides that, LRT Defendants present no evidence in support of their request. The assessment of almost three quarters of a million dollars in fees is based upon two vague, self-serving affidavits. (*See* Meuting Aff. & Marshall Aff.) This testimony asserts without factual basis that $700,000 in fees is "reasonable." (*See id.*) Verification for the request would be limited to an *in camera* inspection. (*See id.*) LRT Defendants apparently deem scrutiny by Xcel Energy to be unnecessary. Plainly, such a showing is insufficient.

By putting attorneys' fees directly at issue, LRT Defendants have waived any claim of privilege—and none arguably existed to begin with—over their billing records. *See Colton v. United States*, 306 F. 2d 633, 637-38 (2d Cir. 1962), *cert. denied*, 371 U.S. 951 (1963); *see also P. & B. Marina Ltd. P'ship v. Logrande*, 136 F.R.D. 50, 56 (E.D.N.Y. 1991) ("Billing records and hourly statements which do not reveal client communications are not privileged.") (collecting cases); *Concept Enters., Inc. v. Hartford Ins. Co. of the Midwest*, No. CV007267NM, 2001 WL 34050685, at *8 & n.6 (C.D. Cal. May 22, 2001) ("To be awarded its [breach of good faith] fees, plaintiff must substantiate those fees, with evidence of the time spent by each [ ] attorney on the breach of contract claim, and the portion specifically allocable to plaintiff's successful 'mixed-action' argument.").[6]

Requests for attorneys' fees in federal court must be substantiated. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 437 (1983) ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. . . . [T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."). "In the preparation of fee applications it is insufficient to provide the District

[6]Defendants do not explicitly assert privilege but appear simply to assume that non-disclosure is appropriate by offering only *in camera* review of billing records. (*See* Marshall Aff. ¶ 5.)

Court with very broad summaries of work done and hours logged." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Defense*, 675 F.2d 1319, 1327 (D.C. Cir. 1982) (*NACV*); *cf.* Local R. 54.3 (requiring "itemized motion for the award of fees" under the Equal Access to Justice Act.) The rationale for such documentation is clear: "[T]he application must be sufficiently detailed to permit the District Court to make an independent determination whether or not the hours claimed are justified." *NACV*, 675 F.2d at 1327.

This Court recently applied a similar analysis:

> Due to insufficiently detailed timekeeping, there is no way of determining with certainty which of the fees are attributable to the State court matter and/or the Israeli court matter, and which are attributable to this matter. In addition, many of the fees are insufficiently detailed to award. Many entries contain no information about the subject . . . [and] the Court has absolutely no way of knowing who the timekeepers are. Given this lack of information, the Court cannot ascertain whether the hourly rate is reasonable, and the Court cannot award those particular fees.

*Silverman v. Silverman*, No. 00-2274 (JRT), 2004 WL 2066778, at *5 (D. Minn. Aug. 26, 2004) (footnote and citations omitted).

LRT Defendants' showing is even weaker that those found to be inadequate in *Silverman*. The *Silverman* fee-seeker at least submitted minimal diary entries. *See id.* (noting entry "review email correspondence"). Nothing of the sort is available to the Court and Xcel Energy. There is no information about the subject of the work, and no timekeepers have been identified. The history of this dispute makes LRT Defendants' *in camera* proposal particularly inappropriate. As already noted, there have been several LRT lawsuits, but fees are only being sought in this case. It would be difficult for any judge to sort out which fees were incurred in which action. That situation is made even more daunting by the recent reassignment of this lawsuit to this Court. Without any background in the issues that have been litigated in federal court, this Court would be hard pressed to determine *in camera* the appropriateness of the fee request.

Without more, self-serving affidavits regarding the reasonableness of enormous attorneys' fees do not provide a proper evidentiary basis for summary judgment. LRT Defendants cannot shield their billing records and obtain recovery of $700,000 based on faith. Xcel Energy must have the opportunity to review the particulars of the expenses to determine how any of these fees could possibly have been occasioned by reason of Xcel Energy's not having moved its utilities within the time specified.

## CONCLUSION

Because the ultimate removal of Xcel Energy's facilities was not delayed, this Court must consider the real purpose of LRT Defendants' motion: to punish Xcel Energy for having the temerity to challenge the LRT Defendants' mass transit aspirations. As a matter of principle, such a holding would chill future authority and takings challenges, even though such protests against state actions are often successful. Xcel Energy's post-injunction continuation of the suit obviously was not in bad faith: "It is surely fair to raise the question, as Xcel Energy has done, whether the cost of relocating its utilities in Minneapolis' Fifth Street corridor would be borne by Xcel Energy customers or all Minnesota taxpayers." (Order at 33.) That conclusion puts to rest LRT Defendants' suggestion that Xcel Energy's exercise of its rights was some sort of obdurate unwillingness to comply.

As the American system of laws guarantees, Xcel Energy sought and received its day in court. Rather than directly attacking Xcel Energy's litigation as unmeritorious, LRT Defendants seek to oppress Xcel Energy for failing to bow to MnDOT's will. MnDOT has not suggested that one additional construction dollar was expended because of Xcel Energy's resistance to the relocation orders. In the end, all utility facilities were timely removed from the path of LRT construction, and the grand mass transportation experiment was operational on time and under budget. That fact, coupled with the patent inapplicability of the Rule under which LRT

Defendants proceed, as well as LRT Defendants' complete lack of statutory authority or contractual right requires denial of their motion for summary judgment and dismissal of the counterclaims.

Dated: December 23, 2004

**BRIGGS AND MORGAN**

By **s/ Timothy R. Thornton**
Timothy R. Thornton (#109630)
Thomas J. Basting, Jr., (#283691)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 977-8400

and

**XCEL ENERGY INC.**
Kerry C. Koep
Assistant General Counsel
800 Nicollet Mall
Suite 2900
Minneapolis, MN 55401

**ATTORNEYS FOR PLAINTIFF XCEL ENERGY**